UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **DEEP SOUTH COMMUNICATIONS L.L.C**, | § § § |
| *Plaintiff,* | § Civil Action No. 3:22-cv-00598-JWD-EWD § |
| v. | § Judge Judge John W. deGravelles § |
| **PETER M. FELLEGY,** | § Magistrate Judge Erin Wilder-Doomes § § |
| *Defendant.* | § § |

## DECLARATION OF PETER FELLEGY

I, Peter Fellegy, affirm the following to be true:

1. I am over the age of 18.

2. I have personal knowledge of the facts stated in this Declaration.

3. I currently live in Indianapolis, Indiana and have lived there since before 2017.

4. I began working for Plaintiff Deep South Communications, LLC ("Deep South") on May 17, 2017 as its Vice President of Business Development.

5. I conducted the bulk of negotiations with Deep South regarding my employment from my home in Indiana.

6. I received the Confidentiality and Restrictive Covenant Agreement via email on my first day at Deep South.

7. I was not in Louisiana on my first day of employment with Deep South when I received the Agreement.

8. I took a few days to review the Agreement.

EXHIBIT "A"

9. I then signed the Agreement while I was in Orlando, Florida working a convention on behalf of Deep South and I emailed it back to Deep South's Office Manager later that week when I returned to my Indiana home office.

10. I object to the application of Louisiana law to the Agreement.

11. When working for Deep South, I worked out of my home in Indiana.

12. I was the only Indiana employee for Deep South during my employment there.

13. I maintained my Indiana phone number during my employment with Deep South.

14. I did not maintain an office or ever use the office phone number at Deep South's Baton Rouge, Louisiana location.

15. I did not develop any new business relationships on behalf of Deep South in Louisiana while employed by Deep South.

16. Deep South's owner, Rhett Westerman, developed all Louisiana business opportunities during my tenure with Deep South.

17. During my employment with Deep South, I developed relationships in two states on a regular basis – Florida and Texas.

18. The business opportunities in Florida were primarily in the Boca Raton area with clients headquartered in the area and with tower assets in a number of states, with Florida Department of Transportation across the state of Florida, and with engineering firms supporting the Florida Department of Transportation.

19. The business opportunities in Texas were primarily centered in the Dallas/Fort Worth metro area with potential clients headquartered in the area.

20. I also had 1-2 development opportunities in three other states – Georgia, Oklahoma,, and Pennsylvania, which did not result in any business for Deep South.

21. The contacts in these three states were limited to business in a single county within those states and were not statewide business opportunities.

22. I had no development opportunities in my five years with Deep South within the remaining 11 states listed in Agreement as the "Territory", including Louisiana.

23. I know of no solicitation efforts by or clients of Deep South in five of the sixteen states listed in Exhibit A of the Agreement – Missouri, North Carolina, South Carolina, Tennessee, and West Virginia.

24. The bulk of my work for Deep South occurred from my home in Indiana.

25. I travelled to Louisiana nine times while employed by Deep South to meet with Mr. Westerman and other Deep South employees.

    a. One trip occurred in September 2018 and lasted three days.

    b. Five of the trips occurred in 2019 and each last a few days.

    c. Two trips occurred in 2020 and lasted 1-3 days each.

    d. One trip occurred in November 2021 and lasted one day.

26. Upon my departure from Deep South, I fully completed Deep South's employee exit checklist.

27. I also organized all the information and documents related to each client and prospective clients into an organized folder structure to aid whomever took over for me.

28. I did this to ensure that I put Deep South in the best possible position to succeed after I left.

29. I did this because I had no intention of competing with Deep South.

30. I began working for End 2 End Technologies, Inc. ("End 2 End") on June 27, 2022 as an Account Director – Utilities.

31. I do not develop any business for my current employer End 2 End in the state of Louisiana.

32. I do not travel to Louisiana for my work with End 2 End.

33. I have not solicited any Deep South clients, including those located in Louisiana.

34. I have no intention of soliciting any Deep South clients during the term of the Agreement.

35. I work out of my home in Indiana for End 2 End.

36. The bulk of my work for End 2 End occurs from my Indiana home.

37. I have no responsibility for End 2 End's business relationship with General Electric ("GE").

38. I had no role in End 2 End's retention of GE's business in Arkansas.

39. I provided no information to anyone at End 2 End or any third-party regarding GE's business in Arkansas

40. After my departure from Deep South, I have had no conversations with anyone at GE about Deep South.

41. Deep South and End 2 End are not direct competitors because they principally offer different services.

42. Deep South seeks to develop physical buildouts of wireless networks.

43. End 2 End does not do physical buildouts of wireless networks in-house. Instead, it focuses its business on product sales, and the design and software needed to run the wireless networks.

44. Deep South also seeks out clients that would need its services of physical buildouts – *i.e.* state departments of transportation, prime road/bridge contractors, the US Army Corp of Engineers, major wireless telecom companies, and tower owner/operators.

45. End 2 End's business focuses primarily on utilities.

46. For End 2 End, I prospect for small-scale utilities, such as small electric co-ops and natural gas co-ops. I had no such responsibilities for Deep South.

47. I have no responsibility, nor do I solicit, any of the larger utilities or accounts, for End 2 End.

48. No solicitation of any Deep South client has occurred, is occurring, or will occur during the term of the Agreement.

49. Deep South's information is of no use to me at End 2 End because of the difference in service offerings and the different client-base.

50. On June 6, 2022, I received a call from Mr. Westerman in which he told me that I was in violation of the Agreement because I had accepted a position with End 2 End Technologies, Inc. ("End 2 End").

51. I told him that I did not believe there was a conflict, but that I would review the Agreement with End 2 End and my attorney.

52. I told him that *if* there was a conflict, that I would of course not take the position with End 2 End.

53. I did not admit to Mr. Westerman at any time that I was in violation of the Agreement.

54. After reviewing with End 2 End and my attorney the Agreement, the offerings of both companies, my duties for Deep South, and my duties for End 2 End, I determined that no conflict existed and that I was not, in fact, competing with Deep South.

55. I then spoke to Mr. Westerman again on June 21, 2022, in which I told him that I had analyzed the situation, End 2 End had analyzed the situation, and my attorney had analyzed the situation and none of us could see a conflict.

56. I asked Mr. Westerman to provide me with a written statement as to what he believed the conflict to be.

57. Mr. Westerman told me "I wouldn't know what to write down."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11 Oct 22
           Date                                      Peter Fellegy