### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DEEP SOUTH COMMUNICATIONS L.L.C,** | § | |
| | § | |
| *Plaintiff,* | § | **Civil Action No. 3:22-cv-00598-JWD-EWD** |
| | § | |
| **v.** | § | |
| | § | **Judge John W. deGravelles** |
| | § | |
| **PETER M. FELLEGY,** | § | **Magistrate Judge Erin Wilder-Doomes** |
| *Defendant.* | § | |
| | § | |

### DEFENDANT'S POST-HEARING BRIEF SUPPORTING HIS RULE 12(B)(2) MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

**NOW INTO COURT**, through undersigned counsel, comes Defendant Peter Fellegy ("Mr. Fellegy" or "Defendant") who submits this Post-Hearing Memorandum in Support of his Rule 12(b)(2) Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Opposition to Plaintiff Deep South LLC's ("Deep South" or "Plaintiff") Motion for Temporary Restraining Order.

### SUBSTANTIVE FINDINGS OF FACT

1.      Peter Fellegy ("Mr. Fellegy") resided, and has resided for all relevant times, in Indiana. (Fellegy Decl., ¶ 3; Rec. 86:1-6.)

2.      Fellegy began working for Plaintiff Deep South Communications, LLC ("Deep South") on May 17, 2017 as its Vice President of Business Development. (Rec. 10:4-7.)

3.      On May 17, 2017, Mr. Fellegy received a Confidential and Restrictive Covenant Agreement ("Agreement") in an email from Deep South's Office Manager Christina Springer that he reviewed in Indiana. (Rec. 87:7-88:2).

4.      Mr. Fellegy did not negotiate the Agreement with Deep South. (Rec. 88:19-22)

5.      Mr. Fellegy signed the Agreement in Florida and returned it to Deep South when he returned to his home in Indiana. (Rec. 88:3-9.)

6.      Fellegy resigned from Deep South, effective February 22, 2022. (Complaint, ¶ 9.)

7.      Upon his departure from Deep South, Fellegy fully completed Deep South's employee exit checklist. (Fellegy Decl., ¶ 26; Rec. 100:25-102:15.) He also organized all the information and documents related to each client and prospective client into an organized folder structure to aid whomever took over for him. (Fellegy Decl., ¶ 27; Rec. 100:25-102:15.) Fellegy did this to ensure that he put Deep South in the best possible position to succeed after he left. (Fellegy Decl., ¶ 28; Rec. 102:19-22.) He did this because he had no intention of competing with Deep South. (Fellegy Decl., ¶ 29.)

8.      Mr. Fellegy has had no contact with the state of Louisiana since leaving his employment with Deep South other than this lawsuit.

9.      After a four month gap in employment, Fellegy began working for End 2 End Technologies, Inc. ("End 2 End") on June 27, 2022 as an Account Director. (Fellegy Decl., ¶ 30.)

10.      He does not develop any business for End 2 End in the state of Louisiana. (Fellegy Decl., ¶ 31; Rec. 137:18-22.)

11.      He has not solicited any Deep South clients, including those located in Louisiana. (Fellegy Decl., ¶ 33; Rec. 110:18-20; 137:5-22.)

12.     He has no intention of  soliciting any Deep South clients during the term of the Agreement. (Fellegy Decl., ¶ 34.)

13.     Fellegy also has no responsibility for End 2 End's business relationship with General Electric ("GE"). (Fellegy Decl., ¶ 37.)

14.     He had no role in End 2 End's retention of GE's business in Arkansas. (Fellegy Decl., ¶ 38.)

15.     He provided no information to anyone at End 2 End or any third party regarding GE's business in Arkansas. (Fellegy Decl., ¶ 39.)

16.     After his departure from Deep South, he has had no conversations with anyone at GE about Deep South. (Fellegy Decl., ¶ 40.)

17.     After accepting the job with End 2 End, Mr. Fellegy has not solicited any business in Louisiana. (Rec. 110:18-20; 137:5-22.)

18.     Mr. Fellegy thas not accessed or used any Deep South confidential information since leaving Deep South. (Rec. 103:20-23, 139:2-22.)

19.     On June 6, 2022, Fellegy received a call from Mr. Westerman in which he told Fellegy that he was in violation of the Agreement because he had accepted a position with End 2 End. (Fellegy Decl., ¶ 50.)

20.     Fellegy told him that he did not believe there was a conflict, but that he would review the Agreement with End 2 End and his attorney. (Fellegy Decl., ¶ 51.)

21.     Fellegy told him that *if* there was a conflict, that he would of course not take the position with End 2 End. (Fellegy Decl., ¶ 52.)

22.     At no time did Fellegy ever admit to Mr. Westerman that he was in violation of the Agreement. (Fellegy Decl., ¶ 53.)

23.     After reviewing the Agreement, the offerings of both companies, his duties for Deep South, and his duties for End 2 End, Fellegy determined that no conflict existed and that he was not, in fact, competing with Deep South. (Fellegy Decl., ¶ 54.)

24.     Fellegy next spoke to Mr. Westerman on June 21, 2022. (Fellegy Decl., ¶ 55.)

25.     During that call, Fellegy told Mr. Westerman that he had analyzed the situation, End 2 End had analyzed the situation, and Fellegy's attorney had analyzed the situation and none of them could see a conflict. *Id.*

26.     Fellegy asked Mr. Westerman to provide him with a written statement as to what he believed the conflict to be. (Fellegy Decl., ¶ 56.)

27.     Mr. Westerman told Fellegy "I would know what to write down." (Fellegy Decl., ¶ 57.)

28.     On August 26, 2022, Deep South filed its Verified Complaint for Injunctive and Other Relief ("Complaint"), seeking injunctive and monetary relief against Fellegy for the alleged breach of a Confidentiality and Restrictive Covenant Agreement ("the Agreement"). (Complaint, Doc. 1 and 1-2.)

29.     Deep South alleged that Fellegy breached the Agreement by engaging in competitive activities, soliciting Deep South's "clients", and using Deep South's confidential information. (Complaint, Doc. 1, ¶¶ 49-100.)

30.     On September 26, 2022, Deep South filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. 8.)

31.     The Court heard testimony at an evidentiary hearing on November 2, 2022.

32.     Deep South put forth Exhibit 104 to attempt to establish its presence in all 1,546 counties and parishes listed in the Agreement as the "Territory."

33.    In doing so, it primarily relied on six (6) exhibits to provide the data for the demonstrative exhibit – Plaintiff's Exhibits 1, 2, 3, 37, 77 and 101. (*See* P. Exh. 104, Column "Exh.")

34.    Exhibits 37 and 77 alone provide the basis for 1,051 lines of the 1,546 lines of data (or 66% of the data) found in Deep South's demonstrative exhibit. (*Id.*)

35.    Exhibit 77 is data from an original equipment manufacturer to Deep South related to federal funding for projects related to telecom infrastructure. (*See* Exh. 77; Rec. 174:2-18.)

36.    It is an email from Aviat to Deep South with information about federal funding allocations for the entire United States related to the identified infrastructure program. (*Id.*)

37.    Nowhere in the exhibit does it provide business leads or other development opportunities for Deep South to develop business in the identified counties, parishes, and municipalities. (*Id.*)

38.    Mr. Westerman does not know what to do with the data given by Aviat, and instead asks Mr. Fellegy, Rob Sterrenberg, and Christina Springer whether they "have any ideas of how we can make use of this." (*Id.* at PLTF_001112.)

39.    The exhibit provides no evidence of customers or any solicitation of potential customers within the data provided by Aviat. (*Id.*)

40.    Nor does the testimony before the Court regarding Exhibit 77 provide any such evidence. (Rec. 174:2-175:25.)

41.    Exhibit 37 is an invitation from a Nokia representative to bid on small cell tower construction projects in 2019. (*See* Plaintiff's Exhibit 37, PLTF_001748).

42.     Again, the data that Deep South relies upon is simply the market data for Nokia – no evidence of any actual construction or maintenance work in any of the identified counties. (*Id.*, PLTF_002102-002109 and PLTF_002479-002486.)

43.     The testimony surrounding Exhibit 37 provides no such evidence of actual work performed by Deep South in any of the territory listed by the Nokia representative as Nokia's market. (Rec. 41:19-43:2, 173:8-174:1.)

44.     Mr. Westerman did not testify that Deep South's bid was successful, and Deep South's own exhibits tend to imply that Deep South was not successful. Nokia is not listed as a client on Deep South's client list exported from its Quickbooks accounting software. (*See* Plaintiff's Exhibit 101.)

45.     The Verizon Wireless items in Exhibit 101 are limited to North Houston, Texas and a two other counties. (*Id.*, PLTF_004217)

46.     Exhibit 101 lacks any sort of lengthy recitation of Nokia or Verizon projects, such as it does for a similar agreement with Ericsson. (*Compare* Exh. 101 PLTF_004217 (Verizon undated projects) to Exh. 101, PLTF_004080-PLTF_004197 (Ericsson undated projects).)

47.     Deep South does not actually know where it conducts business within the Territory. Mr. Westerman admits that he has no knowledge of the work done in any of the counties or parishes listed in the Agreement:

Q.:     If I asked you about work you performed in some county in Tennessee in the last three years you wouldn't be able to tell me?

A.:     Sitting on this stand right now, that's correct.

Q.:     And same question for all the counties in Ohio; you couldn't tell me the business that Deep South has done in the last three year or today?

A.:     I can't tell you that sitting here right now. I can't produce an answer for you that's correct.

6

Q.:     Same question for Georgia; you can't tell me about business Deep South –

A.:     Every county and every state here.

Q.:     Every county and every state listed in Exhibit A, as we sit here today, you can't tell us about business Deep South is doing there today or has done in the last three years?

A.:     Correct.

(Rec. 221:7-22.)


## CONCLUSIONS OF FACT AND LAW

### This Court Lack Personal Jurisdiction over Mr. Fellegy

48.     Deep South bears the burden of establishing personal jurisdiction over Mr. Fellegy. *Inmar Rx Solutions, Inc. v. Devos Ltd.*, 786 Fed.Appx. 445, 447 (5th Cir. 2019); *Libersat v. Sundance Energy, Inc.*, 437 F.Supp.3d 557, 565 (W.D. La. 2020).

49.     Where the defendant disputes the factual grounds for personal jurisdiction, the district court may consider the record before it, including "affidavits, interrogatories, depositions, oral testimony or any combination of the recognized methods of discovery." *Libersat*, 437 F.Supp.3d at 565 (quoting *Quick Tehcnologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002).

50.     Where the defendant controverts factual allegations in the complaint with affidavits or other evidence, the plaintiff cannot rest solely on the controverted allegations in the complaint but must counter the defendant's evidence with affidavits or other evidence. *Id.*

51.     The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgement of its courts. *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014).

52.     Thus, a federal court may exercise personal jurisdiction over a non-resident defendant if "the forum state's long-arm statute extends to [such] defendant and the exercise of

jurisdiction comports with due process." *Carmona v. Leo Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019).

53.     To comport with federal due process, a plaintiff in a diversity case must establish that the non-resident defendant "purposely availed himself of the benefits and protections of the form state by establishing minimum contacts with the state" and that "the exercise of jurisdiction [ ] does not offend traditional notions of fair play and substantial justice." *Id.*

54.     General personal jurisdiction exists only when a party's "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum state." *Daimler A.G. v. Bauman*, 571 U.S. 117 (2014).

55.     Nothing within the evidence establishes any sort of continuous and systematic contacts between Mr. Fellegy and Louisiana that would sufficient to support the "exceptional case" of general personal jurisdiction here. *Libersat*, 437 F.Supp.3d at 565.

56.     Thus, only specific personal jurisdiction is at issue.

57.     In determining whether due process allows the exercise of specific jurisdiction, federal district courts consider the following factors:

> (1)     Whether the defendant has minimum contacts with the forum state, i.e., whether it purposefully directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;

> (2)     whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and

> (3)     whether the exercise of personal jurisdiction is fair and reasonable.

*Carmona*, 924 F.3d at 193.

58.    The focus of the specific jurisdiction inquiry is on Mr. Fellegy's contacts with Louisiana, not Deep South. *Inmar Rx Solutions, Inc. v. Devos, Ltd.*, 786 Fed.Appx. 445 (5th Cir. 2019).

59.    Deep South must show that "the *suit* must arise out of or relate to the defendant's contacts within the *forum.*" *Inmar Rx Solutions, Inc.* 786 Fed.Appx. at 447 (emphasis in original) (*citing Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 127 S.Ct. 1773, 1780 (2017)).

60.    "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co.,* 137 S. Ct. at 1780.

61.    Here, only two situations are relevant to the jurisdiction issue, neither of which have any meaningful connection with Louisiana – the signing of the Agreement and Fellegy's employment now with End 2 End. *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018) ("only those acts which relate to the formation of the contract and the subsequent breach are relevant"); *Conveyor Aggregate Products Corp. v. Benitez*, 2019 WL 1921613, at *4 (W.D. Tex. Mar. 4, 2019).

62.    The reason Deep South hauled Mr. Fellegy into court seven months after his departure is Mr. Fellegy's employment with End 2 End – conduct that has nothing to do with the "contacts" Deep South has alleged. Mr. Fellegy's work for End 2 End that is at the core of the dispute is occurring primarily in Indiana.

63.    Deep South does not attempt to link Mr. Fellegy's conduct surrounding the Agreement or his conduct with End 2 End to Louisiana.

64.     Deep South admits that the Agreement was not signed in Louisiana. (Westerman Decl., Doc. 20-1, ¶ 12.) Moreover, the Agreement was not negotiated – it was sent to Fellegy when he was in Florida, he reviewed it in Florida, and he signed it in Indiana. (Fellegy Decl., ¶¶ 6-9.)

65.     The only contact Fellegy had with Louisiana during the signing of the Agreement was when he emailed it back to Deep South's Office Manager. (Fellegy Decl., ¶ 9.) This communication was mandated by Deep South and was not Fellegy's voluntary action. Nor is it sufficient to establish minimum contacts for the purposes of personal jurisdiction because engaging in communications with a resident of the forum state during the course of negotiating a contract is insufficient to subject a nonresident to the court's jurisdiction. *See McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) ("We have held that communications relating to the performance of a contract themselves are insufficient to establish minimum contacts."), *cert. denied*, 562 U.S. 827 (2010); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) ("An exchange of communications in the course of developing and carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law."); *see also XPEL Technologies Corp. v. Md. Performance Works, Ltd.*, No. SA-05-CA-0593-XR, 2006 WL 1851703 at *5 (W.D. Tex. May 19, 2006) (noting that engaging in communications during contract negotiations are insufficient by themselves to establish jurisdiction); *Crandell v. Arthurs*, No. 4:06CV166, 2007 WL 173865, at *4 (E.D. Tex. Jan. 19, 2007) (holding that communications between defendants and plaintiff that led to the contract did not support an exercise of specific jurisdiction over defendants).)

66.     Deep South seeks to establish personal jurisdiction over Mr. Fellegy based on its own affiliation with Louisiana – which it cannot do. The plaintiff "cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary

connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 571 U.S. at 285. A defendant's relationship with a plaintiff, standing alone, is an insufficient basis for jurisdiction. *Id.* at 286. Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State. *Id.* (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Deep South alleges "contacts" for Fellegy that are wholly ancillary to Deep South's employment of Fellegy. It seeks to bootstrap jurisdiction by using its own contacts with Louisiana and its employment of Fellegy as a means of conveying jurisdiction. This is not sufficient under the law to protect Fellegy's due process rights. *Walden*, 571 U.S. at 285.

67.    Mr. Fellegy's alleged competitive conduct also is not directed at Louisiana.  Fellegy works from home in Indiana and is not soliciting any of Deep South's clients. Fellegy is not soliciting anyone in Louisiana.  He is not using any of Deep South's confidential information because the information is of no use to him given the differences in End 2 End's services and the fact that he is not competing with Deep South for clients. The alleged competing conduct that Deep South argues is the basis for the breach of the contract is not occurring in Louisiana. To the extent Fellegy's actions can be characterized as competition or in some way violating the Agreement (which they are not), those actions are not purposefully directed at Louisiana.

68.    Deep South has failed to carry its burden to show (1) Mr. Fellegy had a minimum level of contacts with the State of Louisiana sufficient to convey jurisdiction, and (2) that Deep South's claims arises out of or results from the minor, irrelevant contacts Mr. Fellegy had with Louisiana as a result of his employment with Deep South. Given Mr. Fellegy's lack of contacts with the state of Louisiana and the irrelevancy of the contacts alleged by Deep South in the

adjudication of the underlying claims, seeking to sue Mr. Fellegy in the state of Louisiana violates his due process rights under the Fourteenth Amendment. As such, Deep South's Complaint is dismissed in its entirety for lack of personal jurisdiction pursuant to Federal Rule 12(b)(2).

## Deep South's Motion for Temporary Restraining Order is Denied

69.     Injunctive relief "is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 25 (2008).

70.     The extraordinary nature of the relief "requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).

71.     "[a] temporary restraining order may only be granted if the movant establishes the following four factors: (1) A substantial likelihood of success on the merits; (2) A substantial threat that failure to grant the injunction will result in irreparable injury; (3) That the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) That the injunction will not disserve the public interest." *Lucien v. Jones*, 2016 WL 4942997, at *6–7 (E.D. La. Sept. 16, 2016) (Barbier, J.) (internal citations omitted); *see also Planned Parenthood of Gulf Coast, Inc. v. Gee*, 837 F.3d 477, 488 (5th Cir. 2016) (noting the same factors are required to be established on a motion for preliminary injunction). "Because a temporary restraining order or preliminary injunction is an 'extraordinary remedy,' the moving party carries the heavy burden of proving all four factors." *Smith v. Dep't of Health & Hosps. Louisiana*, 2014 WL 4635540, at *3 (E.D. La. Sept. 15, 2014) (Barbier, J.) (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 622 (5th Cir. 1985)).

72.     The extraordinary relief Deep South seeks in this case is based on an agreement that is presumptively null and void. La. R.S. § 23:921.

73.    Deep South seeks to contravene "[p]ublic policy [that] supports free competition in the market to encourage businesses to compete" and "Louisiana's strong public policy restricting these types of agreements . . . based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself." *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So.2d 294, 298, 313 (La. 2001).

**The non-competition and non-solicitation provisions of the Agreement are overbroad in geographical scope.**

74.    Restraints on trade are only enforceable if the employer can show that it actually conducts business within the geographic locations identified within the covenant not to compete. *Id.* at 1140-41. "[La. R. S. § 23:921] contemplates that the parishes specified in the agreement must be parishes where the Plaintiff ***actually has a location or customers***." *Vartech Sys., Inc. v. Hayden*, 951 So.2d 247, 258 (La. Ct. App. 2006) (emphasis added). Employers are not permitted to lock former employees out of markets in which the employer does not operate. *Id. (citing Cellular One, Inc. v. Boyd,* 653 So.2d 30, 33 (La. Ct. App. 1995).

75.    Over 66% of the territory listed Plaintiff's Exhibit 104 is not based on any actual work done by Deep South *at any time*. Deep South puts forth Exhibit 104 to attempt to establish its presence in all 1,546 counties and parishes listed in the Agreement as the "Territory." In doing so, it primarily relies on five exhibits to provide the data for the demonstrative exhibit – Plaintiff's Exhibits 1, 2, 3, 37, 77 and 101. (*See* P. Exh. 104, Column "Exh.") Exhibits 37 and 77 alone provide the basis for 1,051 lines of the 1,546 lines of data (or 66% of the data) found in Deep South's demonstrative exhibit. (*Id.*) Yet, Exhibits 37 and 77 do not establish that Deep South did any work whatsoever in those counties.

76.    Exhibit 77 is data from an original equipment manufacturer to Deep South related to federal funding for projects related to telecom infrastructure. (*See* Exh. 77; Rec. 174:2-18.) It is

an email from Aviat to Deep South with information about federal funding allocations for the entire United States related to the identified infrastructure program. (*Id.*) Nowhere in the exhibit does it provide business leads or other development opportunities for Deep South to develop business in the identified counties, parishes, and municipalities. (*Id.*) In fact, Mr. Westerman does not know what to do with the data given by Aviat, and instead asks Mr. Fellegy, Rob Sterrenberg, and Christina Springer whether they "have any ideas of how we can make use of this." (*Id.* at PLTF_001112.) The exhibit provides no evidence of customers or any solicitation of potential customers within the data provided by Aviat. (*Id.*) Nor does the testimony before the Court regarding Exhibit 77 provide any such evidence. (Rec. 174:2-175:25.)

77.    Exhibit 37 likewise provides no evidence of actual work performed in a large swath of the Territory Deep South uses it to support. Exhibit 37 is an invitation from a Nokia representative to bid on small cell tower construction projects in 2019. (*See* Plaintiff's Exhibit 37, PLTF_001748). Again, the data that Deep South relies upon is simply the market data for Nokia – no evidence of any actual construction or maintenance work in any of the identified counties. (*Id.*, PLTF_002102-002109 and PLTF_002479-002486.) The testimony surrounding Exhibit 37 provides no such evidence of actual work performed by Deep South in any of the territory listed by the Nokia representative as Nokia's market. (Rec. 41:19-43:2, 173:8-174:1.) Mr. Westerman did not testify that Deep South's bid was successful, and Deep South's own exhibits tend to imply that Deep South was not successful. (Rec. 199:9-25.) Nokia is not listed as a client on Deep South's client list exported from its Quickbooks accounting software. (*See* Plaintiff's Exhibit 101.) The Verizon Wireless items in Exhibit 101 are limited to North Houston, Texas and a two other counties. (*Id.*, PLTF_004217) Exhibit 101 lacks any sort of lengthy recitation of Nokia or Verizon projects, such as it does for a similar agreement with Ericsson. (*Compare* Exh. 101 PLTF_004217

(Verizon undated projects) to Exh. 101, PLTF_004080-PLTF_004197 (Ericsson undated projects).) Deep South backfills 175 counties in Plaintiff's Exhibit 104 with this alleged "work" locations in support of the Territory contained in the Agreement, without providing the Court any evidence that (1) it was successful in obtaining the work from Nokia in 2019 or that (2) the work actually occurred in those 175 counties.

78.     When aggregating the data from Exhibits 37 and 77, it becomes clear that Deep South fails to provide the Court with any evidence that it actually has performed work in at least 66% of the territory listed in the Agreement.

79.     For another large portion of the Territory, Deep South does not establish that it is *currently* carrying on business in those parishes and counties because the work it lays before the Court is over 3 years old. With the data from Exhibit 37 and 77 stripped away due to the lack of any actual business conducted by Deep South in those territories, Plaintiff's Exhibit 104 is left with 495 line items. (*See* Exh. B.) Of these 495 line items, 302 of them relate to work that was completed over three years ago. (*Id.*) In some cases, the work Deep South seeks to present to the Court is over a decade old. (*See Id.*; *see also* Plaintiff Exhibit 3, PLTF_000949-000952 (outlining work completed in 2007 – 2010).) Thus, for this additional 20% of the Territory, Deep South provides no evidence that it has worked in those counties and parishes for over three years. It certainly does not establish that it is currently "carr[ying] on a like business" in those counties and parishes, as required by Section 921 and Deep South's own Agreement. (*See* Joint Exh. 1, Section 5.A)("The 'Territory' as used in this Agreement, shall consist of the following parish or parishes, county or counties, and/or municipality or municipalities set forth on Exhibit A attached hereto, *so long as Employer carries on a like business therein.*" (emphasis added)); Rec. 215:12-216:10.)

Mr. Westerman admitted that Deep South's Agreement uses present tense to describe the protection it is intended to provide. (Rec. 215:12-216:10)

80.    This leaves Deep South with a mere 193 counties listed with either actual work performed in the last three years or a customer location at some point in Deep South's history. This represents 12.5% of the territory it now claims Mr. Fellegy should be prevented from operating in on behalf of Deep South. Of these 193 counties, 124 of the counties are listed due to single cell tower maintenance job Deep South has done for a large telecommunications client Ericsson – work that certainly is not substantially nor threatened by Mr. Fellegy's sale of microwave radios to small electric co-ops and natural gas utilities.

81.    All that remains of Deep South's bid to block competition in 1,546 counties and parishes is 69 counties where Deep South claims to have customers located. (*See* Exh. A; *see also* Plaintiff's Exh. 101.) Again, Deep South provides no evidence of actual work performed in these counties for these customers. Nor does it provide any evidence that the customers listed in Plaintiff's Exhibit 101 are current customers. (Rec. 157:17-158:18.) It is simply a print-off of any customer Deep South has had in the past twenty years of its existence without any context by which to derive when and where any work has actually occurred.

82.    Deep South does not actually know where it conducts business within the Territory. Mr. Westerman admits that he has no knowledge of the work done in any of the counties or parishes listed in the Agreement. This lack of understanding of where Deep South's work actually takes place is telling, given Deep South is the drafter of the Agreement and is obligated under Section 921 to have some business basis for identifying the Territory as it does.

83.    Deep South's expansive view of its territory is not permitted under Section 921. Deep South argues that somehow it is exempt from the statutory requirements and that it should

receive special treatment under the statute due to the nature of the telecommunications business. (Rec. 244:3-20.) No such special treatment exists under the statute. Instead, the explicit language of the statute requires that Deep South "carries on a like business" in the specified territory. La. R.S. § 23:921(C). After 4,000+ pages of exhibits and 6 hours of witness testimony (including from Deep South's owner), Deep South provided the Court with zero evidence of actual business conducted by Deep South at any time in over 66% of the Territory it seeks to protect. Instead, it asks the Court to protect territory where work "might" be for Deep South at some point in the undefined future. To adopt Deep South's interpretation of "carrying on business" would render the geographic limitation found in Section 921 meaningless and would run contrary to the well-established Louisiana case law that Section 921 mandates the territory specified in the agreement be territory where Deep South actually has a location or customer. *Vartech Sys., Inc. v. Hayden*, 951 So.2d 247, 258 (La. Ct. App. 2006); *McLaughlin v. BancorpSouth Ins. Servs., Inc.*, CV 17-7604, 2018 WL 1035083, at *5 fn. 6 (E.D. La. Feb. 23, 2018); *H2O Hair, Inc. v. Marquette*, 960 So.2d 250, 260 (La. Ct. App. 2007).

84.    Deep South argues that the *H2O Hair* case somehow supports its claim that solicitation alone can support a territory under Section 921. The *H2O Hair* court created no such interpretation of Section 921. That court held that the employee could be prohibited from competing in a neighboring parish, Orleans Parish, where the employer did not have a location, because it was "uncontradicted that a substantial portion of H2O's *customers are residents of Orleans Parish*." *H2O Hair, Inc.*, 960 So.2d at 260. The fact that H2O solicited for customers in Orleans Parish resulted from the fact that the employer's clients lived there. *Id.* The case does not stand for the premise that Deep South wishes – that solicitation alone, absent the existence of any

actual client in the territory, is sufficient to justify designating a parish or county as off limits under Section 921.

85.     Deep South cannot establish substantial likelihood on the merits based on this Agreement, where the evidence clearly shows that the Agreement is unenforceable. Deep South drafted the Agreement, meaning that it should have been able to produce at least cursory evidence (all of which it would control) at this stage to show it actually conducts work or has customers in the 1,546 counties and parishes listed in Exhibit A. Even under Deep South's misguided interpretation of Section 921 – that solicitation alone can justify the territory – it fails to provide any evidence of actual solicitation for over 57% of the territory. It, instead, relies solely on market data from an OEM for over half of the territory with no evidence that it actually solicits any customers in that territory. Any way the Court interprets "carrying on business" as it relates to the geographic limitation under Section 921, Deep South's Motion for Temporary Restraining Order should be denied.

### Deep South failed to show that Mr. Fellegy is actually competing against Deep South, which is necessary for injunctive relief

86.     Deep South fails to establish any significant business activity that would be threatened by Mr. Fellegy's current employment with End 2 End in any of the Territory. Mr. Fellegy is an Account Director for Utilities that sells microwave radios to small utilities. (Rec. 107:20-108:10.) These radios are used to convey data from one point to another single point or multiple end points. (Rec. 5:2-15, 108:11-109:20.) His sales are almost entirely product-based. (Rec. 123:18-22.) He is currently focused on the Great Lakes region for his sales efforts, including Wisconsin, Illinois, Indiana, Ohio, Michigan, Kentucky, and Tennessee. (Rec. 110:11-17.) End 2 End is currently working on hiring another Account Director for Oklahoma, Missouri, Arkansas,

Texas, and Louisiana. (Rec. 115:23-116:12.) Mr. Fellegy is not actively selling in those states for

End 2 End. (Rec. 116:13-16.)

87.    In contrast, Deep South defines its business in the Agreement as:

- Microwave communications design and construction
- Fiber optics communications
- Distributed antenna systems (DAS)
- Intelligent transportation systems (ITS)
- Communications tower build-outs and maintenance
- Cellular and microwave maintenance and build-outs

(Joint Exhibit 1, Section 1.) Deep South admits the business description for Deep South in the

Agreement does not talk about the sale of any products, such as microwave radios. (Rec. 213:15-

215:1. It does not include the word "reseller," "value-added reseller," or "channel partner." (Rec.

215:3-11.) Instead, the work described is that of contractor work for construction purposes. (Rec.

213:15-25.)

88.    The evidence put forth by Deep South regarding actual work it has completed in

the past is relates only to communication tower buildouts and maintenance for a major

telecommunications customer, Ericsson. (*See* Plaintiff's Exh. 1 and 2.) Such overly broad

definitions of the employer's business violated La. R.S. 23:921(C) and are null and void."

*Paradigm Health System, L.L.C. v. Faust*, 218 So.2d 1068, 1073 (La. Ct. App. 2017).

89.    Additionally, Deep South's client contact list contains only seven utility customers

in its 18-year history. (*See* Plaintiff's Exh. 101.) Those seven utilities were confined to Texas,

Louisiana, Mississippi, Arizona, and New Mexico – states in which Mr. Fellegy is not actively

selling. (*Id.*; Rec. 116:13-16) Mr. Fellegy pitched to only one utility in his 5-year tenure with Deep

South and that work was for tower construction – bid that was unsuccessful. (Rec. 95:9-96:25.)

90.    Deep South's business is based in construction services, with product sales being a

passive inclusion in proposals for the purposes of effectuating the services requested by the client.

(Rec. 123:10-17, 124:9-21.) Deep South's work is the opposite of what Mr. Fellegy is now selling on behalf of End 2 End. (Rec. 124:12-24.)

91.    Deep South has an overly broad view of what it does and seeks to block Mr. Fellegy from operating in 16 states where (1) Deep South does not provide all the services listed in the business description and (2) without any actual evidence that Mr. Fellegy's sales for End 2 End competes with Deep South in that territory. Deep South represents to the Court that it provides all of its offerings across the 16-state territory and, therefore, Mr. Fellegy "must" be competing with it because he works for End 2 End. Yet, the evidence shows a much narrower view of what Deep South actually does in the Territory it seeks to protect. Deep South's work, as presented, is maintenance of cell towers for major telecom clients, not the sale of microwave radios to utilities. Tellingly, Deep South provides no evidence of any sale of microwave radios to any customer, let alone utilities, to show that it provides the same service that Mr. Fellegy is currently selling.

92.    The exception under La R.S. 23:631(C) mandates an "employer is only entitled to keep ex-employees from competing with the employer's *actual business*, not some overblown contractual definition of business designed to cover the proverbial waterfront and keep ex-employees from being able to make a living in any segment of the ex-employer's industry." *Paradigm Health System, L.L.C.*, 218 So.3d 1068 at 1073 (emphasis added) (citing *Vartech Sys., Inc.*, 951 So. 2d at 259). Yet, Deep South attempts to do just that with this Agreement. And it does so in states that Mr. Fellegy is admittedly not doing any business for End 2 End.

93.    In fact, Mr. Westerman testified to the lack of any competitive threat from Mr. Fellegy. When asked to provide some examples of how Mr. Fellegy posed a competitive threat to Deep South, Mr. Westerman could not identify any evidence to that effect. (Rec. 222:24-223:19.) In the four months since Mr. Westerman raised an objection to Mr. Fellegy's employment with

End 2 End, Deep South has never produced any explanation as to what it considers the competitive threat. Indeed, Mr. Westerman raised the objection to Mr. Fellegy's employment three weeks *before* Mr. Fellegy started with End 2 End, had a territory, or even knew what he would be selling. (Rec. 104:2-105:11.) When pressed to explain the conflict, Mr. Westerman said that he "wouldn't know what to write down" and has never provided Mr. Fellegy with an understanding of what he thought the competition might be. (Rec. 105:23-106:17.) The cease and desist letter sent by Deep South's counsel did nothing to explain the competition either. (Rec. 117:2-21.)

94.     Deep South's entire argument rests on the premise that it "believes" Mr. Fellegy is competing, not any actual evidence. That belief is directly contradicted by the evidence of what Mr. Fellegy actually does for End 2 End. Deep South's unfounded belief that competition exists is not enough to establish grounds for extraordinary injunctive relief – it must establish an actual violation of the Agreement. *See West Carroll Health System, L.L.C.,* 92 So.3d at 1136 ("Even though La. R.S. 23:921 mandates the court to issue injunctive relief upon proof of the obligor's failure to perform, without the necessity of proving irreparable injury, the employer *must still establish that it is entitled to relief.* Where *the actions sought to be enjoined pursuant to a noncompetition agreement do not fall under the statutory exception*, . . . the employer is unable to establish that it is entitled to the relief sought." (emphasis added) (internal quotations omitted)).

**Deep South lacks any evidence of solicitation of Deep South clients or use of confidential information, thereby lacking any basis in which to restrain Mr. Fellegy**

95.     The deficiency of any evidence or facts supporting Deep South's Motion for Temporary Restraining Order is even more pronounced when looking at its non-solicitation and use of confidential information claims. Mr. Fellegy has not solicited any business from Louisiana on behalf of End 2 End. (Rec. 110:18-20; 137:5-22.) In fact, his new employer has specifically told him not to solicit business in Louisiana and in the Gulf South territory. (Rec. 136:15-24.) Deep

South has no knowledge of any solicitation by Mr. Fellegy of any Deep South customer. (Rec. 209:20-210:5.) The Court correctly determined that it heard no evidence that Mr. Fellegy actually solicited business from a Deep South client, and Deep South's attorney conceded that no such evidence existed. (Rec. 253:14-22.)

96.     Moreover, the testimony before the Court established the *lack* of any use of Deep South's confidential information by Fellegy. Mr. Fellegy did not retain any confidential information from Deep South's system (Rec. 91:1-4.) He also is not using any Deep South confidential information in his employment with End 2 End. (Rec. 103:20-23, 139:2-22.) Again, the Court correctly determined that Mr. Fellegy was not doing anything with any of Deep South's confidential information. (Rec. 255:4-11.)

97.     Thus, apart from the unenforceability of the Agreement, Deep South provides the Court with no conduct on Mr. Fellegy's part that needs to be restrained.

### A Temporary Restraining Order is Not Otherwise Warranted in this Case.

98.     Deep South delayed seeking injunctive relief for months after it was first notified of Fellegy's employment at End 2 End. Such "[d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, ... a substantial period of delay ... militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Wireless Agents, LLC v. T-Mobile USA, Inc*., No. 3:05-cv-94-D, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) (citing *High Tech Med. Instrumentation, Inc., v. New Image Industries, Inc*., 49 F.3d 1551, 1557 (5th Cir. 1995)). "[W]ait[ing] over a month" to file for injunctive relief "undermines plaintiff's assertion that it has suffered and will continue to suffer irreparable harm." SMH Enterprises, L.L.C., v. Krispy Krunchy Foods, L.L.C., 2022 WL 137051 *7 (E.D. La. Jan. 14, 2022). Deep South's blatant lack

of diligence is wholly inconsistent with its current contention that it has been suffering immediate and irreparable harm because of Fellegy's employment with End 2 End.

99.     Deep South asks the Court to prevent Fellegy from earning a living. The harm to be caused to Fellegy is not threatened or speculative – an order from this Court precluding him from working for End 2 End removes his livelihood. Deep South's fears do not outweigh this actual harm to Fellegy, especially when there is no enforceable non-compete agreement and no violation of the Confidentiality Agreement. Any loss of income will constitute a serious injury to Fellegy that is not outweighed by Deep South's speculative potential harm. The reality of the circumstance is that Fellegy has not harmed Deep South and will not harm Deep South.

100.    Preventing Fellegy from working in a competing business directly contravenes Louisiana's strong public policy in favor of free competition. *West Carroll Health System, L.L.C.*, 92 So.3d at 1136. The relief requested is particularly injurious to the public interest since there is no evidence or alleged facts to support the argument that Fellegy has done anything wrong. The public's interest lies with individuals being able to earn a living and the relief requested by Deep South directly infringes on that interest. As such, the Motion for Temporary Restraining Order should be denied.

101.    Given the extraordinary nature of the relief requested and the lack of any evidence warranting such relief, Deep South's Motion for Temporary Restraining Order is denied.

Respectfully Submitted,

*/s/ Andrew P. Burnside*
Andrew P. Burnside, T.A., La Bar No. 14116
Claire R. Pitre, La Bar No. 36257
**Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
701 Poydras Street, Suite 3500
New Orleans, Louisiana 70139
Telephone: 504.648.3840
Facsimile: 504.648.3859
Email:  drew.burnside@ogletreedeakins.com
 claire.pitre@ogletreedeakins.com

—and—

Michelle Renee Maslowski, In Bar No. 27238-49
*Admitted Pro Hoc Vice*
Maslowski Law
5602 Elmwood Avenue, Suite 104,
Indianapolis, Indiana 46203,
Telephone: 317.854.3811
Email: michelle.maslowski@maslowskilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed via the Court's Electronic Filing

System, which provides for service on all parties.

This 16th day of November, 2022.

*/s/ Andrew P. Burnside*
Andrew P. Burnside

24