**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| DEEP SOUTH COMMUNICATIONS L.L.C. | ) ) ) ) | CIVIL ACTION |
| | ) | NO. 22-00598-JWD-EWD |
| v. | ) ) | |
| PETER M. FELLEGY | ) | |

---

**PLAINTIFF'S POST-HEARING BRIEF ON ISSUES OF JURISDICTION AND ISSUES RAISED BY THE MOTION FOR TEMPORARY RESTRAINING ORDER  [DOC. 8] AND MOTION TO DISMISS [DOC. 16] PURSUANT TO THE COURT'S MINUTE ENTRY [DOC. 45]**

---

Plaintiff, Deep South Communications L.L.C. ("Deep South" or "Plaintiff"), submits its post-hearing brief on issues of jurisdiction and issues raised in the Motion for Temporary Restraining Order (Doc. 8) (the "Motion for TRO") and Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and for Failure to State a Claim (the "Motion to Dismiss") (Doc. 16) and pursuant to the Court's Minute Entry (Doc. 45).

## I.      INTRODUCTION AND PROCEDURAL HISTORY

This is a breach of contract action for injunctive relief brought against Deep South's former employee, Defendant, Peter M. Fellegy ("Fellegy" or "Defendant"). On September 26, 2022, Deep South filed a Motion for TRO, which Fellegy opposes (Docs. 8, 17, and 23), seeking a temporary restraining order enforcing confidentiality, non-competition, and non-solicitation obligations under the parties' Confidentiality and Restrictive Covenant Agreement (the "Agreement") (Doc. 1-2; Joint Ex. 1), which Louisiana law governs. Also pending before this Court is Fellegy's Motion to Dismiss, which Deep South opposes (Docs. 16, 20, 21, 42, and 43). The Court held an

1

evidentiary hearing on November 2, 2022, after which it took both the Motion for TRO and the

Motion to Dismiss under advisement (Doc. 45). The Court further ordered the parties to submit

simultaneous post-hearing briefs on or before November 16, 2022 (Doc. 45).

## II.    PARTIES TO THE HEARING

### A.    Plaintiff – Louisiana-Based Deep South Communications L.L.C.

1.    Deep South is a wireless technologies services company that was founded by Rhett

Westerman ("Westerman"), its President, who is a Baton Rouge native and resident.

2.    Deep South, a Louisiana company, is headquartered in Baton Rouge.

3.    Deep South specializes in microwave communications design and construction,

fiber optics communications, distributed antenna systems, intelligent transportations systems,

communications tower build-outs and maintenance, and cellular and microwave maintenance and

build-outs[1] servicing a number of industry segments, including carrier and public networks,

intelligent transportation systems networks, offshore oil and gas, regional utilities and co-ops,

railroad communications networks.[2]

4.    Deep South operates in Louisiana and throughout the United States.[3]

### B.    Defendant – Peter M. Fellegy

5.    Fellegy was employed by Deep South beginning on May 17, 2017, first as the Vice

President of Business Development and then the Manager of Business Development, until his

resignation on February 22, 2022.

6.    In these roles, Fellegy was responsible for developing and maintaining business

relationships and sales for the benefit of Deep South throughout its footprint, generating sales and

---

[1] Joint Ex. 1, ¶ 1; Tr. 35:22-36:19.
[2] Tr. 37:4-24.
[3] Tr. 163:10-164:2 and 93:11-15 (acknowledging that Deep South "would go all over the country for" its customers). Deep South is registered to do business in 40 states, is a licensed general contractor in 20 states plus Puerto Rico, and has an electrical license in many states as well. Pl. Ex. 100.

business development leads, and providing and compiling feedback regarding clients in addition to helping create overall business development strategies.[4] He was the only business development employee during his employment with Deep South.[5] His position required him to search for business opportunities with existing Deep South customers and new customers.[6]

7.    Following his resignation, Fellegy obtained employment with End 2 End Technologies ("E2E") in June 2022 as a Sales Account Director, reporting to the Senior VP of Sales, and remains employed with E2E to date.[7]

### III.    SUBSTANTIVE FINDINGS OF FACT

**A.    Fellegy "reached out" to Deep South in Louisiana.**

8.    Fellegy sought and purposefully availed himself of employment opportunities at Deep South, which did not advertise for a position or recruit or solicit Fellegy.[8]

9.    Fellegy knew Deep South was a Louisiana-based company when he sought employment.[9]

10.    Fellegy understood if Deep South hired him, he would be reporting to Baton Rouge,[10] and, in fact, he specified the location he was "applying for" as Baton Rouge on his employment application.[11]

11.    Fellegy flew to Louisiana to interview in person with Westerman.[12]

12.    Fellegy understood when he accepted employment with Deep South that regular

---

[4] Doc. 1, ¶ 12.
[5] Tr. 10:21-24.
[6] Tr. 35:17-21.
[7] Tr. 5:10-15 and 69:9-12.
[8] Tr. 7:1-7.
[9] Tr. 7:11-13 and 11:3-5.
[10] Tr. 8:13-15.
[11] Tr. 8:6-12; Pl. Ex. 97 at PLTF_004010. He indicated a desire for remote work from Indiana as well.
[12] Tr. 9:22-25.

business trips to Louisiana would be a requisite of his employment.[13]

**B.  Fellegy's employment with Deep South involved daily contact with Louisiana.**

13.     Fellegy reported directly to the Westerman in Baton Rouge for the entirety of his employment.[14]

14.     Westerman managed and supervised Fellegy from Baton Rouge throughout Fellegy's employment with Deep South.

15.     Fellegy frequently communicated, including by telephone and electronic communication, with Westerman and Christina Springer (Deep South's Office Manager), who is also based out of Baton Rouge, Louisiana.

16.     During his employment, Fellegy could be contacted via Deep South's main telephone line (with a Baton Rouge area code) through an assigned extension. Calls received via Fellegy's extension were forwarded to a cell phone, the service for which Deep South paid.

17.     Fellegy was required to contact Deep South's Baton Rouge office to address or resolve payroll, benefits, or similar questions or problems.

18.     Medical coverage, medical benefits, and retirement plans were administered from Louisiana for Fellegy's employment with Deep South.

19.     Deep South tasked Fellegy with finding a new 401k plan for its employees, and adopted the plan recommended by Fellegy.

20.     Fellegy received his paychecks from Louisiana.

21.     Deep South paid Fellegy's salary using its account at a bank located in Louisiana.

**C.  Fellegy meaningfully directed his employment-related and business activities to**

---

[13] *See* Tr. 173:3-7.
[14] Tr. 10:15-17.

**Louisiana throughout his employment with Deep South.**

22.     The nature of Fellegy's position involved significant travel – to Louisiana and elsewhere in the United States – to develop business for his Louisiana employer.[15]

23.     The evidence demonstrates that the quantity (more than twenty trips in a five-year period, which included a two-year pandemic during which travel was limited) [16] and the quality (meeting with Deep South employees[17] as well as customers and prospects regarding Louisiana business opportunities) of Fellegy's travel to Louisiana evidences that he purposefully directed his activities to the state of Louisiana and availed himself of its benefits, such that he should be subject to the jurisdiction of Louisiana courts.

24.     Fellegy frequently visited the office for purposes of "catching up" with Deep South personnel in Baton Rouge and he also participated in strategy sessions in Baton Rouge.[18]

---

[15] In fact, during the height of the pandemic, Fellegy associated his failure to develop significant business on Deep South's behalf with his inability to travel. Pl. Ex. 52 at PLTF_002501.

[16] (1) June 5, 2017 date to June 9, 2017 (Pl. Ex. 12 at PLTF_002924- PLTF_002925; Pl. Ex. 103 at PLTF_003038); (2) *unknown date* to June 26, 2017 (Pl. Ex. 103 at PLTF_003039); (3) June 27, 2017 to *unknown date* (Pl. Ex. 103 at PLTF_003061); (4) Aug. 29, 2017 to Sept. 1, 2017 (Pl. Ex. 103 at PLTF_003042, PLTF_003047, and PLTF_003072); (5) Dec. 19, 2017 to Dec. 22, 2017 (Pl. Ex. 103 at PLTF_003045, PLTF_003037, and PLTF_003074); (6) Mar. 27, 2018 to Mar. 30, 2018 (Pl. Ex. 21; Pl. Ex. 103 at PLTF_003043 and PLTF_003049); (7) July 11, 2018 to July 13, 2018 (Pl. Ex. 103 at PLTF_003046 and PLTF_003052); (8) Mid-Aug. date unknown (Pl. Ex. 28); (9) Sept. 25, 2018 to Sept. 28, 2018 (Pl. Ex. 28 at PLTF_003034; Pl. Ex. 103 at PLTF_003053); (10) Dec. 18, 2018 to Dec. 21, 2018 (Pl. Ex. 33 at PLTF_001111; Pl. Ex. 35 at PLTF_002909-PLTF_002916; Pl. Ex. 103 at PLTF_003044, PLTF_003050, and PLTF_003073); (11) Mar. 24, 2019 to Mar. 28, 2019 (Pl. Ex. 38 at PLTF_002872-PLTF_002880; Pl. Ex. 103 at PLTF_003059 and PLTF_003055); (12) July 21, 2019 to July 22, 2019 and July 24 to July 25, 2019 (Pl. Ex. 41 at PLTF_001080-PLTF_001093); (13) Aug. 6, 2019 to Aug. 9, 2019 (Pl. Ex. 43 at PLTF_002965); (14) Nov. 3, 2019 to Nov. 8, 2019 (Pl. Ex. 103 at PLTF_003058 and PLTF_003048); (15) Jan. 27, 2020 to Jan. 30, 2020 (Pl. Ex. 50); (16) July 21, 2020 to July 23, 2020 (Pl. Ex. 103 at PLTF_003036; Pl. Ex. 103 at PLTF_003068); (17) Nov. 10, 2020 to Nov. 13, 2020 (Pl. Ex. 59 at PLTF_003010; Pl. Ex. 103 at PLTF_003064 and PLTF_003040); (18) Dec. 8, 2020 to Dec. 11, 2020 (Pl. Ex. 64 at PLTF_002619; Pl. Ex. 103 at PLTF_003063 and PLTF_003054); (19) Apr. 6, 2021 to Apr. 9, 2021 (Pl. Ex. 73 at PLTF_002940; Pl. Ex. 76; Pl. Ex. 103 at PLTF_003066 and PLTF_003041); (20) *unknown date* to July 25, 2021 (Pl. Ex. 103 at PLTF_003057); (21) July 26, 2021 to *unknown date* (Pl. Ex. 103 at PLTF_003060); (22) Aug. 9, 2021 to Aug. 13, 2021 (Pl. Ex. 80 at PLTF_002948; Pl. Ex. 103 at PLTF_003065 and PLTF_003056); (23) Nov. 15, 2021 to Nov. 20, 2021 (Pl. Ex. 89 at PLTF_002957; Pl. Ex. 92 at PLTF_002859-PLTF_002860, PLTF_002862-PLTF_002863, and PLTF_002866; Pl. Ex. 103 at PLTF_003035, PLTF_003067, PLTF_003062, and PLTF_003051).

[17] Fellegy traveled to Baton Rouge to "catch up" with Deep South personnel, Pl. Ex. 92 at PLTF_002859, and participate in strategy sessions, Tr. 31:15-17; Pl. Ex. 76. He described the time he spent in Baton Rouge as "important and valuable for [him.]" Tr. 34:8-19; Pl. Ex. 57 at PLTF_002935.

[18] Fellegy even extended his trips to Louisiana for additional "quality time" with Westerman, his boss. Pl. Ex. 91 at PLTF_002956.

25.     Fellegy obtained confidential business information by using computers while in Deep South's Baton Rouge office, accessing Deep South's network servers (located on site in Louisiana), and printing materials in the office.

26.     As a Deep South employee, Fellegy traveled to Louisiana on "many" occasions in connection with conducting business[19] – meeting with business associates, customers, and prospects to develop potential business opportunities for Deep South[20] on what he characterized as "Biz Dev" trips.[21]

27.     Even while working remotely from Indiana, Fellegy directed his business development efforts to Louisiana,[22] for example, soliciting bids for projects in Louisiana,[23] soliciting opportunities on Deep South's behalf in the "Gulf Coast region," which would include Louisiana,[24] and New Orleans,[25] among other locations in Louisiana.[26]

28.     Fellegy made representations that he would be directing his "full effort" towards certain potential business opportunities in several states, including Louisiana.[27]

29.     Fellegy was actively involved with Deep South projects located in Louisiana.[28]

**D.     Fellegy received confidential information during his employment with Deep South.**

30.     Fellegy had access to and received from Deep South non-public, confidential information related to its business, including existing and prospective customer names, addresses,

---

[19] Tr. 17:18-21.
[20] Tr. 68:2-19; Pl. Ex. 44 at PLTF_001102; Pl. Ex. 55; Pl. Ex. 67; Pl. Ex. 76; Pl. Ex. 80 at PLTF_002947; Pl. Ex. 82; Pl. Ex. 102; Pl. Ex. 97 at PLTF_004026.
[21] Pl. Ex. 35 at PLTF_002909-PLTF_002916; Pl. Ex. 44 at PLTF_001102.
[22] Despite his prior declaration to the contrary, Fellegy testified that he did develop some business in Louisiana. Tr. 127:10-14; Pl. Exs. 25, 67, and 82.
[23] *See* Pl. Ex. 9 at PLTF_000929 and PLTF_000931; Pl. Ex. 10 at PLTF_000921; Pl. Ex. 11 at PLTF_000923; Pl. Ex. 37 at PLTF_001748; Pl. Ex. 46 at PLTF_000933.
[24] Pl. Ex. 87 at PLTF_000996 (same); Pl. Ex. 57 at PLTF_002935 (mentioning discussions with Boh Brothers regarding Deep South's "push in to [sic] DOT projects across the Gulf Coast"); Ex. 97 at PLTF_004047.
[25] Pl. Ex. 97 at PLTF_004018 and PLTF_004029; Joint Ex. 2 at PLTF_004027.
[26] Pl. Ex. 70 at PLTF_003888; Pl. Ex. 78 at PLTF_002510.
[27] Pl. Ex. 57 at PLTF_002936.
[28] Pl. Ex. 25.

phone numbers, and other similar information.

31.    Fellegy also had access to and received from Deep South non-public, confidential information related to its wireless technology services business, including its business relationships, financial performance, strategies for conducting business, price lists, sales, promotional and marketing strategies and information, and other trade secrets.

32.    Fellegy stored Deep South's customer names, contacts, telephone numbers, addresses, email addresses, and similar information on his personal cell phone while employed.[29]

33.    Deep South requested that Fellegy return the Deep South contacts and related information stored on his phone when he resigned, but Fellegy still has Deep South's contacts and related information on his personal cell phone.[30]

34.    Fellegy has used this information since his employment at Deep South ended and while working for E2E.

**E.    Fellegy executes the Agreement.**

35.    As a condition of his employment, Fellegy entered into the Agreement with Deep South and agreed to submit to Louisiana law.[31]

### i.    Fellegy's Confidentiality Obligations

36.    In the Agreement, Fellegy acknowledged that he had access "to existing and new valuable information relating to the business and clients of [Deep South] that is nonpublic, confidential, proprietary, and/or a trade secret and would be particularly valuable to [Deep South's] competitors, including **but not limited to** business plans and strategies; business processes; … business records and files; business proposals; client lists; client information; client source lists;

---

[29] Tr. 80:6-81:2. Fellegy used his cell phone for Deep South business, including for purposes of communicating with Deep South customer, prospects, suppliers, and other business contacts. Tr. 79:23-80:5.
[30] Tr. 81:10-82:3.
[31] Joint Ex. 1, § 12.

… pricing; sales plans and activities; customer service strategies or activities; marketing and other technical data and studies; … sales, promotional, and marketing strategies and information…."[32]

37.     Fellegy agreed that he would not "disseminate, divulge, misappropriate, or use … any Confidential Information except as expressly authorized by the Company … " both "during and after the end of [his] employment relationship with [Deep South]."[33] In other words, Fellegy's confidentiality obligations are perpetual.

38.     Deep South's Confidential Information has independent economic value because it is not generally known to the public or its competitors.[34]

39.     Deep South takes reasonable steps to protect its Confidential Information,[35] including operating out of a gated, secure facility, restricting the use of video cameras, cell phones, and recording devices around company information and records, and prohibiting taking personal pictures on work cell phones or at job sites.[36] Additionally, Deep South employees are required to return all equipment, files, records, keys, and any other materials that were company property at the end of their employment with Deep South.[37]

### ii.     Fellegy's Restrictive Covenant Obligations

40.     Section 5 of the Agreement includes post-employment restrictive covenants in which Fellegy agreed not to conduct certain activities within the "Territory," consisting of parishes and counties specified in Exhibit A thereto, during the two years following the end of his employment.[38]

---

[32] Joint Ex. 1, § 3 (emphasis added).
[33] Joint Ex. 1, § 4.
[34] For instance, the Deep South customer and business contacts on Fellegy's phone are not readily available as a collection or individually anywhere publicly. Tr. 168:15-169:10.
[35] Tr. 11:10-13.
[36] Tr. 170:25-171:24.
[37] Def. Ex. 2-1, § 3.2.
[38] Joint Ex. 1, § 5.

41.    Section 5B of the Agreement restricts competition as follows:

**Non-Competition.** While employed by Employer and for a period of two years following the end of such employment relationship, Employee shall not, in the Territory, directly or indirectly, whether as an employee, consultant, independent contractor, agent, officer, director, owner, partner, operator, shareholder of 1% or more of stock, or in any other capacity, engage in any business that directly or indirectly competes with or is similar to the business of Employer.[39]

42.    Section 5C of the Agreement prohibits solicitation as follows:

**Non-Solicitation.** While employed by Employer and for a period of two years following the end of such employment relationship, Employee shall not, in the Territory, (1) directly or indirectly solicit, request, seek, or obtain, for the benefit of Employee or any person or entity other than Employer, the business of any person or entity that is a client of Employer during Employee's employment by Employer or that is a client of Employer during the two-year period following the end of such employment relationship, or (2) directly or indirectly solicit, request, influence, induce, or otherwise encourage any client of Employer as described herein to restrict, limit, or cease doing business with Employer.[40]

**F.    Fellegy goes to work for E2E, one of Deep South's competitors, and engages in competitive activity.**

43.    E2E is a network infrastructure specialist engaged in the business of consulting, engineering, and executing comprehensive solutions for clients throughout the United States[41] in a number of different industry sectors, including oil and gas, utilities, water, wastewater, and transportation,[42] the same industries that Deep South services.[43]

44.    E2E sells hardware and software for microwave solutions, and software to manage industrial communications networks; they sell consulting with businesses about wireless networking needs, designing and engineering wireless networks, and they "sell" tower

---

[39] Joint Ex. 1, § 5B.
[40] Joint Ex. 1, § 5C.
[41] Pl. Ex. 106.
[42] Tr.71:16-72:1.
[43] E2E and Deep South both focus on utilities including small-scale utilities, such as electric co-ops and gas co-ops. *Compare* Tr. 105:18-22 *with* Pl. Ex. 98 at PLTF_004054 – PLTF_004064; Tr. 45:10-18, 46:7-13 (Fellegy targeted regional utilities and co-ops during his employment with Deep South), and 95:9-21 (Fellegy "aggressive[ly] pitch[ed]" and "push[ed] on utilities").

construction; they sell tower and antenna installation; they deploy the products and services they sell, provide project planning and development, and provide training to individuals so they can operate and maintain networking infrastructure[44] – all services that Deep South also provides.[45]

45.     There were discussions about a possible business opportunity between E2E and Deep South – further reflecting that both businesses are engaged in the same or similar business.[46]

46.     E2E competes directly with Deep South throughout the United States, including in the states identified as the "Territory" of the Agreement.[47] For instance, Fellegy's assigned territory with E2E includes 15 of the 16 states covered by the Agreement.[48] And, although Fellegy testified that he has not yet solicited any business on behalf of E2E in Louisiana, he said that he is "trying."[49]

47.     As an employee of E2E, Fellegy is engaging in business in direct competition with Deep South.

**G.    Fellegy develops business with General Electric Co.**

48.     During his employment with Deep South, Fellegy developed a business relationship on Deep South's behalf with General Electric Co. ("GE").[50]

---

[44] Tr. 72:5-74:16 and 75:1-25; Pl. Ex. 106; *see also* Tr. 24:19-25 (both companies sell Ceragon products); Tr. 25:21-26:3 (both companies sell Aviat products); Tr. 50:20-51:14 (both companies sell towers). GE is a customer of both companies. Tr. 52:9-53:5; *see also* Tr. 108:2-10.

[45] Tr. 187:7-14; *see also* Tr. 151:10-152:21 (discussing Deep South's services and products).

[46] Tr. 78:4-18 and 53:13-23.

[47] Tr. 176:23-177:14.

[48] Fellegy testified that his assigned territory includes twenty-two states: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, and Wisconsin, fifteen of which overlap with the "Territory" identified in his Agreement with Deep South. Tr. 5:16-6:17 and 134:6-135:16. Fellegy testified that he has been responsible for this territory "for the entire time at End-2-End." Tr. 71:5-8.

[49] Tr. 110:18-20. Fellegy further testified that the reason he has not solicited business for E2E in Louisiana is because E2E is "working through some databases right now." Tr. 111:1-4. Later, Fellegy directly contradicted himself, claiming that he is not trying to solicit business in Louisiana and that he was told not to without being given any explanation, even though Louisiana is within his assigned territory and he is financially incentivized by E2E to make sales. Tr. 136:15-138:9. Fellegy's revised testimony is inexplicable and not credible. It also is irrelevant, because he is working for a competing business and Louisiana is in the territory of his enforceable restrictive covenants in his Agreement with Deep South.

[50] Tr. 57:3-6 and 112:13-113:7.

49.    GE expressed a desire to make Deep South its partner for its wireless product line for the State of Arkansas account.[51]

50.    The GE representative with whom Fellegy worked to develop a business relationship on Deep South's behalf is the same individual who connected him with his current employer, E2E.[52]

51.    Ultimately, Deep South learned after Fellegy's departure that GE decided not to make the switch to Deep South and that Fellegy's new employer, E2E, would continue to be GE's partner for its product line for the Arkansas state account.[53]

**H.    Fellegy admits his conduct violates the Agreement but refuses to cease and desist.**

52.    Westerman contacted Fellegy on or about June 6, 2022, upon learning of Fellegy's employment with E2E, reminded Fellegy of the Agreement and his obligations to Deep South, and informed him he was in violation of the Agreement.

53.    During the June 2022 conversation, Fellegy acknowledged that he was in violation of the Agreement and indicated that he would leave E2E if necessary.[54]

54.    Thereafter, however, Fellegy stopped communicating with Westerman and continued his employment with E2E.

55.    On August 26, 2022, Deep South's counsel sent Fellegy a cease and desist letter, in response to which Fellegy made it clear that he had no intention of ceasing to work for E2E in Deep South's territory.[55]

**I.    Deep South's is entitled to injunctive relief and damages.**

56.    The Agreement provides for injunctive relief in the event of Fellegy's violation,

---

[51] Tr. 57:18-20, 59:3-15, and 61:8-11; Pl. Ex. 66.
[52] Tr. 65:25-67:8.
[53] Tr. 62:5-12.
[54] Tr. 182:3-22.
[55] Pl. Ex. 105.

stating in pertinent part that Deep South **"shall be entitled to temporary, preliminary, and/or permanent injunctive relief restraining Employee from such breach or threatened breach, and/or compelling or ordering Employee's compliance with this Agreement, without the necessity of proof of actual damage or the posting of any security or bond** . . . ."[56]

57.    Fellegy is breaching his obligations to Deep South by being employed as a Sales Account Director for E2E, a competitor who engages in the same or similar business as Deep South and shares some of the same customers and services the same industry segments as Deep South, working in the Territory covered under the Agreement, and by retaining Deep South's confidential information on his personal cell phone.

## IV.    CONCLUSIONS OF FACT AND LAW

### A.    This Court has personal jurisdiction over Fellegy.

58.    A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if two requirements are satisfied: (1) the forum state's long-arm statute confers personal jurisdiction; and (2) the exercise of jurisdiction does not exceed the boundaries of due process.[57] Because Louisiana's long-arm statute extends jurisdiction to the full limits allowed by due process, this Court need only determine whether it can exercise jurisdiction over Fellegy consistent with due process.[58]

59.    Exercising personal jurisdiction over a nonresident defendant is compatible with due process when: (1) the defendant has minimum contacts with the forum state, *i.e.*, he purposely directed his activities toward the forum state or purposefully availed himself of the privileges of conducting activities there; (2) the plaintiff's cause of action arises out of or results from the

---

[56] Joint Ex. 1, § 6 (emphasis added).
[57] *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 270 (5th Cir. 2006); *Cent. Healthcare Servs. v. Schwing*, No. CV 09-4289, 2009 WL 10679642, at *2 (E.D. La. Oct. 7, 2009).
[58] *See* La. Rev. Stat. § 13:3201(B); *Petroleum Helicopters, Inc. v. Avco Corp.*, 513 So. 2d 1188, 1192 (La. 1987); *Luv N' Care v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).

defendant's forum-related contacts; and (3) the exercise of personal jurisdiction is fair and reasonable.[59]

60.    Defendants who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for consequences of their actions."[60]

### i.    Fellegy has minimum contacts with Louisiana.

61.    Establishing a defendant's minimum contacts with the forum state requires contacts that are more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or third person."[61]

62.    Determining whether a nonresident defendant has sufficient contacts with the forum state to establish specific jurisdiction is a highly-factual inquiry that is dependent in large part on the specific claims asserted. This case concerns an employment dispute arising from the defendant's initial agreement to and subsequent breach of specific ongoing obligations that were a condition of the employment relationship.

63.    Unlike a typical breach of contract claim, claims against former employees for breach of restrictive covenant agreements create continuing obligations, which many courts have held result in sufficient contacts to establish personal jurisdiction.[62] As a result, cases involving claims such as this one are typically filed in the employer's home state, "where continuing

---

[59] See Luv N' Care, 438 F.3d at 469.
[60] Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 2184 (1985) (quoting Travelers Health Assoc. v. Virginia, 339 U.S. 643, 647 (1950)); see also Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 780 (7th Cir. 2003) (recognizing exercise of specific jurisdiction appropriate where a defendant "has deliberately engaged in significant activities within the forum state" or "created continuing obligations between itself and a resident of the forum").
[61] Burger King Corp., 471 U.S. at 475, 105 S. Ct. 2184.
[62] See, e.g., W. Capra Consulting Grp., Inc. v. Snyder, No. 1:19 C 4188, 2019 WL 3935045, at *6 (N.D. Ill. Aug. 20, 2019); Kelly Services, Inc. v. Noretto, 495 F.Supp.2d 645 (E.D. Mich. 2007).

obligations are owed[.]"[63]

64.    A nonresident employee "purposefully avail[s]" himself of the benefits of a forum state when he who works for a forum-state employer, repeatedly travels to the employer's headquarters in the forum state, and directs his employment activities and communications to the employer's headquarters in the forum state.[64]

**ii.    This breach of contract lawsuit arises out of Fellegy's contacts with Louisiana.**

65.    A controversy "arises out of" the defendant's contacts with the forum state if the "activity in the forum state is the genesis of [the] dispute," or "if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim."[65]

66.    When a claim is "based on a contract which had substantial connection with that State" then the plaintiff's claims can be said to arise out of connections with that forum.[66]

67.    Where, as here, an employee purposefully avails himself to a suit in the forum state by obtaining employment with a company based in the forum state, courts have consistently held that claims concerning that employee's employment with the resident employer arise out of the employee's connections with the forum state.[67]

68.    Without the employment relationship between Fellegy and Louisiana-based Deep South and the Agreement put in place to facilitate the creation of that relationship, there would be

---

[63] *Zep, Inc. v. First Aid Corp.*, No. 09 CV 1973, 2010 WL 1195094, at *2 (N.D. Ill. Mar. 19, 2010); *see also Kelly Services*, 495 F.Supp.2d at 653–55; *FBR Capital Markets & Co. v. Short*, No. 09 CV 1016, 2009 WL 3254458, at *3 (E.D. Va. 2009); *Crossfield Hastech, Inc. v. Harris Corp.*, 672 F.Supp. 580. 585–88 (D.N.H. 1987).
[64] *Direct Biologics, LLC v. McQueen*, No. 1:22-CV-381-SH, 2022 WL 1409984, at *7 (W.D. Tex. May 4, 2022).
[65] *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 303 (4th Cir. 2012) (alteration in original and citations omitted).
[66] *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).
[67] *See, e.g.*, *Bleecker*, 2022 WL 939819, at *4; *see also Snyder*, 2019 WL 3935045, at *6 "[A]s [defendant's] contacts with Illinois arise out of the employment agreement that lies at the heart of [plaintiff's] claim, [plaintiff] has established that its injury 'arise[s] out of' or 'relate[s] to' [defendant's] contacts"); *Short*, 2009 WL 3254458, at *3.

no dispute.[68]

iii.    **This Court's exercise of jurisdiction over Fellegy is fair and reasonable.**

69.    "An otherwise valid exercise of personal jurisdiction is presumed to be reasonable."[69] Once the court finds that the first two prongs are satisfied, the burden shifts to the defendant to present a "compelling case" that the exercise of jurisdiction would be unreasonable.[70]

70.    Most often, "the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."[71]

71.    Factors considered in this analysis include: "(1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies."[72]

72.    Here, only the first factor—the burden on the defendant—could arguably weigh against exercising jurisdiction over Fellegy, but Fellegy failed to introduce any evidence that litigation in this forum would be unreasonably burdensome on him. Instead, the evidence shows that Louisiana is one of the states in his assigned territory at E2E.

73.    The remaining factors either favor Deep South, are neutral, or are inapplicable.

74.    Louisiana has an interest in providing a forum in which its residents can seek

---

[68] *See Pedowitz Grp., LLC v. Ogden*, No. 1:13-CV-00839-RLV, 2013 WL 11319834, at *3 (N.D. Ga. Nov. 29, 2013) (rejecting defendant employee's theory that his alleged "competition" from the employment agreement such conduct violated).

[69] *Geauxdavri, LLC v. Slepcevic*, No. CV 06-11274, 2007 WL 9811208, at *5 (E.D. La. June 7, 2007) (citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995)); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) ("It is rare to say the assertion is unfair after minimum contacts have been shown.").

[70] *Wien Air Alaska*, 195 F.3d at 215 (citing *Burger King Corp*., 471 U.S. at 477); *see also Seiferth*, 472 F.3d at 276 (citations omitted).

[71] *In re Chinese Manufactured Drywall Prods. Liab. Litig*., 742 F.3d 576, 592 (5th Cir. 2014) (citations and quotations omitted).

[72] *Id*. (citations omitted).

redress for injuries caused by out-of-state actors.[73] Moreover, the fact that the parties agreed that Louisiana law would govern this dispute further implicates Louisiana's interest because the dispute requires a general application of its laws.[74]

75.     Deep South has an obvious interest in receiving relief in Louisiana because it is headquartered in Louisiana and chose to litigate in this forum, and many of the witnesses and documents relevant to this matter are located at its home office in Louisiana.[75]

76.     The fourth factor is neutral, and the fifth factor does not apply.

77.     Thus, this Court's exercise of jurisdiction over Fellegy is reasonable and would not offend traditional notions of fair play and substantial justice.

**B.      The Agreement complies with Louisiana law.**

**i.      Louisiana Restrictive Covenant Law Generally**

78.     "Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void. However, every contract or agreement, or provision thereof, which meets the exceptions as provided in this Section, ***shall be enforceable***."[76]

79.     "Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from

---

[73] *See Geauxdavri*, 2007 WL 9811208, *5.

[74] Louisiana law applies to the Agreement. *See* Joint Ex. 1, § 12. Fellegy's argument that the Agreement's choice of law provision is invalid under La. R.S. 23:921(A)(2) is irreconcilable with his contentions that Louisiana law does not apply to him and that he is not and never has been a Louisiana citizen or employee. *See Waguespack v. Medtronic, Inc.*, 185 F.Supp.3d 916, 927 (M.D. La. 2016) (the provision "applies to all employers ***who employ Louisiana citizens and employees***" and "will apply to govern disputes with ***Louisiana employees***") (emphasis added). This provision does not apply to him because his is not a Louisiana citizen or employee. There is simply no authority to support the notion that this Louisiana statute gives a non-resident who contracts with a Louisiana employer the right to avoid the application of Louisiana law to the contract.

[75] *See Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).

[76] La. R.S. 23:921 (A)(1) (emphasis added).

soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment."[77]

80.    "[A] person who becomes employed by a competing business, regardless of whether or not that person is an owner or equity interest holder of that competing business, may be deemed to be carrying on or engaging in a business similar to that of the party having a contractual right to prevent that person from competing."[78] This provision of the statute expressly recognizes that a person who becomes employed by a competing business, even when the person is not an owner or equity interest holder, by virtue of employment be deemed to be carrying on or engaging in a business similar to that of the former employer. The question of whether businesses are competing is based upon the activities of the business, not the individual employee.[79]

81.    "[F]ailure to perform [restrictive covenant obligations] may entitle the obligee to recover damages for the loss sustained and the profit of which he has been deprived. In addition, upon proof of the obligor's failure to perform, ***and without the necessity of proving irreparable injury***, a court of competent jurisdiction shall order injunctive relief enforcing the terms of the agreement."[80]

82.    Louisiana law does not require that the agreement include a definition of an

---

[77] La. R.S. 23:921 (C).

[78] La. R.S. 23:921 (D).

[79] The Court posed the question during oral argument after the hearing whether Fellegy would be in violation of his non-compete with Deep South if he went to work at E2E as a janitor. This is an interesting hypothetical, but it does not reflect the facts of this case and, thus, the Court need not answer it. Fellegy is selling products and services to industry segments at E2E that directly compete with Deep South's business. The language of the statute is clear that the comparison is of one business to another in answering the questions whether they are similar or like, and whether they are competing. Nothing in the statute suggests that non-compete enforceability hinges on the position of the employee, which as noted above would not matter in any event in this case since Fellegy's position at both companies is to generate revenue through developing business and making sales. Further, the case law supports that Deep South and E2E are similar, competing businesses. *See* n. 103 *infra*.

[80] La. R.S. 23:921 (H) (emphasis added).

employer's business for the agreement to be valid.[81]

83.    The Agreement permissibly restricts Fellegy from being employed by a competing business and soliciting customers of DSC during the two years period after his employment with Deep South ends in specified counties and parishes set forth in Exhibit A thereto.[82]

**ii.    The Agreement's business description and scope comply with Louisiana law.**

84.    Louisiana Revised Statute § 23:921 permits an employer and employee to agree that the employee will refrain from "engaging in or carrying on a business similar to that of the employer" subject to restrictions.

85.    The statute does not define what engaging in or carrying on a similar business means or even require that a restrictive covenant contain a description of the employer's business.[83] What engaging in or carrying on a similar business means depends upon the nature of the business at issue in each case.[84]

86.    Although not required, the Agreement contains a narrowly-tailored description of Deep South's business as follows:

> A telecommunications contractor specializing in microwave communications design and construction, fiber optics communications, distributed antenna systems (DAS), intelligent transportations systems (ITS), communications tower build-outs

---

[81] *Vartech Sys., Inc. v. Hayden*, 2005-2499 (La. App. 1 Cir. 12/20/06) (business description not required), 951 So. 2d 247, 258–59 (*citing Baton Rouge Computer Sales, Inc. v. Miller–Conrad*, 99–1200 (La. App. 1st Cir.5/23/00), 767 So.2d 763, 764).

[82] *Hose Specialty & Supply Management Co., Inc. v. Guccione*, 865 So.2d 183, 194 (La.App. 5 Cir. 2003) (finding no significant difference between county and parish as both refer to the same type of geographic subdivision of a state).

[83] *Baton Rouge Computer Sales, Inc. v. Miller-Conrad,* 767 So.2d 763, 764 (La. App. 1 Cir. 2000).

[84]*Arthur J. Gallagher & Co. v. Babcock*, 339 F. App'x 384, 387 (5th Cir. 2009) (holding that the district court erred in finding a restrictive covenant overly broad based upon the sheer number of parishes listed in the geographic territory "without first considering evidence regarding the nature and extent" of the business).

and maintenance, cellular and microwave maintenance and build-outs.[85]

### iii.    Deep South engages in wireless technologies services in the Agreement's territory.

87.    Restrictive covenants must be limited to geographically to specified "parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein."[86]

88.    Deep South specified in the Agreement each parish and county in the states in which it carries on business.[87]

89.    Westerman testified that Deep South engages in and carries on its wireless technology business in every parish and county identified in Exhibit A to the Agreement.[88] Deep South presented additional evidence demonstrating that it operates throughout the defined territory, which consisted of customer account records from its accounting system,[89] records of job tickets from a single customer, Ericsson,[90] and emails from Fellegy, other Deep South representatives, customers, prospects and others about customer meetings, job locations, and

---

[85] Joint Ex. 1, § 1. Included within the description of employer's business is the "development and maintenance of business relationships and accounts with various persons and/or entities with whom Employer conducts business, including customers, consumers, borrowers, vendors suppliers, contractors, or otherwise, are hereinafter collectively referred to as Employer's 'clients.'" Fellegy insists that this somehow broadens the scope of Deep South's business, but such arguments are hyperbole as it is axiomatic that any business of selling products and services necessarily includes developing and maintaining relationships with customers, vendors, and such other third parties who are essential to that business. Regardless, the severability provision of the Agreement authorizes blue pencil reformation if ever deemed necessary. See Joint Ex. 1, § 7.

[86] Arthur J. Gallagher & Co. v. Babcock, 703 F.3d 284, 292 (5th Cir. 2012) (citing La. R.S. 23:921(C); see also Aon Risk Servs. of La., Inc. v. Ryan, 807 So.2d 1058, 1060 (La.Ct.App.2002); Team Envtl. Servs., Inc., 2 F.3d at 126).

[87] Joint Ex. 1, Exhibit A thereto.

[88] See Pl. Ex. 104; Tr. 161:21-24, 164:21-23, 144:24-145:4; see also Tr. 219:10-220:7 (explaining Deep South's business model and confirming that Deep South "absolutely do[es] business in all of the[] states [listed in Exhibit A to the Agreement] and all of [those] jurisdictions").

[89] See Pl. Ex. 104, and Pl. Ex. 101.

[90] See Pl. Exs. 104, 1, and 2. Deep South has a Master Services Agreement with Ericsson to perform cell site maintenance for Ericsson wherever they have cell sites located, including in the southeast, Ohio, Illinois, Indiana, West Virginia, Kentucky, Tennessee, Florida, Mississippi, Alabama, Georgia, Arkansas, and Oklahoma, among other states. Tr. 165:12-166:5.

business opportunities and proposals.[91]

90.    In *Moores Pump & Supply, Inc. v. Laneaux*, the court held a non-competition agreement covering 43 of Louisiana's 64 parishes was not overbroad because the employer solicited business in each of the named parishes.[92] The court stated that the employer "established a prima facie case that it solicits business in all the parishes listed" and "the fact that they do not have specific projects ongoing in all forty-three parishes requires no such finding [that they were not doing business in them]."[93]

91.    In *H2O Hair, Inc. v. Marquette*, the court similarly held that "advertisement and solicitation of customers in [a neighboring] Parish constituted 'carrying on a like business'" for purposes of the statute.[94]

92.    The statute also does not impose any numerical limitation on the parishes and counties that may be specified in a restrictive covenant.[95]

93.    Listing all parishes or all counties in a state or states does not *per se* render a restrictive covenant overbroad, as the Fifth Circuit recognized:

> **It is certainly possible for a company to conduct a like business in all of Louisiana's parishes; and, if that were the case, the plain language of § 23:921(C) provides for the protection of that company's interests. Louisiana's case law supports this conclusion**. . . . [I]n *Vartech Systems, Inc.,* 951 So.2d at 258, non-competition agreements naming all of Louisiana's parishes were examined. The court stated: 'The listing of all 64 parishes does not automatically render the specification overly broad.' *Id.*[96]

---

[91] *See* Pl. Ex. 104 and source documents referenced therein. Pl. Ex. 104 is simply an example of some of Deep South's business; it is not a comprehensive list of all customers, prospects, and/or jobs Deep South has performed. Tr. 184:11-185:4.

[92] 727 So.2d 695, 698 (La. App. 3 Cir. 1999); *see also Gallagher*, 703 F.3d at 388.

[93] *Id.*

[94] 960 So. 2d 250, 258-60 (La. App. 5 Cir. 5/15/07).

[95] *Environmental Safety & Health Consulting Services, Inc. v. Fowler*, 2020 WL 1173587, at *11 (La. App. 4 Cir. Mar. 11, 2020) (stating "[t]he relevant question for statutory enforceability is not the number of parishes listed").

[96] *Arthur J. Gallagher & Co. v. Babcock,* 339 F. App'x 384, 387-388 (5th Cir. 2009), *cert. denied,* 558 U.S. 115 (2010) (emphasis added); *see also Fowler,* 2020 WL 1173587, at *6, stating that "the number of parishes listed" is not the relevant question for enforceability).

94.     Even if Deep South did not carry on a like business in every single parish or county in the "Territory" (which it does), Louisiana law allows courts to rely on a contractual severability clause to excise the geographic areas in which an employer does not conduct such business.[97]

95.     Deep South has presented evidence that it engages in business in the areas specified in the Agreement.

## C.    Deep South carried its burden of proving entitlement to a temporary restraining order.

96.     Rule 65 provides that a party is entitled to a TRO relief upon a showing of the four elements:

(A) likelihood of success on the merits;
(B) likelihood of suffering irreparable harm in the absence of the relief sought;
(C) the threatened injury to plaintiff outweighs the threatened harm to defendant; and
(D) the relief will not disserve the public interest.[98]

97.     Injunctive relief "is customarily granted on the basis of procedures that are less formal and on evidence that is less complete than a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing."[99]

98.     All four elements are satisfied in this case and are supported by compelling and competent evidence admitted at the hearing of Fellegy's ongoing breaches of the Agreement by remaining employed with a competitor operating in the restricted territory, Deep South's loss of at least one business opportunity estimated to be in excess of $500,000, and Fellegy's possession

---

[97] *Babcock*, 703 F. 3d at 292 (citing *See, e.g., Dixie Parking Serv., Inc. v. Hargrove*, 691 So.2d 1316, 1320 (La. Ct. App. 1997) (discussing the Louisiana Supreme Court's reversal of *AMCOM of La., Inc. v. Battson*, 666 So.2d 1227 (La. Ct. App. 1996))).

[98] *Brock Services, L.L.C. v. Rogillio,* 936 F.3d 290, 296 (5th Cir. 2019) (citing *Cardoni v. Prosperity Bank,* 805 F.3d 573, 579 (5th Cir. 2015); *Republican Party of Louisiana v. Schedler*, 11–796, 2011 WL 6003188, *2, (M.D. La. Nov. 30, 2011) (citing *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008)); *Snow v. Lambert*, 15-567, 2015 WL 5071981, at *1 (M.D. La. Aug. 27, 2015) (citing *Clark v. Prichard,* 812 F.2d 991, 993 (5th Cir. 1987).

[99] *University of Texas v. Comenisch,* 451 U.S. 390, 395 (1981).

and continued use of Deep South's confidential customer contacts.[100]

99.    The restrictions sought to be enforced in Fellegy's Agreement are not only compliant with Louisiana law, they are also reasonable.

### i.    Deep South is likely to succeed on the merits of its claim.

100.    The elements of a breach of contract claim under Louisiana law are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee.[101]

101.    Deep South has presented evidence of the valid Agreement between Fellegy and Deep South reflecting Fellegy's undertaking of certain obligations to Deep South.

102.    Fellegy has breached and is continuing to breach his non-competition obligations by actively working for one of Deep South's direct competitors, E2E, in the restricted territory.

103.    Fellegy has breached and is continuing to breach his non-solicitation obligations by diverting Deep South business to E2E.

104.    Fellegy has breached and is continuing to breach his confidentiality obligations by failing to return Deep South's confidential customer names and contact information, which he stored on his personal cell phone and continues to use by communicating with those contacts.[102]

105.    Louisiana courts have found the activity of sales of products or services to be "similar" within the meaning of the statute even when the products or services are not entirely the same, which is what "similar" means.[103]

---

[100] Tr. 186:2-19.

[101] *Denham Homes, L.L.C. v. Teche Fed. Bank*, 2014-1576 (La. App. 1 Cir. 9/18/15); 182 So. 3d 108, 119.

[102] Tr. 81:15-82:14, 83:7-12, and 84:21-85:3..

[103] *Ticheli v. John H. Carter Co., Inc.*, 996 So.2d 437, 440-441 (La. App. 2 Cir. 9/17/08) (concluding that companies that sold various types of industrial valves and instrumentation from different manufacturers engaged in a business that was at least "similar," finding that the trial court committed manifest error by concluding otherwise); *Baton Rouge Computer Sales, Inc. v. Miller-Conrad*, 767 So.2d 763, 765 (La. App. 1 Cir. 05/23/00) (concluding that "while the types of computer systems sold may be diverse, the business of selling them is not an activity subject to various descriptions or definitions").

106.    E2E engages in a business similar to that of Deep South.[104]

**ii.    Deep South will suffer irreparable harm in the absence of injunctive relief.**

107.    Irreparable injury is <u>not</u> required for issuance of a preliminary injunction for enforcement of restrictive covenants in employment contracts.[105] Under Louisiana Revised Statute § 23:921(H), "upon proof of the obligor's failure to perform, and without the necessity of proving irreparable injury, a court of competent jurisdiction shall order injunctive relief enforcing the terms of the agreement."[106]

108.    Though not required, Deep South has made a showing of irreparable harm.

109.    Irreparable harm exists "even where economic rights are involved, when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative."[107] For example, a loss of a customers and damage to goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable.[108]

110.    Deep South will suffer irreparable harm here because allowing Fellegy to continue to violate his obligations and the law puts Deep South at a competitive disadvantage in the marketplace and undercuts its goodwill and relationships with its existing customers.[109] Fellegy's conduct has also caused Deep South to lose potential business with GE and possibly others with whom he continues to communicate.

---

[104] *See supra* Part II.F. and authorities cited therein.

[105] La. R.S. § 23:921(H).

[106] *See also Technical Industries, Inc. v. Banks*, 419 F.Supp.2d 903, *915 (W.D. La. 2006); *Cellular One, Inc. v. Boyd*, 653 So.2d 30, 35 (La. App. 1 Cir. 1995) ("[U]pon proof of a breach of the agreement, and without the necessity of proving irreparable injury, the court may issue an injunction.").

[107] *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 (5th Cir. 1989).

[108] *See id.* (affirming district court's holding that damage to goodwill was irreparable because it might be "incapable of calculation").

[109] *Corrosion Specialties and Supply, Inc.* v. *Dicharry,* 631 So.2d 1389, 1392 (La. App. 5 Cir. 1994) ("[H]arm to a competitive position…constitutes irreparable harm for which injunctive relief may be had.")

###### iii.    The threatened harm to Deep South outweighs any possible harm to Fellegy.

111.    The potential harm to Fellegy is mitigated by the limited scope, time, and geographic area applicable to the obligations at issue.

112.    Fellegy may perform non-competitive work <u>anywhere</u> without violating the Agreement.

113.    Fellegy may perform competitive work in any of the counties in the 34 states outside of the "Territory" identified in the Agreement, including Indiana, the state in which he currently resides – and has for at least the last five years.

114.    Fellegy will not be harmed by honoring the promises he already made, and in exchange for which he received substantial compensation, confidential information (including some of which he has yet to return to Deep South as required by his Agreement), and customer relations opportunities in the industry.

115.    The entry of the Proposed TRO maintaining the status quo between the parties until such time as Deep South can obtain a ruling on the merits will not harm Fellegy.

###### iv.    Injunctive relief will not disserve the public interest.

116.    A business should be able to rely upon the agreements it makes, and it is the duty of the court system to ensure parties are protected from injury caused by a breach.[110]

117.    An injunction to enforce the correct application of the law, in and of itself, serves the public interest.[111]

118.    The Agreement is valid and enforceable, and "employers have a substantial interest

---

[110] *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 783 (S.D. Miss. 2011) (The "public has an interest in ensuring that parties uphold valid contractual agreements entered into voluntarily and knowingly.").
[111] *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (finding that the public is served when the law is followed).

in ensuring these contracts are enforced."[112]

119.    Thus, granting a TRO will not disserve the public interest.

120.    Deep South has satisfied its burden of proving a likelihood of success on the merits and entitlement to a TRO as prayed for in its Motion for TRO.

BY ATTORNEYS:

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

*s/Jennifer L. Anderson*
Jennifer L. Anderson (La. Bar No. 23620)
450 Laurel Street, 21st Floor
Baton Rouge, Louisiana 70801
Telephone: (225) 381-7020
Facsimile: (225) 343-3612
Email: jlanderson@bakerdonelson.com

AND

Emily Olivier Kesler (La. Bar No. 37747)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5927
Facsimile: (504) 585-6925
Email: ekesler@bakerdonelson.com

***Counsel for Deep South Communications L.L.C.***

---

[112] *See J.P. Morgan Sec. LLC v. Manne*, 16-818, 2016 WL 7223358, at *6 (M.D. La. Dec. 12, 2016).