**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DEEP SOUTH COMMUNICATIONS L.L.C,** | § | |
| | § | **Civil Action No. 3:22-cv-00598-JWD-EWD** |
| *Plaintiff,* | § | |
| | § | **Judge John W. deGravelles** |
| **v.** | § | |
| **PETER M. FELLEGY,** | § | |
| | § | **Magistrate Judge Erin Wilder-Doomes** |
| *Defendant.* | § | |
| | § | |

**DEFENDANT'S POST-HEARING REPLY BRIEF SUPPORTING HIS RULE 12(B)(2) MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

**NOW INTO COURT**, through undersigned counsel, comes Defendant Peter Fellegy ("Mr. Fellegy" or "Defendant") who submits this Post-Hearing Reply Memorandum in Support of his Rule 12(b)(2) Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Opposition to Plaintiff Deep South LLC's ("Deep South" or "Plaintiff") Motion for Temporary Restraining Order.

**Substantive Findings of Fact**

1.      Much of Deep South's "Substantive Findings of Fact" lack any citation to record evidence, including such key alleged findings as "Fellegy has used this [confidential] information since his employment at Deep South ended and while working for E2E." (*See* Doc. 52, ¶¶ 15-21, 30-31, 34, 47.)

2.      Deep South knew that Mr. Fellegy used his personal cell phone for business purposes and did not object to that use. (Rec. 89:10-20; 224:7-16; 225:2-9.)

3.      Deep South did not communicate to Mr. Fellegy that all contacts created while at Deep South needed to be stored in the Google app that Deep South provided, and not on the Contacts section of his phone where one would naturally store such contacts. (Rec. 228:12-21.)

4.      Deep South did not periodically check Mr. Fellegy's personal cell phone during his employment to ensure confidential information was stored correctly. (Rec. 228:1-4.)

5.      Rhett Westerman ("Mr. Westerman") admitted he did not require Mr. Fellegy to install an app that would protect DSC's info on his cell phone. (Rec. 227:6-10.)

6.      Upon Mr. Fellegy's resignation from Deep South, it did not require Mr. Fellegy to turn in his personal cell phone for wiping of any Deep South confidential information.

7.      Mr. Fellegy completed Deep South's employee exit checklist upon his resignation. (Fellegy Decl., ¶ 26.)

8.      He also organized and condensed all the information and documents related to each client and prospective client into an organized folder structure to aid whomever took over for him. (Fellegy Decl., ¶ 27; Rec. 100:25-101:18.)

9.      The contacts on Mr. Fellegy's phone were included in the information on the laptop he sent back to Deep South at the end of his employment. (Rec. 102:3-12.)

10.     Mr. Fellegy provided Deep South and his replacement with as much information as possible to be successful - "[i]t seemed like an orderly and professional thing to do." (Rec. 102:19-22; Jt Exh. 2.)

11.     Mr. Fellegy attempted to negotiate a business opportunity for End 2 End to become a customer of Deep South in June 2022 – after he no longer worked for Deep South. (Rec. 122:12-123:3.)

12.     He did this to be helpful to Deep South and wanted to make sure that it had an opportunity to look at End 2 End as a potential customer. (Rec. 123:3-9.)

13.     Mr. Westerman told Mr. Fellegy that he could have all the clients he brought to Deep South. (Rec. 106:24-107:2). Deep South was to keep all the clients and relationships Mr. Fellegy had built while he was there. (Rec. 107:2-4.)

14.     General Electric ("GE") approached Deep South about becoming a channel partner for Arkansas prior to Mr. Fellegy's departure. (Complaint, ¶ 34.)

15.     GE made the determination that it was going to retain End 2 End in Arkansas in January of 2022, while Mr. Fellegy was still working at Deep South. (Rec. 114:22-115:7.) Fellegy's employment with End 2 End did not begin until June 27, 2022 – four months later.  (Fellegy Decl., ¶ 30; Rec. 115:8-11.) Despite Deep South's speculative testimony suggesting Mr. Fellegy somehow influenced GE to retain End 2 End Technologies, LLC ("E2E" or "End 2 End") for the Arkansas account (Rec. 186:2-19), there is no record evidence to support that contention.

16.     During those four months, Fellegy had no conversations with GE regarding Deep South. (Fellegy Decl., ¶ 40; Rec. 115:12-14.)

17.     After his employment at End 2 End began, Fellegy has had no responsibility for any of the GE business with End 2 End. (Fellegy Decl., ¶ 37; Rec. 115:15-22.)

18.     Mr. Fellegy had no role in End 2 End's retention of GE's business in Arkansas. (Fellegy Decl., ¶ 38.) The timeline evident in the record does not support the contention that Fellegy somehow impacted GE's decision to keep E2E.

19.     Mr. Fellegy has no active role in End 2 End's business development in the South Central states – Oklahoma, Missouri, Arkansas, Texas, and Louisiana. (Rec. 115:23-116:16.)

**Conclusions of Fact and Law**

20.     Mr. Fellegy has not ratified the choice of law provision in the Agreement.

3

21.    It is well-established that non-competition and non-solicitation agreements are disfavored in Louisiana and must be narrowly and strictly construed against the party seeking enforcement. *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019); *SWAT 24 Shreveport Bossier, Inc. v. Bond,* 808 So.2d 294, 298 (La. 2001); *Acadian Cypress & Hardwood Inc. v. Stewart*, 121 So. 3d 667, 669 n.1 (La. Ct. App. 2013) (noting Louisiana's "underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden" and "the fundamental right of individuals to seek success in our free-enterprise society").

22.    Deep South is incorrect in its assertion that Section 921's automatic nullification of choice of law provisions in non-compete agreements is available only to Louisiana residents. First, the relevant language set out in Section 921(A)(2) is clear that an "employee" has a right to object to a choice of law provision; the term "employee" is not modified by any adjective, let alone one suggesting that it was intended to protect only Louisiana citizens. La. R.S. § 23:921(A)(2). The Louisiana legislature indicated an ability to distinguish between resident and foreign entities and individuals, as it does so earlier in Section 921(A)(2) when it refers to "foreign or domestic" employers. *Id.* The legislature chose not to modify "employee" with a "domestic" adjective to distinguish from non-resident employees, meaning that it intended for Section 921(A)(2) to apply to *all* non-compete agreements, not just the agreements involving Louisiana employees.

23.    Second, the case cited by Deep South do not support this "citizen only" argument either. In *Waguespack v. Medtronic*, 185 F.Supp.3d 916, 921 (E.D. La. 2016), the employees were Louisiana employees; the case did not involve the application of Section 921 to non-resident employees. The *Waguespack* court analyzed the constitutionality of Section 921, which requires an analysis of local interest when balancing local interests with effects on interstate commerce

4

under the Commerce Clause of the U.S. Constitution. *Id.* at 927. This is the source of the "local interest" language Deep South relies upon, which does not support its conclusion that Section 921(A)(2) is only available to Louisiana employees because of that local interest. Section 921(A)(2) is applicable in this case.

24.      La. R.S. § 23:921, which governs restrictive covenants, provides that "[e]very contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void. However, every contract or agreement, or provision thereof, which meets the exceptions as provided in this Section, shall be enforceable." La. R.S. § 23:921(A)(1). La. R.S. § 23:921(C) contains the exceptions that are pertinent to this matter:

> [a]ny person ... may agree with his employer to refrain from carrying on or engaging *in a business similar to that of the employer* and/or *from soliciting customers of the employer* within a specified parish or parishes, municipality or municipalities, or parts thereof*, so long as the employer carries on a like business therein*, not to exceed a period of two years from termination of employment.

(emphasis added).

25.      Louisiana law requires "mechanical adherence" to the statutory requirements of § 23:921, especially with respect to the geographical and time limitations. *L & B Transp., LLC v. Beech*, 568 F. Supp. 2d 689, 693 (M.D. La. 2008) (*quoting Sentilles Optical Services v. Phillips*, 651 So.2d 395, 399 (La. Ct. App. 1995)). The likelihood of an individual becoming a public burden is heightened when his restrictive covenant is overly broad in duration and geographical scope. *See Southeastrans, Inc. v. Landry*, 20-CV-00086, 2021 WL 972098, at *4 (W.D. La. Mar. 15, 2021); *Traffic Jam Events, LLC v. William Lilley, Lilley Consulting, Inc., and Ty Prestwood*, 2:21-CV-122, 2021 WL 1226409, at *3 (E.D. La. Apr. 1, 2021); *L & B Transp., LLC*, 568 F. Supp.2d at 693. In light of this public policy, "mechanical adherence" principally concerns the compliance of

non-competition and non-solicitation obligations with La. R.S. § 23:921(C)'s substantive requirements – particularly, the time and geographical limitations. *Volt Power, LLC v. Deville,* 1:21-CV-00395, 2021 WL 1554435, at *4 (W.D. La. Apr. 20, 2021).

26.     Under Louisiana law, a non-compete agreement's geographic scope must identify with reasonable certainty those areas in which the employer lawfully may prohibit competition. La. R.S. 23:921. Under La. R.S. § 23:921, there are two independent requirements for the geographical limitation: (a) the parishes where competition is restrained must be "specified" within the agreement itself; and (b) a substantive limit requiring non-competition agreements to be "limited in enforcement to parishes where the first employer ***actually carries on a like business therein***." *Waguespack v. Medtronic, Inc.,* 185 F.Supp.3d at 929 (internal quotations and citations omitted; emphasis added).

27.     Deep South's exhibits definitively show that the geographical limitation of the Agreement is overbroad on its face. According to its own exhibits, Deep South *does not* maintain customers and/or physical locations in the vast majority of the territory listed in the Agreement. Deep South seeks to restrict Mr. Fellegy from working for End 2 End in every parish and county of 16 states. Yet, its own exhibits show that Deep South's clients and projects are only located in a fraction of those parishes and counties. By its own admission, the geographic scope of the Agreement is overbroad and unenforceable.

28.     Deep South's argument that mere solicitation in the Territory is sufficient to enforce the geographical scope is both untenable and contrary to Louisiana case law requiring an actual customer and/or physical locations in the listed parishes and counties. First, such a standard would be impossible to enforce, especially in light of Deep South's use of phrases like "operates throughout the United States" as included in what constitutes solicitation. Second, Louisiana courts

have routinely required an actual customer or physical location in the listed parishes and counties. *Vartech Sys., Inc. v. Hayden*, 951 So.2d 247, 258 (La. Ct. App. 2006); *McLaughlin v. BancorpSouth Ins. Servs., Inc.*, 17-CV-7604, 2018 WL 1035083, at *5 (E.D. La. Feb. 23, 2018).

29.    In *McLaughlin v. BancorpSouth Ins. Servs., Inc.*, 2018 WL 1035083, at *5 fn. 6 (E.D. La. Feb. 23, 2018), the court explained that it did not condone an "employer's unchecked recitation of every parish in the state as a means to circumvent the letter and intent of La. R.S. § 23:921, which allows for a narrowly tailored/least restrictive means employment agreement." "Taken to the extreme, a party could in this manner simply list every parish, county, or municipality in numerous states and then foist upon the courts the burden of conducting a factual inquiry to determine where the agreement is enforceable. Employers would be free routinely to present employees with grossly overbroad covenants not to compete." *Id*. (internal citations omitted). The Court further recognized that "it is the job of the parties, not the Court, to write a legally valid contract" *Id*. (*citing O'Sullivan v. Gupta*, No. 17-609, 2017 WL 3438349, at *6 (E.D. La. Aug. 10, 2017)).

30.    To the extent Deep South seeks to prevent competition in parishes and counties where it "might" carry on business at some indefinite point in the future because it is "ready" to do business in the listed Territory, its argument does not save the Agreement. Employers cannot unilaterally claim additional territory where it might otherwise operate in the future to restrict a former employee's employment with another business operating in that territory. Such agreements are overly broad, "in derogation of the common right," and unenforceable. *Id*. Where an employer wishes to protect future business interests, it can do so based on the guidance provided in *Causin, L.L.C. v. Pace Safety Consultants, LLC*, No. 2018-CA-0706, 2019 WL 385206, at *7 (La. Ct. App. Jan. 30, 2019). The employer must provide an avenue for the former employee to contest the expansion of the territory into territory where the employer had not previously conducted business

or otherwise had customers. *Id.* Deep South did not do this. Instead, it simply restricted former employees from the entire territory that it *might* do business in the future – something that is not permitted under Section 921.

31.     Deep South's attempt to circumvent the geographic limitations requirement of La. R.S. § 23:921 runs contrary to the long-established precedent set by Louisiana courts that such agreements are disfavored and should be strictly construed.

*32.*     Deep South, as the architect and drafter of the Agreement, had an obligation to narrowly tailor the geographical scope of the territory to comply with the public policy against such agreements. *See* La. R.S. § 23:921; *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So.2d 294, 298 (La. 2001). Deep South clearly has not done so and relies on this Court to re-write the Agreement. Such reliance is inappropriate. *L&B Transport, LLC v. Beech*, 568 F.Supp.2d 689, 698 (M.D. La. 2008). The majority of courts in Louisiana decline to save invalid non-competition provisions through reformation. *Id.* at 693; *Team Environmental Services, Inc. v. Addison,* 2 F.3d 124, 127 (5th Cir. 1993); *Summit Institute v. Prouty,* 691 So.2d 1384, 1389 (La. Ct. App. 1997); *Sentilles Optical Services v. Phillips,* 651 So.2d 395, 400 (La. Ct. App. 1995); *Water Processing Technologies, Inc. v. Ridgeway,* 618 So.2d 533, 536 (La. Ct. App. 1993); *Comet Industries, Inc. v. Lawrence,* 600 So.2d 85, 88 (La. Ct. App. 1992). "If courts always reformed invalid non-competition provisions, employers would be free to routinely present employees with grossly overbroad covenants not to compete." *L&B Transport, LLC*, 568 F.Supp.2d at 693. (internal quotations omitted) (quoting *Team Environmental Services, Inc.,* 2 F.3d at 127). Courts should not be placed "in the business of either saving or writing a contract that is not generally favored by law. *Id.* at 693-694. Given Deep South's burden to show an enforceable non-compete agreement to restrain Mr. Fellegy pursuant to a TRO, it has failed to meet that burden. *See id.*

**Deep South fails to show any solicitation by Mr. Fellegy that violates
the Agreement and, thus, a temporary restraining order is unwarranted.**

33.     Deep South's application for a temporary restraining order to prevent Mr. Fellegy from

soliciting its clients cannot be granted because there is no evidence that Mr. Fellegy is actually

soliciting Deep South's clients. Mr. Fellegy is not soliciting any of Deep South's clients because

End 2 End's client-base is wholly separate from Deep South's client base. (Fellegy Decl., ¶ 48.)

Mr. Fellegy focuses on small-scale utilities, such as small electric co-ops and natural gas co-ops.

(Fellegy Decl., ¶ 46.) He has no responsibility, nor does he solicit, any of the larger utilities or

accounts. (Fellegy Decl., ¶ 47.) He has no responsibility, nor does he solicit, General Electric on

behalf of End 2 End. (Fellegy Decl., ¶ 37.) No solicitation of any Deep South client has occurred,

is occurring, or will occur within the two-year limitation period. (Fellegy Decl., ¶ 48.)

34.     Deep South provides no evidence of actual solicitation of any Deep South client by Mr.

Fellegy. Its entire non-solicitation claim is based on suspicion and speculation, which is not

sufficient to support injunctive relief.

35.     Thus, regardless of what law is applied, no violation of the non-solicitation provision has

been alleged and a temporary restraining order is inappropriate and unnecessary to maintain the

status quo.

**Deep South Failed to Show Any Need for a Temporary Restraining Order
Against Mr. Fellegy to Avoid the Use of its Confidential Information.**

36.     A former employee is allowed to rely on his memory or general knowledge and skill gained

in his former employment to compete with his former employer, without violating a non-disclosure

agreement. *NCH Corp. v. Broyles,* 749 F.2d 247, 254 (5th Cir.1985); *Ashland Chemical, Inc. v.
Lombardino*, 1993 WL 390147, *4 (E.D. La. 1993); *L&B Transport, LLC v. Busby*, 2008 WL

4845103, *5 (M.D. La. 2008). "Louisiana courts have consistently declined to issue an injunction

against a former employee's solicitation of customers when the former employee relied on his

9

memory and did not have a list." *Pure Air Daigle, LLC v. Stagg*, No. CV 6:16-1322, 2017 WL

11534244, at \*11 (W.D. La. Jan. 11, 2017); *L&B Transport, LLC*, 2008 WL 4845103 at \*5

(quoting *Weighing & Control Services, Inc. v. Bert Williams,* 1989 WL 6011 at \*2 (ED. La. 1989));

*Ferrellgas, LP v. McConathy*, 2010 WL 1010831, \*8-9 (W.D. La. 2010).

37.     Moreover, confidential information must be in fact confidential. Deep South did not take

reasonable steps to protect the contacts in Mr. Fellegy's phone as confidential information. It knew

of his use of a personal cell phone for business purposes, but did not require him to maintain the

contacts in the Google app, check for proper storage of the contacts in light of its lack of

communication to Mr. Fellegy regarding proper storage, or require Mr. Fellegy to send the phone

in for confirmation of the removal of all Deep South's alleged confidential information.

38.     During the two-week transition period between his resignation and his last day with Deep

South, Fellegy went above and beyond what a typical departing employee would do. He not only

completed Deep South's employee exit checklist, but he also organized and condensed all the

information and documents related to each client and prospective client into an organized folder

structure to aid whomever took over for him. (Jt. Exh. 2, Fellegy Decl., ¶¶ 26-27.) Fellegy provided

Deep South and his replacement with as much information as possible to be successful – the exact

opposite of what Deep South is now accusing him of doing without any factual basis. Fellegy's

behavior is the very opposite of what one would expect from a former employee intent on

competing with Deep South.

### A Temporary Restraining Order is Otherwise Unwarranted.

39.     Any harm alleged by Deep South is purely speculative, at best. No facts support a

conclusion that Deep South has been harmed by the actions of Fellegy. At this very moment, Deep

South has suffered no harm by Fellegy.

40.     Deep South infers in the Application that Fellegy was somehow responsible for Deep South's failure to obtain business in Arkansas from General Electric ("GE"). (Complaint, ¶ 36.) Deep South further suggests—without any evidence to support its claim—that the GE business went to End 2 End. (Complaint, ¶ 35.) These allegations are purely speculative.

41.     These suggestions are not only wholly speculative, but they are false. First, as Deep South acknowledges, the alleged GE business began to develop prior to Fellegy's departure. (Complaint, ¶ 34.) GE made the determination that it was going to retain End 2 End in Arkasas in January of 2022, while Mr. Fellegy was still working at Deep South. (Rec. 114:22-115:7.) Fellegy's employment with End 2 End did not begin until June 27, 2022 – four months later. (Fellegy Decl., ¶ 30; Rec. 115:8-11.) During those four months, Fellegy had no conversations with GE regarding Deep South. (Fellegy Decl., ¶ 40; Rec. 115:12-14.)  And after his employment at End 2 End began, Fellegy has had no responsibility for any of the GE business that resides with End 2 End. (Fellegy Decl., ¶ 37; Rec. 115:15-22.) He had no role in End 2 End's retention of GE's business in Arkansas. (Fellegy Decl., ¶ 38.) He provided no information to anyone at End 2 End or any third-party regarding GE's business in Arkansas. (Fellegy Decl., ¶ 39.) Thus, Deep South's failure to obtain business from GE in Arkansas is due to its own failings, not any conduct on the part of Fellegy. Deep South provides no evidence or factual representations to the contrary.

42.     Second, contrary to Deep South's allegation, End 2 End did not acquire the GE business that Deep South alleges it lost. GE was an existing client of End 2 End that pre-dated Fellegy's hire (a fact that Deep South admits). (Complaint, ¶ 35.) Thus, the "loss" of GE business by Deep South was the result of GE's decision not to switch providers in Arkansas based on what Deep South offered – not on any conduct by Fellegy or End 2 End.

43.     At least one court has denied an application for an injunctive relief based precisely on this type of speculative evidence. *EHO360,* 2021 WL 3054867, at \*5. As here, the plaintiff in that case had "no evidence that it has actually lost customers to [defendant's new employer]. Nor did Plaintiff present any other evidence indicating that Defendants are currently using—or even currently in possession of—Plaintiff's confidential information…. But even if the Court were to draw the inference that [one of the defendants] possesses Plaintiff's confidential information, Plaintiff has not presented any evidence he is using that information. Rather, Plaintiff premises its irreparable-harm allegation on the notion that [defendant's new employer] *could* use Plaintiff's confidential information. This suspicion does not give rise to a substantial threat of imminent, irreparable harm." (Emphasis added) *Id.* (citing *Snelling & Snelling, Inc., v. Ryvis, Inc*., 1999 WL 1032799, at \*2 (N.D. Tex. Nov. 10, 1999) (rejecting plaintiff's assertion that it would suffer irreparable harm where defendants had 'obtained confidential information from' plaintiff because plaintiff could not 'establish that it is currently losing customers' or 'that defendants are using confidential information to [plaintiff's] detriment')).

44.     Mr. Fellegy's actual loss of income outweighs Deep South's speculative harm. Deep South must next show that the threat of harm to Deep South outweighs the actual harm to be caused to Fellegy if the court were to grant an injunction. As discussed above, Deep South's allegations that Fellegy intends to compete, solicit Deep South's clients, and use Deep South's confidential information is entirely speculative. On the back of the speculation, Deep South asks the Court to prevent Fellegy from earning a living. The harm to be caused to Fellegy is not threatened or speculative – an order from this Court precluding him from working for End 2 End removes his livelihood. Deep South's fears do not outweigh this actual harm to Fellegy, especially when there is no enforceable non-compete agreement and no violation of the Confidentiality Agreement. Any

12

loss of income will constitute a serious injury to Fellegy that is not outweighed by Deep South's speculative potential harm. The reality of the circumstance is that Fellegy has not harmed Deep South and will not harm Deep South. Deep South lacks any evidence to the contrary.

45.     Furthermore, injunctive relief cannot be warranted over the real harm to Fellegy where the allegations related to use of Deep South's confidential information are the barest of speculation. Deep South's entire claim for use of confidential information is based on "information and belief," rather than any actual facts. (Complaint, ¶¶ 89-90, 96-99.) To the contrary, Fellegy has not used, and does not intend to use, any of Deep South's confidential information. (Fellegy Decl., ¶¶ 26-29, 49.) Thus, Deep South's conjecture that Fellegy has breached his obligations under the Agreement is not sufficient to warrant injunctive relief. *See SMH Enterprises, L.L.C.*, 2022 WL 137051, at *7 (denying a temporary restraining order where the plaintiff failed to establish that (1) confidential information was actually disclosed to the defendant and (2) the defendant would disclose any confidential information to any additional parties). Accordingly, Deep South "has only pointed to speculative injuries that are insufficient to show a likelihood that [it] will suffer irreparable harm absent a TRO." *Id.* Deep South's Motion for Temporary Restraining Order should be denied.

46.     The granting of Deep South's motion is not in the public interest. Deep South argues that the requested restraining order will not disserve the public interest. This statement is completely without merit. Preventing Fellegy from working in a competing business directly contravenes Louisiana's strong public policy in favor of free competition. *West Carroll Health System, L.L.C.,* 92 So.3d at 1136. The relief requested is particularly injurious to the public interest since there is no evidence or alleged facts to support the argument that Fellegy has done anything wrong. The public's interest lies with individuals being able to earn a living and the relief requested by Deep

South directly infringes on that interest. As such, the Motion for Temporary Restraining Order should be denied.

### Conclusion

This Court should deny Deep South's application for a TRO. As amply demonstrated at the hearing, Deep South takes an expansive view of section 921 and has built that view into the Agreement at issue in this action. However, that approach is indefensible given the fact that Deep South's Agreement starts from a place of disfavor under Louisiana law and is to be strictly construed against enforcement. Under section 921, less is more. Because the Deep South Agreement has an overbroad definition of its business, overbroad Territory of 16 states with little or no evidence of current locations or customers in the vast majority of counties and parishes listed, and Deep South has failed to show Mr. Fellegy has actually done anything to compete with or solicit customers of Deep South, this Court should decline to issue a TRO.

Respectfully Submitted,

/s/ Andrew P. Burnside
Andrew P. Burnside, T.A., LA Bar No. 14116
Claire R. Pitre, La Bar No. 36257
**Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
701 Poydras Street, Suite 3500
New Orleans, Louisiana 70139
Telephone: 504.648.3840
Facsimile: 504.648.3859
Email:  drew.burnside@ogletreedeakins.com
          claire.pitre@ogletreedeakins.com

—and—

Michelle Renee Maslowski, IN Bar No. 27238-49
*Admitted Pro Hac Vice*
Maslowski Law
5602 Elmwood Avenue, Suite 104,
Indianapolis, Indiana 46203
Telephone: 317.854.3811
Email: michelle.maslowski@maslowskilaw.com

***Attorneys for Defendant, Peter M. Fellegy***

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been filed via the Court's Electronic Filing

System, which provides for service on all parties.

This 23rd day of November, 2022.

*/s/ Andrew P. Burnside*

Andrew P. Burnside

53886693.v6-OGLETREE