UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DEEP SOUTH COMMUNICATIONS,
LLC

CIVIL ACTION

VERSUS

NO. 22-598-JWD-EWD

PETER M. FELLEGY

RULING AND ORDER

I.    INTRODUCTION

This matter comes before the Court on two motions.  First, Plaintiff Deep South Communications, LLC ("Deep South" or "Plaintiff") has filed the *Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunctive Relief* ("*Motion for TRO*") (Doc. 8). Then, in response to briefing schedules from this Court, Defendant Peter M. Fellegy ("Fellegy" or "Defendant") submitted two filings: (1) *Defendant's Rule 12(b)(2) Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim* ("*Motion to Dismiss*") (Doc. 16); and (2) *Defendant's Opposition to Deep South's Motion for a [TRO]* ("*Defendant's Opposition*") (Doc. 17). Plaintiff then filed: (1) an *Opposition to Defendant's [Motion to Dismiss]* ("*Plaintiff's Opposition*") (Doc. 20); and (2) a *Memorandum in Reply to Defendant's Opposition to [Motion for TRO]* ("*Plaintiff's Reply*") (Doc. 23).

A hearing on both motions was originally scheduled for October 26, 2022. (Doc. 15.) However, Defendant filed a motion to continue the hearing, and on October 25, 2022, the Court held a status conference during which it granted that motion and ordered the hearing to be reset for November 2, 2022. (Doc. 36.) At that time, the Court additionally ordered the parties to

exchange their proposed exhibits for the hearing and granted the parties leave to submit supplemental briefing on those proposed exhibits to address their impact, if any, on the issue of personal jurisdiction. (*Id.*)

On November 2, 2022, a hearing was held on Plaintiff's *Motion for TRO*, (Doc. 8), and Defendant's *Motion to Dismiss*, (Doc. 16). (*See* Doc. 45.) Subsequently, the parties requested a transcript of the hearing and filed additional briefs addressing the issues raised by the *Motion for TRO* and the issue of personal jurisdiction. (Docs. 51, 52.) Thereafter, both parties responded to the other's post-hearing brief by filing reply briefs. (Docs. 54, 55.)

Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court finds that personal jurisdiction over Defendant exists, that Plaintiff has adequately stated a claim for relief in the operative complaint on all claims except one, and that Plaintiff has not met its burden in proving it is entitled to a temporary restraining order. Accordingly, the Court will deny in part and grant in part the *Motion to Dismiss* and deny the *Motion for TRO* in its entirety.

## II.    RELEVANT BACKGROUND

This case arises out of a contractual dispute between a Louisiana employer and its former employee, a nonresident of Louisiana. Plaintiff, Deep South, is a "wireless technologies services company that was founded and remains headquartered in Baton Rouge, Louisiana." (*V. Compl.* ¶ 6, Doc. 1.) "Deep South operates throughout the state of Louisiana and throughout the United States." (*Id.* ¶ 7.) Defendant, Fellegy, began employment with Deep South in May 2017 and continued working there until his resignation on February 22, 2022. (*Id.* ¶¶ 8–9.) Fellegy was initially hired as the "Vice President of Business Development" and continued in that role until becoming the "Manager of Business Development." (*Id.*) His general responsibilities included

"developing and maintaining relationships and sales for the benefit of" the company, generating "sales and business development leads," providing and compiling "feedback regarding clients," and "helping create overall business development strategies." (*Id.* ¶ 12.)

As a citizen of the state of Indiana, Fellegy worked remotely during his employment with Deep South, but "regularly traveled to Louisiana during his employment" as "his position was based out of Deep South's headquarters in Baton Rouge, Louisiana." (*Id.* ¶¶ 10–11.) As a condition of his employment with Deep South, Defendant entered into a Confidentiality and Restrictive Covenant Agreement (the "Agreement") on May 18, 2017. (*Id.* ¶ 16–17.) Defendant did not sign the Agreement in Louisiana; rather, he signed this Agreement in Florida before emailing it back to Deep South. (Decl. of Rhett Westerman, Ex. A, ¶ 12, Doc. 20-1.) The Agreement contained, among other things, provisions regarding non-competition, non-solicitation, and non-disclosure of confidential information. (The Agreement, §§ 4, 5, Doc. 8-4.)

Several months after Defendant's resignation from Deep South, he began working for End 2 End Technologies ("End 2 End"). (*V. Compl.* ¶ 30, Doc. 1.) According to the *Verified Complaint*, End 2 End "holds itself out as a network infrastructure specialist" and "competes directly with Deep South throughout the United States." (*Id.* ¶¶ 31–32.) Also relevant to this cause of action is General Electric Co. ("GE"), a former potential customer of Deep South, the specifics of whose involvement will be discussed below. (*See id.* ¶¶ 34–36.)

### A. Claims for Relief, Prayer, and the Instant Motions

Plaintiff filed the instant action against Defendant for breach of contract, alleging that Defendant violated the Agreement after his resignation from Deep South. (*V. Compl.* ¶¶ 49–100, Doc. 1.) More specifically, Plaintiff first claims that Fellegy's employment with End 2 End constitutes a breach of the Agreement's non-compete clause. (*Id.* ¶¶ 49–64.) Second, Plaintiff

claims a violation of the non-solicitation clause because Defendant allegedly "has solicited, induced, and diverted Deep South customers and their business for his and [End 2 End]'s benefit since his resignation, including the business of GE." (*Id.* ¶ 76.) Third, Plaintiff alleges Defendant "used Deep South's Confidential Information" to procure a benefit for his new employer in violation of the non-disclosure of confidential information provision. (*Id.* ¶ 89.) Deep South seeks both injunctive relief, (*id.* ¶¶ 101–108), and damages, including damages for lost profits, as well as costs and attorney's fees (*id.* at 16–17.)

In seeking injunctive relief, Plaintiff prays for "a temporary restraining order, preliminary injunction, and permanent injunction" prohibiting "Fellegy and all persons or entities acting in concert with him" from: (1) further violating the Agreement; (2) servicing, soliciting, or attempting to solicit any customer of Deep South for whom Fellegy had responsibility or was privy to information about while employed at Deep South; (3) divulging, revealing, communicating, using, or permitting use of Deep South's confidential information. (*Id.* at 15–16.)

On September 26, 2022, Plaintiff filed the instant *Motion for TRO* requesting an order "to enforce certain contractual obligations pursuant to the Confidentiality and Restrictive Covenant Agreement . . . including Fellegy's obligation not to compete with Deep South, his obligation not to solicit Deep South's clients, and his obligation not to use or exploit Deep South's confidential information." (Doc. 8 at 1.) In response, Defendant filed, inter alia, the instant *Motion to Dismiss*, seeking dismissal under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Doc. 16.)

## III.   APPLICATION OF LOUISIANA LAW

As a preliminary matter, the Court must address whether Louisiana law governs the instant dispute. Resolution of this issue turns on: (1) the validity of the choice-of-law clause contained in the parties' Agreement; and, if that clause is not valid, then (2) choice-of-law principles.

Here, the relevant choice-of-law clause provides: "This Agreement shall be governed exclusively by the law of the State of Louisiana and/or applicable federal law, without regard to conflicts of laws principles." (The Agreement, § 12, Doc. 8-4.) With respect to employers' use of choice-of-forum and choice-of-law clauses in employment contracts, Louisiana law provides:

> The provisions of every employment contract or agreement, or provisions thereof, by which any foreign or domestic employer or any other person or entity includes a choice of forum clause or choice of law clause in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, shall be null and void *except* where the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and *ratified by the employee* after the occurrence of the incident which is the subject of the civil or administrative action.

La. R.S. 23:921(A)(2) (emphasis added).

Defendant asserts that, because he did not ratify the Agreement's choice-of-law clause, La. R.S. 23:921(A)(2) renders it unenforceable. (Doc. 16-1 at 8; Doc. 17 at 9.) As a result, he contends that Louisiana law does not govern the interpretation of the Agreement and that the choice-of-law clause cannot be considered for purposes of personal jurisdiction. Instead, "a choice-of-law analysis should be completed" to determine the applicable substantive law. (Doc. 17 at 9.) In response, Plaintiff argues that Section 921(A)(2) only applies to and for the protection of employees who are Louisiana citizens; the statutory provision is not meant "for nonresidents to use to repudiate their choice of Louisiana law agreements entered into with Louisiana citizens such as Deep South." (Doc. 20 at 11; Doc. 23 at 4.)

Courts have applied Section 921(A)(2) to invalidate both choice-of-forum and choice-of-law provisions in employment agreements when a Louisiana employee did not ratify those provisions after the incident that is now the subject of the dispute. *See, e.g., Westbrook v. Pike Elec., L.L.C.*, 799 F. Supp. 2d 665, 671 (E.D. La. 2011); *see also O'Quin v. Fin. Servs. Online, Inc.*, No. 18-36, 2018 WL 5316360, at *13 (M.D. La. Oct. 26, 2018) (finding that, for purposes of the conflicts of law discussion, the choice of laws provision was likely invalid as Plaintiff had not ratified it after his termination). However, neither party here has pointed to a case where Section 921(A)(2) was applied to a choice-of-law clause entered into by a non-Louisiana resident employee.

In support of its position that Section 921(A)(2) only applies to Louisiana employees, Plaintiff relies primarily on dicta from *Waguespack v. Medtronic, Inc.*, 185 F. Supp. 3d 916 (M.D. La. 2016) and *Sawicki v. K/S Stavanger Prince*, 2001-0528 (La. 12/7/01), 802 So. 2d 598. In *Sawicki*, the Louisiana Supreme Court recognized Section 921(A)(2) as embodying a "strong Louisiana public policy concerning forum selection clauses" and ultimately applied that statutory provision to a forum selection clause for the benefit of a foreign employee. 802 So. 2d at 603. However, in reaching that conclusion, the court noted: "This court recognizes that La.Rev.Stat. 23:921A(2) also contains restrictions on the enforceability of choice of law clauses, but we do not comment on the applicability of the statute to choice of law clauses, as that issue is not before us." *Id.* at 603 n.5.

Moreover, while this Court in *Waguespack* emphasized Section 921(A)(2)'s applicability to Louisiana citizens and employees, nowhere in that decision did the Court find that Section 921(A)(2) *only* applies to protect Louisiana-based employees. Rather, the Court discussed the effects of Section 921(A)(2) to determine whether it discriminated against out-of-state business

and effectuated a legitimate local interest. *Waguespack*, 185 F. Supp. 3d at 927. Thus, neither *Sawicki* nor *Waguespack* demonstrate that Section 921(A)(2) applies only to Louisiana employees. However, the Court need not reach a final conclusion on this issue at this stage because it finds that, for the reason set forth below, Louisiana law applies.

In determining which state's substantive law governs a dispute in diversity cases, the court applies "the choice-of-law rules of the state in which the action was filed, in this case, Louisiana." *Cutrer v. TWT Transp., L.L.C.*, 485 F. Supp. 3d 677, 685–86 (M.D. La. 2020) (deGravelles, J.) (quoting *Abraham v. State Farm Mut. Auto. Ins. Co.*, 465 F.3d 609, 611 (5th Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941))). "Under Louisiana law, '[t]he threshold question in determining [a choice of law issue] is whether there is a true conflict, a false conflict, or no conflict.' " *Bilyeu v. Johanson Berenson LLP*, No. 08-02006, 2010 WL 3896415, at *5 (W.D. La. Sept. 30, 2010) (alterations in original) (quoting *Wooley v. Lucksinger*, 2006-1140 (La. App. 1 Cir. 12/30/08), 14 So. 3d 311, 356 (citing La. C.C. art. 3515 *et seq.*, and, *e.g.*, *Champagne v. Ward*, 2003-3211 (La. 1/19/05), 893 So. 2d 773, 786)). For example, "[i]f the laws of two states are substantially similar such that they would yield the same resolution of a particular [issue] then there is no conflict and no need for a conflict of laws analysis." *Id.*

Hence, a conflicts-of-law analysis under La. Civ. Code arts. 3540 and 3537 requires—at the very least—consideration of the policies and applicable laws of each state. Here, however, although Defendant asks the Court to engage in a choice-of-law analysis and find that Louisiana law does not govern this dispute, (Doc. 17 at 9), Defendant fails to assert what state's law should instead apply or how, if at all, a competing state's laws are different from those of Louisiana.

"The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. Of Commerce &*

*Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (citations omitted); *see also United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver"). "By analogy, failure to brief an argument in the district court waives that argument in that court." *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp 2d 738, 748 n.10 (S.D. Tex. 2003)); *see also United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) (citing *U.S. v. Dominguez–Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008); *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")); *Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." (citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

Because Defendant has not presented any argument as to what state law should apply if Louisiana law does not apply, the Court finds that Defendant failed to brief this issue and thus waived any argument to the contrary for purposes of resolving the instant motions. Accordingly, "the Court declines [and is unable] to engage in an extensive conflicts of law analysis under La. Civ. Code arts. 3540 and 3537." *Glob. Energy Servs., Inc. v. US Applicators, LLC*, No. 18-512,

2020 WL 1073961, at *6 (M.D. La. Mar. 5, 2020) (deGravelles, J.). As such, Louisiana law applies to govern the instant dispute.[1]

## IV.    FELLEGY'S MOTION TO DISMISS

Defendant seeks dismissal under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Having carefully considered the matter, the Court will deny the *Motion to Dismiss* with respect to the issue of personal jurisdiction and the claims for breach of the non-competition and non-solicitation clauses. However, the Court will grant the *Motion to Dismiss* with respect to Plaintiff's claim that Defendant breached the Agreement's non-disclosure of confidential information provision.

### A.  Personal Jurisdiction

#### 1. Rule 12(b)(2) Standard

When a nonresident defendant moves to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant. *Herman v. Cataphora, Inc.*, 730 F.3d 460, 464 (5th Cir. 2013). "The court may consider 'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.' " *Road Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. CCR Fire Prot., LLC*, No. 16-448, 2018 WL 3076743, at *4 (M.D. La. June 21, 2018) (citing *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985))). "Moreover, on a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether" the plaintiff has met her burden in showing personal

---

[1] If Defendant seriously contends that the law of another state applies to govern the merits of this case, he will be given an opportunity to brief that issue prior to the trial of this matter.

jurisdiction exists. *Johnson v. Multidata Sys. Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citations omitted).

In a diversity action, a federal district court may exercise personal jurisdiction over a non-resident if the state's long-arm statute permits an exercise of jurisdiction over that defendant and an exercise of jurisdiction would comport with the requirements of the Due Process Clause of the Fourteenth Amendment. *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). Pursuant to La. R.S. 13:3201(B), Louisiana's long-arm statute, courts are permitted to exercise personal jurisdiction over non-residents consistent with the Louisiana State Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *A & L Energy, Inc. v. Pegasus Grp.*, 791 So. 2d 1266, 1270 (La. 2001). As such, only a federal due process analysis is necessary to determine whether personal jurisdiction may be exercised over the defendant. Generally, a court's exercise of personal jurisdiction over a non-resident defendant comports with due process when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001) (citing, inter alia, *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Supreme Court has recognized two types of personal jurisdiction: "general" and "specific" jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923–25 (2011). "Specific" jurisdiction, sometimes referred to as "case-linked" or "conduct-linked" jurisdiction, requires an "affiliation between the forum and the underlying controversy." *Id.* at 919 (cleaned up). By contrast, "general" or "all purpose" jurisdiction permits a court to assert jurisdiction over a defendant based on forum connections unrelated to the underlying suit. *Id.* "In

deciding whether there is personal jurisdiction, the Court should first determine whether the connection between the forum and the circumstances giving rise to the suit can justify the exercise of specific jurisdiction." *O'Quin v. Fin. Servs. Online, Inc.*, No. 18-36, 2018 WL 5316360, at *6 (M.D. La. Oct. 26, 2018) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014)).

The Fifth Circuit has articulated a three-step analysis for the specific jurisdiction inquiry. *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002). First, the court must determine "whether the defendant has minimum contacts with the forum state." *Id.* Second, the court considers "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts." *Id.* Third, "[i]f the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

### 2. Analysis

At the outset, the Court notes that only specific personal jurisdiction is at issue here, as Defendant asserts that general jurisdiction is clearly lacking, (Doc. 16-1 at 3), and Plaintiff has provided no argument to the contrary, (*see* Doc. 20). Moreover, even if general jurisdiction was a point of contention, the starting point in this Court's analysis is to determine whether specific personal jurisdiction can be exercised. *See Daimler*, 571 U.S. at 139 n.20. Because the Court finds that Plaintiff has satisfied its burden of establishing specific personal jurisdiction over Defendant, the Court need not discuss the issue of general jurisdiction over Defendant.

### a. *Minimum Contacts*

"A defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [they] should reasonably anticipate being haled into

court there.' " *Nuovo Pignone*, 310 F.3d at 379 (alteration in original) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980))). The "minimum contacts" prong requires " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

Here, Plaintiff maintains that Defendant's contacts with Louisiana are more than sufficient to constitute minimum contacts. The Court agrees. Although Defendant worked remotely from his home in Indiana most of the time during his employment with Deep South, he is alleged to have "regularly traveled to Louisiana during his employment with Deep South, approximately every one to two months, to attend in-person meetings with the President and others at Deep South's headquarters." (*V. Compl.* ¶ 11, Doc. 1.) He not only met with Deep South personnel while in Louisiana, but also "scheduled in-person meetings with various Deep South customers located in Louisiana in an effort to develop business opportunities on Deep South's behalf." (Decl. of Rhett Westerman, ¶ 23, Doc. 20-1.) When he was not physically in Louisiana, he frequently communicated with Deep South's customers located in Louisiana. Plaintiff has presented evidence to support at least some of the email communications and in-person meetings. (*See id.* at 13–45.)

Defendant contests some of the facts set forth by Plaintiff, including the alleged frequency with which he traveled to Louisiana, arguing he only traveled to Louisiana "nine times" during his five years of employment. (Decl. of Peter Fellegy, ¶ 25, Doc. 16-2.) But he offers no evidence to support those contentions. And, in its supplemental opposition, Plaintiff points to additional exhibits evidencing a substantial amount of contact by Fellegy with Louisiana. (*See* Doc. 42 at 1–2; *see also* Plaintiff's Supplemental and Amended Exhibit List for Hearing, Doc. 41.) Where, as

here, there are "conflicts between the facts contained in the parties' affidavits[,]" the Court must resolve that conflict in the plaintiff's favor. *Johnson*, 523 F.3d at 609. The additional evidence contained in Plaintiff's exhibits, (*see* Doc. 42), further strengthens this conclusion. Viewing all of these contacts together, it is clear that Defendant should have reasonably anticipated being haled into court in Louisiana.

**b.  *Relatedness of the Claim to Defendant's Contacts***

The question of "whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts" is a closer call. *Nuovo Pignone*, 310 F.3d at 378. On the one hand, Defendant cites several Fifth Circuit cases in which the court explained that, in breach of contract cases, the only acts relevant for purposes of this second prong are those relating to the formation of the contract and the subsequent breach of that contract. *See Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018); *see also McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009). According to Defendant, the alleged acts forming the basis for the breach of contract claim are Defendant's employment with End 2 End and his purported solicitation of GE, neither of which occurred in or relate to the state of Louisiana. (Doc. 16-1 at 7.) On the other hand, Plaintiff argues that its claim "is more properly characterized as a dispute over the terms of [Fellegy's] employment with a Louisiana-based company, and therefore it arises out of Fellegy's connections with Louisiana." (Doc. 20 at 12.)

The Court agrees wholeheartedly with (and is bound by) the Fifth Circuit's interpretation here. *See O'Quin*, 2018 WL 5316360, at *8 (explaining that the only actions that could support specific jurisdiction over defendant were "those relating to the Employment Contract, on which this action is based."). However, the Fifth Circuit has not yet addressed the issue of specific

13

personal jurisdiction in the context of claims for breach of non-competition, non-solicitation, or non-disclosure of confidential information clauses.

In contrast, the case law presented by Plaintiff directly confronts the exact issue before the Court today. For example, in *Direct Biologics, LLC v. McQueen*, No. 22-381, 2022 WL 1409984, at *7 (W.D. Tex. May 4, 2022), the Western District of Texas—a court likewise bound by Fifth Circuit precedent—found that the former employee's alleged contacts with Texas were sufficient to show that the court had specific personal jurisdiction over him. There, the former employer, Direct Biologics, sued its former employee for—among other things—breach of the employment contract's non-competition and non-solicitation provisions and misappropriation of trade secrets. *Id.* at *1, *5. Direct Biologics alleged that the former employee, a nonresident defendant, had worked for the company for four years, "repeatedly traveled to the company's headquarters in Austin, and directed his employment activities and communications to Direct Biologics' headquarters." *Id.* at *7. Direct Biologics further asserted that the former employee "breached his employment contracts with his Texas-based employer, and these breaches . . . caused injury to Direct Biologics *in* Texas." *Id.* Based on these allegations, the court concluded that the former employee "purposely availed himself of the benefits of the State of Texas and ha[d] sufficient contacts with Texas for this Court to exercise jurisdiction over him." *Id.*

Similarly, here, Fellegy allegedly travelled to Louisiana at least twenty-two times throughout his five-year employment with Deep South and routinely communicated with Deep South's Baton Rouge headquarters and Louisiana-based clients. (Doc. 42 at 1–2, 4–6.) Plaintiff has submitted a substantial amount of evidence to support this assertion. (*See* Doc. 41; *see also* Decl. of Rhett Westerman, Exs. A–G attached thereto, Doc. 23-1.) The *Direct Biologics* court did not discuss in detail the frequency with which the former employee travelled to Texas or

14

communicated with other employees at the Texas-based headquarters, but found that the former employee's "repeated[]" contacts with Texas and the fact that the employer sustained injury in Texas were nevertheless sufficient for purposes of specific jurisdiction. *Direct Biologics,* 2022 WL 1409984, at *7. The Court finds that the same result is justified here.

Furthermore, several cases cited by Plaintiff, though from district courts outside the Fifth Circuit, likewise support a finding of specific personal jurisdiction in this case. Given the factual similarities between those cases and the one at issue, the Court finds them equally persuasive. In *Belimed, Inc. v. Bleecker*, No. 22-00891, 2022 WL 939819 (D.S.C. Mar. 29, 2022), the employer, Belimed, sued its former employee, a nonresident defendant, for violation of state trade secret statutes and breach of the "Non-disclosure, Non-solicitation, and Non-competition Agreement." *Id.* at *1, *2. There, during his employment, the defendant-employee primarily worked out of his home state—Arizona—and covered several other states that did not include the forum state. *Id.* at *1. In determining that the second requirement for establishing specific personal jurisdiction was satisfied, the court explained:

> This action, at its core, concerns *the terms of* Bleecker's *employment* with a South Carolina-based company and, therefore, arises out of Bleecker's connections with South Carolina. To be sure, Bleecker states in his affidavit that he executed the Agreement in Phoenix, Arizona, which is a contact related to the breach of contract claim that occurred outside the state. ECF No. 25 ¶ 2. However, the instant action is still "based on a contract which had substantial connection with [South Carolina]" and on Bleecker's degree of interaction with individuals in South Carolina, many who may have played a role in establishing the terms of the Agreement. *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). Accordingly, the second prong has been established.

*Id.* at *5 (alteration in original) (emphasis added).

Similarly, in *W. Capra Consulting Group, Inc. v. Snyder*, No. 19-4188, 2019 WL 3935045 (N.D. Ill. Aug. 20, 2019), an Illinois corporation, W. Capra, sued its former employee, a Florida

citizen, in an Illinois district court for breaching the non-competition clause in the parties' employment contract. *Id.* at *1. Similar to the Agreement in the instant case, the employment agreement there stated that the non-competition clause was "in consideration of [employee's] employment by [employer] and a sign on bonus . . . ." *Id.* at *2. As for the defendant-employee's contacts with Illinois, he travelled to Illinois twice during his employment to attend holiday parties hosted by W. Capra and communicated frequently over the phone and through email with W. Capra personnel. *Id.* at *3–4. None of the defendant's contacts with Illinois that the court focused on concerned the defendant's new employment with a competitor, which was the basis for the breach of contract claim. Nevertheless, the court concluded: "as [defendant's] contacts with Illinois *arise out of* the *employment agreement* that lies at the heart of W. Capra's claim, W. Capra has established that its injury 'arise[s] out of' or 'relate[s] to' [defendant's] contacts." *Id.* at *6 (second and third alterations in original) (emphasis added) (citations omitted).

In *FBR Capital Markets & Co. v. Short*, No. 09-1016, 2009 WL 3254458 (E.D. Va. Oct. 9, 2009), the former employer, FBR, brought an action in a Virginia district court against its former employee, a citizen of New York. *Id.* at *1–2. FBR claimed that the defendant "breached her covenant not to compete, her non-solicitation agreement, and FBR's confidential and proprietary information policy by going to work for [a direct competitor] immediately after termination of her employment at FBR." *Id.* at *2. The defendant's new employment with one of FBR's competitors—the alleged basis for the claim—in no way concerned Virginia. The court ultimately found that specific personal jurisdiction over the defendant was established, reasoning as follows:

> In this case [defendant] purposefully availed herself of the privilege of conducting activities in the state by accepting and maintaining employment with a Virginia-based company, interviewing for employment in Virginia, and traveling to Virginia for training purposes. Additionally, the contact that [defendant] had with Virginia is *related to the plaintiff's claim* against [her] *as this suit is over the terms of her*

16

> *employment* with FBR, and any injury that may have been caused by [defendant]'s departure from FBR would be felt by the company in Virginia.

*Id.* at *3 (emphasis added).

The Court finds the cases discussed above instructive on the issue at hand. Like the defendant-employees in *Bleecker*, *Snyder*, and *Short*, Fellegy primarily worked outside of the forum state during his employment. However, Fellegy's contacts with Louisiana are more substantial than the contacts found sufficient in those cases, as Fellegy not only met with Deep South personnel in Louisiana, but also met with clients and customers in Louisiana throughout his years of employment. Irrespective of the frequency or purpose of the contacts with the forum state, the courts in *Bleecker*, *Snyder*, and *Short* all agreed on one thing: covenants not to compete, solicit, or disclose confidential information are part and parcel of the terms of employment, regardless of the fact that some of those obligations may not be triggered until employment has ended.

Given Louisiana's differential treatment of restrictive covenants in employment contracts from ordinary contractual obligations, *see* La. R.S. 23:921, the Court sees no reason why the same would not be true here. This conclusion is further buttressed by the fact that the Agreement, which Fellegy signed within his first few days of employment, begins by stating: "In consideration of initial and/or continued at-will employment . . . Employer and Employee do hereby agree" to the contract as follows. (The Agreement, Doc. 8-4 at 1.) Fellegy's substantial contacts with Louisiana, all of which related to his employment with a Louisiana-based company, indicate that Deep South is *not* "seek[ing] to establish personal jurisdiction over [him] based on Deep South's residency" alone. (Doc. 43 at 2.) Therefore, the Court rejects the narrow view advanced by Defendant and concludes that Deep South's breach of contract claim more broadly concerns the terms of Fellegy's employment. As a result, the Court finds that said claim arises out of or relates to Defendant's contacts with Louisiana.

### c.  *Fairness and Reasonableness of Asserting Jurisdiction*

Once the plaintiff satisfies the first two prongs of the specific jurisdiction analysis, the burden shifts to the defendant, who must show that the exercise of personal jurisdiction would be unfair or unreasonable. *See Nuovo Pignone*, 310 F.3d at 382. To succeed, "the defendant must make a 'compelling case' against" the assertion of personal jurisdiction. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (quoting *Burger King*, 471 U.S. at 477)). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Id.* (citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1549 (Fed. Cir. 1995)). "The interests to balance in this determination are the burden on the defendant having to litigate in the forum; the forum state's interests in the lawsuit; the plaintiff's interests in convenient and effective relief; the judicial system's interest in efficient resolution of controversies; and the state's shared interest in furthering fundamental social policies." *Id.* (citation omitted).

Although Fellegy acknowledges his burden on this issue, (*see* Doc. 16-1 at 4), he otherwise leaves this third prong unaddressed in his motion. In opposition to the motion, Plaintiff correctly points out the different factors considered in this determination before concluding that a balancing of those interests weighs in favor of asserting jurisdiction. (Doc. 20 at 13–14.) In Defendant's reply brief, he argues that personal jurisdiction over him "does not comport with due process and would be unfair and unreasonable" because he lives in Indiana and all the witnesses and evidence relevant to his employment with End 2 End is located outside Louisiana. (Doc. 21 at 4.)

This is not one of those "rare" cases where the exercise of personal jurisdiction over the defendant would be unfair. *Brandt*, 195 F.3d at 215. Further, Defendant did not discuss the factors set forth above and failed to substantively respond to Plaintiff's arguments on these points (aside from his assertions about the location of himself, evidence, and witnesses). Hence, Defendant has

not presented a "compelling case" for why personal jurisdiction would be unreasonable. *Id.* Thus, the Court finds that Defendant failed to meet his burden of rebutting Plaintiff's claims.

For all these reasons, the Court finds that Plaintiff has satisfied its burden of showing that the Court has specific personal jurisdiction over Defendant here. Therefore, with respect to the personal jurisdiction ground, the *Motion to Dismiss* is denied.

### B.  Stating a Claim for Relief

#### 1. Rule 12(b)(6) Standard

In *Johnson v. City of Shelby, Mississippi*, the Supreme Court explained that "Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial

> experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. This standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

The Fifth Circuit further explained that, in deciding a Rule 12(b)(6) motion, all well-pled facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

### 2. Applicable Law & Analysis

At the outset, the Court notes that it may properly consider the Confidentiality and Restrictive Covenant Agreement here while conducting a Rule 12(b)(6) analysis. As this Court has recently stated:

> The general rule regarding what may be considered in deciding a Rule 12(b)(6) motion is well known.

> "In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of

Evidence 201." *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam) (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019)). *See also Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 726 (5th Cir. 2018).

*Liberty Mut. Fire Ins. Co. v. Shaw Grp., Inc.*, No. 20-871, 2022 WL 896804, at *10 (M.D. La. Mar. 25, 2022) (deGravelles, J.). The Agreement at issue here—which forms the basis for this breach of contract suit—is attached to Plaintiff's *Verified Complaint*. (*See* Doc. 1-2.)[2] Thus, the Court may properly consider it in its analysis.

Turning now to the sufficiency of Plaintiff's claims under Rule 12(b)(6), in the *Verified Complaint*, Plaintiff sets forth a breach of contract claim based on Defendant's alleged violation of three different clauses in the Agreement: the non-competition provision, the non-solicitation provision, and the non-disclosure of confidential information provision. Defendant seeks dismissal of the operative complaint, arguing Plaintiff has failed to state a plausible claim for breach of any one of those three provisions. (*See* Doc. 16.)

Louisiana's non-compete statute, La. R.S. 23:921, specifically addresses restrictive covenants such as the covenants not to compete with or solicit the business of a former employer. *See* La. R.S. 23:921(C). However, "[n]on-disclosure and confidentiality provisions are not subject to the requirements of La. R.S. 23:921." *Austin v. Indus. Oils Unlimited, L.L.C.*, No. 17-1625, 2020 WL 5834799, at *7 (W.D. La. Sept. 30, 2020) (citing *NovelAire Techs., LLC v. Harrison*, 2009-1372 (La. App. 4 Cir. 10/13/10), 50 So. 3d 913, 918–919); *see also O'Sullivan v. Sunil Gupta, M.D., LLC*, No. 17-609, 2017 WL 3438349, at *4 (E.D. La. Aug. 10, 2017) (citing *Maestri v. Destrehan Veterinary Hosp., Inc.*, 554 So. 2d 805, 810 (La. App. 5th Cir. 1989); *Engineered Mech. Serv., Inc. v. Langlois*, 464 So. 2d 329, 334 n.15 (La. App. 1st Cir. 1984) ("Confidentiality

---

[2] The Agreement is likewise attached to Plaintiff's *Motion for TRO*. (*See* Doc. 8-4.) When discussing the Agreement herein, the Court will reference only Doc. 8-4 rather than citing both Doc. 1-2 and Doc. 8-4.

agreements have been held enforceable and not subject to the prohibition (and requirements) of La. R.S. 23:921.")). With this distinction in mind, the Court will bifurcate its analysis of Plaintiff's breach of contract claims.

### a. *The Restrictive Covenants*

#### i. Louisiana Law on Non-Competes Generally

"Louisiana has long had a strong public policy disfavoring noncompetition agreements between employers and employees." *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 2000-1695 (La. 6/29/01), 808 So. 2d 294, 298 (citing *La. Smoked Products, Inc. v. Savoie's Sausage & Food Prods.*, 96–1716, p. 11 (La. 7/1/97), 696 So. 2d 1373, 1379). "Thus, the longstanding public policy of Louisiana has been to prohibit or severely restrict such agreements." *Id.* "Louisiana's strong public policy restricting these types of agreements is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden." *Id.* (citing *McAlpine v. McAlpine*, 94–1595, p. 11 (La.9/5/96), 679 So. 2d 85, 91). Therefore, "[b]ecause such covenants are in derogation of the common right, they must be strictly construed against the party seeking their enforcement." *Id.* (citing *Hirsh v. Miller*, 187 So. 2d 709, 714 (La. 1966); *Turner Professional Servs., Ltd. v. Broussard*, 99–2838, p. 3 (La. App. 1 Cir. 5/12/00), 762 So. 2d 184, 185). This strong public policy disfavoring non-compete agreements is expressed in La. R.S. 23:921(A)(1), which provides:

> Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void. However, every contract or agreement, or provision thereof, which meets the exceptions as provided in this Section, shall be enforceable.

La. R.S. 23:921(A)(1).

Thus, as evidenced by La. R.S. 23:921(A)(1), "non-competition agreements are unenforceable unless they fit within one of the statute's narrow exceptions." *Waguespack v. Medtronic, Inc.*, 185 F. Supp. 3d 916, 928 (M.D. La. 2016) (Brady, J.) (citing *SWAT 24 Shreveport Bossier, Inc.*, 808 So. 2d at 298). The statutory exception relevant to the instant case is set forth in Section 921(C), which provides in relevant part:

> Any person . . . who is employed as an . . . employee may agree with his employer to refrain from carrying on or engaging in a *business similar to* that of the employer and/or *from soliciting* customers of the employer *within a specified parish or parishes*, municipality or municipalities, or parts thereof, so long as the employer *carries on a like business therein*, not to exceed a period of two years from termination of employment.

La. R.S. 23:921(C).

Put another way, Section 921(C) essentially provides "three overarching requirements for employer–employee noncompetes: (1) a two-year maximum duration, (2) a list of the areas in which the former employee is restrained, and (3) competition between the former employee and employer." *Waguespack*, 185 F. Supp. 3d at 928–29 (quoting Jacob Ecker, *At the Breaking Point: Adapting Louisiana Employment Noncompete Law to the Information Age*, 75 LA. L. REV. 1317, 1333 (2015)).

ii.    Analysis

Defendant first contends that the non-competition and non-solicitation clauses[3] cannot be sued on as they are unenforceable for being overbroad in both geographical scope and the scope of activities they restrict. (Doc. 16-1 at 12–18.)

Section 5 of the Agreement at issue here addresses the restrictive covenants Defendant agreed to:

---

[3] It must be noted that "Louisiana courts make no distinction between non-compete and customer non-solicitation clauses; both must comply with the mandates of La. R.S. 23:921(C)." *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 623 n.4 (W.D. La. 2010) (citations omitted).

   A. **<u>The Territory.</u>** The "Territory", as used in this Agreement, shall consist of the following parish or parishes, county or counties, and/or municipality or municipalities set forth on *Exhibit A attached hereto*, so long as Employer carries on a like business therein.

   B. **<u>Non-Competition.</u>** While employed by Employer and for a period of two years following the end of such employment relationship, Employee shall not*, in the Territory*, directly or indirectly, whether as an employee, consultant, independent contractor, agent, officer, director, owner, partner, operator, shareholder of 1% or more of stock, or in any other capacity, engage in any business that directly or indirectly *competes with or is similar to the business of Employer.*

   C. **<u>Non-Solicitation.</u>** While employed by Employer and for a period of two years following the end of such employment relationship, Employee shall not, *in the Territory*, (1) directly or indirectly solicit, request, seek, or obtain, for the benefit of Employee or any person or entity other than Employer, the business of any person or entity that is a client of Employer during Employee's employment by Employer or that is a client of Employer during the two year period following the end of such employment relationship, or (2) directly or indirectly solicit, request, influence, induce, or otherwise encourage any client of Employer as described herein to restrict, limit, or cease doing business with Employer.

(The Agreement, § 5, Doc. 8-4 (emphasis added).) Exhibit A, which is referenced in Section 5(A) as defining the "Territory" or geographical scope of the Agreement, lists by name all 64 parishes of the state of Louisiana as well as every county in fifteen other states. (*See* Exhibit A, "Territory," Doc. 8-4 at 5–14.)

     The Court first addresses the validity of the covenants based on the Agreement's geographic scope. As this Court explained in *Waguespack*, the geographical limitation set forth in La. R.S. 23:921(C) consists of "two independent requirements: (a) the parishes where competition is restrained must be 'specified' within the agreement itself; and (b) a substantive limit requiring non-competition agreements to be 'limited in enforcement to parishes where the first employer actually carries on a like business therein.' " 185 F. Supp. 3d at 929 (quoting Ecker, *supra*, at 1334–35 (internal quotations and citations omitted)). With respect to the first "specificity"

requirement, "[w]hat is important is that the geographic limitation be express and clearly discernable." *Id.* (alteration in original) (quoting *Vartech Sys., Inc. v. Hayden*, 2005-2499 (La. App. 1 Cir. 12/20/06), 951 So. 2d 247, 258). In other words, the non-compete agreement's geographical restriction must specifically identify by name each parish in which the former employee is prohibited from competing and/or soliciting customers. *See id.* at 929–30.

Here, the parties do not dispute that the Agreement's geographical restriction satisfies the "specificity" requirement because it specifically lists all 64 parishes of the state of Louisiana as well as every county in fifteen other states. (*See* Exhibit A, "Territory," Doc. 8-4 at 5–14.) Instead, at issue is the "substantive limit" imposed by La. R.S. 23:921(C), which requires "non-competition agreements to be limited in enforcement to parishes where the first employer actually carries on a like business therein." *Waguespack*, 185 F. Supp. 3d at 929 (citation and quotations omitted). Relying primarily on *Vartech*, 951 So. 2d 247, Defendant asserts that the geographical scope in the Agreement is impermissibly broad because La. R.S. 23:921 requires Plaintiff to "have an *actual location or actual customers* in [each] parish or county in which they seek to enforce a non-competition or non-solicitation agreement under [the statute]." (Doc. 16-1 at 13.) In response, Plaintiff argues that the geographical scope defined in the Territory complies with La. R.S. 23:921 as "the statute does not impose any numerical limitation on the parishes and counties that may be specified in a restrictive covenant." (Doc. 20 at 14.) As long as "the employer conducts a like business in all [listed] parishes[,] the statute provides protection." (*Id.* at 15.)

In an unpublished decision, a panel of the United States Court of Appeals for the Fifth Circuit dealt with non-competition and non-solicitation-of-customer provisions that listed "all of Louisiana's parishes by name." *Arthur J. Gallagher & Co. v. Babcock*, 339 F. App'x 384, 387 (5th Cir. 2009). The court stated that the listing of every parish in Louisiana did not automatically

render the provisions at issue overbroad *per se*. *Id.* Instead, the district court is to engage in a factual inquiry, "first considering evidence regarding the nature and extent of [the employer]'s business" to determine whether the employer carried on a like business in each of those parishes. *Id.* And, in a later decision in that case, the Fifth Circuit reemphasized the importance of this "factual inquiry" requirement: "We have already made clear that these provisions were not invalid merely because they attempted to reach every Louisiana parish." *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 292 (5th Cir. 2012) (citing *Babcock*, 339 F. App'x at 387).

The *Verified Complaint* here states that "Deep South operates throughout the state of Louisiana and throughout the United States." (*V. Compl.* ¶ 7, Doc. 1.) Construing this fact in a light most favorable to Plaintiff, the Court finds that dismissal based on overbroad geographic scope is not appropriate at this stage of the litigation; Plaintiff will be required to show that it actually "conducts business" in each area listed in the Territory, but that showing is not required for purpose of the *Motion to Dismiss*.

Furthermore, even if the geographic scope was deemed overbroad at this stage, the restrictive covenants would not be deemed null and void because the Agreement here contains a standard severability clause. (*See* The Agreement, § 7, Doc. 8-4.) "Under Louisiana law, non-solicitation and non-competition clauses must be limited to geographic areas in which the employer conducts 'a like business,' and the agreement must make this limitation clear by specifying the 'parish or parishes, municipality or municipalities, or parts thereof' in which the employer operates." *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 292 (5th Cir. 2012) (citations omitted). "A court may, however, rely on a contractual severability clause to excise the geographic areas in which an employer does not conduct such business." *Id.*

Next, Defendant maintains that the restrictive covenants are unenforceable because the Agreement contains an overly broad definition of Plaintiff's business, prohibiting more activity by the employee than is permitted under La. R.S. 23:921(C). (Doc. 16-1 at 14–15.) Plaintiff responds that the business description set forth in the Agreement complies with the statute and is not overbroad, pointing out that the statute neither defines what is meant by "engaging in or carrying on a similar business" nor does it require a restrictive covenant to contain a description of the employer's business. (Doc. 20 at 17.)

To comply with La. R.S. 23:921(C), "a noncompete agreement must identify with reasonable certainty those areas which the employer lawfully may prohibit competition." *Brand Energy Sols., LLC v. Gilley*, No. 16-1025, 2017 WL 238917, at *6 (W.D. La. Jan. 18, 2017). Hence, when a non-compete agreement defines the "business similar" to that of the employer's in an ambiguous or overly broad manner, the agreement fails to comply with La. R.S. 23:921(C) and is thus unenforceable on its face. *See id.* at *7 ("Even though the Agreement attempts to define 'business similar', the ambiguities created by the activities that prohibit and prevent Mr. Gilley from working are significant . . . . Accordingly, we find that the 'business similar' as defined in the Agreement is over broad as well as over reaching.") The policy underlying this principle is simple: "an 'employer is only entitled to keep ex-employees from competing with the employer's actual business, not some overblown contractual definition of business designed to cover the proverbial waterfront and keep ex-employees from being able to make a living in any segment of the ex-employer's industry.' " *Paradigm Health Sys., L.L.C. v. Faust*, 2016-1276 (La. App. 1 Cir. 4/12/17), 218 So. 3d 1068, 1073 (quoting *Vartech Sys., Inc.*, 951 So. 2d at 259 n.15).

Again, the non-compete clause here prohibits Defendant, in the "Territory" for two years after employment ends, from "directly or indirectly, whether as an employee, consultant,

independent contractor, agent, officer, director, owner, partner, operator, shareholder of 1% or more of stock, or in any other capacity, <u>engag[ing] in any business</u> that directly or indirectly <u>competes with</u> or <u>is similar to</u> **the business of Employer**." (The Agreement, § 5(B), Doc. 8-4 (emphasis added).) Section 1 of the Agreement defines Deep South's business as follows:

> 1. **<u>Employer's Business.</u>** Employer is a telecommunications contractor specializing in microwave communications design and construction, fiber optics communications, distributed antenna systems (DAS), intelligent transportations systems (ITS), communications tower build-outs and maintenance, cellular and microwave maintenance and build-outs. **Employer's business also includes** the *development and maintenance of business relationships and accounts* with various persons and/or entities with whom Employer conducts business, including customers, consumers, borrowers, vendors, suppliers, contractors, or otherwise, are hereinafter collectively referred to as Employer's "clients."

(The Agreement, § 1, Doc. 8-4 (emphasis added).) When Section 5(B) and Section 1 are read together, Defendant is prohibited from engaging in "any business" that "competes with or is similar to" the "development and maintenance of business relationships and accounts" with virtually anyone with whom Deep South has ever transacted business. This broad contractual definition of Deep South's business creates notable ambiguities concerning what exact activities the non-compete clause prohibits Fellegy from engaging in. The Court agrees with Defendant that "the 'business similar' as defined in the Agreement is over broad as well as over reaching." *Gilley*, 2017 WL 238917, at *7; *see also Paradigm Health Sys.*, 218 So. 3d at 1073; *Vartech Sys., Inc.*, 951 So. 2d at 259 n.15.

However, because of the Agreement's severability clause**,** the impermissible business definition does not render the entire non-compete clause void on its face. Like with overly broad geographic limitations, courts have indicated that a severability clause may be used to delete other impermissible language, thereby reforming the provision at issue and rendering it enforceable. *See McLaughlin v. BancorpSouth Ins. Servs., Inc.*, No. 17-7604, 2018 WL 1035083, at *4 (E.D. La.

Feb. 23, 2018) (finding that the term "financial services or products" was broad, vague, and ambiguous, and the agreement was unenforceable as to that term, "[b]ut as with the overly broad geographic references, this provision does not render [the entire provision] void on its face in light of the [agreement's] severability clause."); *see also SWAT 24 Shreveport Bossier, Inc. v. Bond*, 2000-1695 (La. 6/29/01), 808 So. 2d 294, 309.

Because the impermissible portion of the business description (specifically, the second sentence set forth in Section 1) can be deleted without issue, the Court relies on the severability clause to reform the definition of Deep South's business contained in Section 1 of the Agreement and render the Agreement enforceable. Therefore, the Court finds that the restrictive covenants in this case are enforceable and thus can form the basis of Plaintiff's breach of contract claim. Accordingly, Plaintiff's claims for breach of the restrictive covenants will not be dismissed on this ground.

### b.  *The Non-Disclosure of Confidential Information Provision*

The Court now turns to the question of whether Plaintiff has stated a "legally cognizable claim" for breach of the non-disclosure of confidential information provision. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir. 2014). Defendant asserts that the operative complaint "simply concludes that a breach has occurred without alleging any conduct on Mr. Fellegy's part that actually breaches the contract, which is insufficient under *Iqbal*." (Doc. 16-1 at 18.) In response, Plaintiff claims Defendant mischaracterizes the *Verified Complaint* and "overlooks several material factual allegations that raise a reasonable hope or expectation that discovery will reveal relevant evidence on this claim." (Doc. 20 at 21.)

Section 4 of the Agreement addresses Fellegy's obligations regarding confidential information. That provision provides:

**4. Non-Disclosure of Confidential Information.** Employee agrees that, during and after the end of Employee's employment relationship with Employer, Employee will *not communicate, divulge, or make available* to any person or entity (other than Employer, its clients, or other persons or entities expressly authorized by Employer *to receive* such information) *any Confidential Information*, except upon the prior written authorization of Employer or as may be required by law or valid legal process.

(The Agreement, § 4, Doc. 8-4 (emphasis added).)

Section 3 of the Agreement defines "Confidential Information" as that term is used in the non-disclosure of confidential information provision:

**3. Confidential Information.** Employee understands that, during the course of Employee's employment relationship with Employer, Employee has had and/or will continue to have access to existing and new valuable information relating to the business and clients of Employer that is nonpublic, confidential, proprietary, and/or a trade secret and would be particularly valuable to the Employer's competitors, *including but not limited to* business plans and strategies; business processes; research and development; training and other operational methods and techniques; manuals, policies, and procedures; business records and files; business proposals; *client lists; client information;* client source lists; purchasing methods; pricing; sales plans and activities; customer service strategies or activities; marketing and other technical data and studies; employment and other personnel data; financial plans, reports, and strategies; profits and losses; budgets; projections; price lists; sales, promotional, and marketing strategies and information; proprietary computer software and data; and internal correspondence, notes, and memoranda relating to any of the foregoing (all hereinafter "Confidential Information").

(*See id.* § 3 (emphasis added).)

Generally, in order to recover for breach of contract, a plaintiff must prove the following elements: "(1) the obligor's undertaking an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the failure to perform resulted in damages to the obligee." *RAMJ Constr., L.L.C. v. Seola Enterprises, Inc.*, No. 17-01789, 2018 WL 3232781, at *2 (M.D. La. July 2, 2018) (quoting *Denham Homes, L.L.C. v. Teche Fed. Bank*, 2014-1576 (La. App. 1 Cir. 9/18/15), 182 So. 3d 108, 119) (citing La. Civ. Code art. 1994). Consequently, for purposes of the 12(b)(6) motion, the Court here must determine whether the *Verified Complaint* alleges facts

sufficient to raise a "reasonable expectation" that "discovery will reveal relevant evidence of each element of" Plaintiff's claim for breach of the confidentiality provision. *Lormand*, 565 F.3d at 257; *Twombly*, 550 U.S. at 556. For the reasons set forth below, the Court finds this standard has not been met.

As to the first element required for breach of contract claims, the operative complaint shows Defendant undertook the obligation to not disclose, "communicate, divulge, or make available to any person or entity" any confidential information as that term is defined in Section 3 of the Agreement. (The Agreement, § 4, Doc. 8-4.)

The second element requires Plaintiff to show, based on the allegations in the *Verified Complaint*, that Defendant breached the non-disclosure of confidential information provision. According to Plaintiff, Defendant "had access to and received from Deep South non-public, confidential information related to its wireless technology services business, including existing and prospective client names, addresses, phone numbers, and other similar information." (*V. Compl.* ¶ 84, Doc. 1.) In claiming that Defendant breached his confidentiality obligations, Plaintiff alleges: "Upon information and belief, Fellegy *used* Deep South's Confidential Information to solicit Deep South's clients, to induce such clients to reduce their business with Deep South, and to divert such clients and/or their business from Deep South for" the benefit of Fellegy and End 2 End. (*V. Compl.* ¶¶ 89, 90, Doc. 1 (emphasis added).) The *Verified Complaint* further provides: "Upon information and belief, Fellegy *used* his knowledge of Deep South customer data, addresses, phone numbers, and other similar information to solicit their business for himself and/or [End 2 End]." (*Id.* ¶ 96 (emphasis added).)

As the above-stated allegations show, Plaintiff's primary claim is that Defendant breached the non-disclosure of confidential information provision contained in Section 4 of the Agreement

31

because he "used" information the Agreement defined as confidential. However, by its literal

terms, Section 4 does not explicitly prohibit employees from "using" confidential information;

rather, it provides that the employee "will not communicate, divulge, or make available to any

person or entity . . . any Confidential Information[.]" (The Agreement, § 4, Doc. 8-4.)

     The central question thus becomes whether Fellegy's "use" of confidential information can

be considered a breach under the language of the contract. In resolving this issue, the Court must

apply general principles of contract interpretation. The Louisiana Supreme Court has instructed:

> Contracts have the effect of law for the parties and the [i]nterpretation of a contract
> is the determination of the common intent of the parties. The reasonable intention
> of the parties to a contract is to be sought by examining the words of the contract
> itself, and not assumed. When the words of a contract are clear and explicit and
> lead to no absurd consequences, no further interpretation may be made in search of
> the parties' intent. Common intent is determined, therefore, in accordance with the
> general, ordinary, plain and popular meaning of the words used in the contract.
> Accordingly, when a clause in a contract is clear and unambiguous, the letter of that
> clause should not be disregarded under the pretext of pursuing its spirit, as it is not
> the duty of the courts to bend the meaning of the words of a contract into harmony
> with a supposed reasonable intention of the parties. However, even when the
> language of the contract is clear, courts should refrain from construing the contract
> in such a manner as to lead to absurd consequences. Most importantly, a contract
> must be interpreted in a common-sense fashion, according to the words of the
> contract their common and usual significance. Moreover, a contract provision that
> is susceptible to different meanings must be interpreted with a meaning that renders
> the provision effective, and not with one that renders it ineffective. Each provision
> in a contract must be interpreted in light of the other provisions so that each is given
> the meaning suggested by the contract as a whole.

*Clovelly Oil Co., LLC v. Midstates Petroleum Co.*, LLC, 2012-2055 (La. 3/19/13), 112 So. 3d 187,

192 (quotation marks and citations omitted).

     Based on Louisiana principles of contract construction, the Court finds that the Agreement

here does not include the employee's "use" of confidential information in its prohibition. The

language of Section 4 is clear and explicit: "Employee will not communicate, divulge, or make

available to any person or entity (other than Employer, its clients, or other persons or entities

expressly authorized by Employer to receive such information) any Confidential Information[.]" (The Agreement, § 4, Doc. 8-4.) The Court acknowledges that perhaps the spirit or purpose of the non-disclosure provision would be better served by interpreting it as prohibiting use of confidential information to solicit Deep South clients. However, given the contract's unambiguous language and the plain meaning of the words "communicate," "divulge," and "make available to [another] person or entity," it would be inappropriate for this Court to disregard those clear and explicit terms in pursuit of the spirit of Section 4. (*Id.*) The contractual language unquestionably speaks to conveying confidential information to another, rather than mere use alone by the employee.[4]

Reading Section 4 as a whole further bolsters this interpretation, as that provision specifically prohibits the employee from conveying any confidential information to another person or entity "other than Employer, its clients, or other persons or entities expressly authorized by Employer *to receive* such information[.]" (The Agreement, § 4, Doc. 8-4 (emphasis added).) Use of the words "to receive" clearly complements the preceding phrase whereby the employee is restricted from transmitting any prohibited information. Nowhere in the *Verified Complaint* does Plaintiff allege that Defendant communicated, divulged, or made available Deep South's confidential information to another person or entity, not even End 2 End.

Furthermore, even if the Court was convinced that the contractual language is unclear, "[i]t is axiomatic that courts construe ambiguities of an agreement against the drafter of an agreement." *Robinson v. Robinson*, 1999-3097 (La. 1/17/01), 778 So. 2d 1105, 1122; *see also Prejean v. Guillory*, 2010-0740 (La. 7/2/10), 38 So. 3d 274, 280 (stating the general rule that "any ambiguity in a contract is construed against the drafter thereof"); *Michael Clayton Enter., LLC v. Hossley*,

---

[4] Allegations of use or misappropriation of the confidential information alone may have carried more weight had Plaintiff brought a claim under the Louisiana Uniform Trade Secrets Act, *see generally, Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612 (W.D. La. 2010), but Plaintiff's claim here is for breach of contract only. As such, Plaintiff's claim is properly analyzed under the general principles of contract interpretation in Louisiana.

No. 13-00537, 2015 WL 9255551, at *3 (M.D. La. Dec. 18, 2015) (Jackson, J.) (explaining that "contractual ambiguities . . . must be construed against the drafter"). Plaintiff drafted the Agreement in this case. Assuming, for the sake of this argument, that "communicate," "divulge," and "make available to [another] person or entity" are susceptible to multiple meanings, construing those words against Plaintiff here would ultimately lead the Court to the same conclusion: mere "use" of the information, without more, is not prohibited under the language of the contract.

Finally, although only the allegations in the pleadings are generally considered when conducting a Rule 12(b)(6) analysis, the Court notes that the *Motion to Dismiss* and *Motion for TRO* were presented almost simultaneously, and the subsequent hearing concerned certain issues falling under the *Motion to Dismiss*. For this reason, the Court emphasizes that even if it were to go beyond the pleadings and consider the hearing testimony for purposes of its Rule 12(b)(6) analysis, the same conclusion would follow. As more fully explained below, that testimony did not expand the type of factual allegations made in the *Verified Complaint*, but rather corroborated the allegations that Defendant "used" confidential information (here, customer contacts) by speaking with one or more of those contacts after the end of his employment with Deep South. In other words, the testimony—like the pleadings—did not establish any alleged communication or divulging of confidential information by Defendant to any other person or entity.

Therefore, the Court finds that Plaintiff's assertions regarding breach of the non-disclosure of confidential information provision are insufficient to survive a 12(b)(6) motion to dismiss. Accordingly, as it relates to the claim for breach of this provision, the *Motion to Dismiss* is granted. With respect to the claims for breach of the non-compete and non-solicitation provisions, however, the *Motion to Dismiss* is denied.

## V.    DEEP SOUTH'S MOTION FOR TRO

### A.  Standard for TROs Generally

"[I]njunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) (citing *Allied Mktg. Group, Inc. v. C.D.L. Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)); *see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.") (citing 7 Moore's Federal Practice ¶ 65.04(s) (1982); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2942, at 368 (1973)).

"Injunctive relief is an extraordinary remedy, to be granted only if Plaintiffs clearly demonstrate (1) a substantial likelihood of success on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the Defendants, and (4) that granting the preliminary injunction will not disserve the public interest." *Gumns v. Edwards*, No. 20-231, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (Dick, C.J.) (citing *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted); *Justin Indus. v. Choctaw Sec., L.P.*, 920 F.2d 262 (5th Cir. 1990)). "Failure to establish any of these elements results in the denial of the motion for injunctive relief." *Sacal-Micha v. Longoria*, 449 F. Supp. 3d 656, 662 (S.D. Tex. 2020) (citing *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003)); *see also Hurley v. Gunnels*, 41 F.3d 662, 662 (5th Cir. 1994) (unreported) ("failure to carry the burden on any one of the four elements will result in the denial of the motion") (citing *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471–72 (5th Cir. 1985) ("[t]he movant has a heavy burden of persuading the district court that all four elements are

satisfied. Thus, if the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue . . .") (citations and quotations omitted)).

"All affidavits should state the facts supporting the litigant's position clearly and specifically. Preliminary injunctions frequently are denied if the affidavits are too vague or conclusory to demonstrate a clear right to relief under Rule 65." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed. 2016). Further, "[i]f the facts as alleged in a verified complaint or supporting affidavits consist largely of general assertions that are substantially controverted by counteraffidavits a preliminary injunction should not be granted unless the moving party makes a further showing sufficient to demonstrate that he will probably succeed on the merits." *Id.* at n.17 (citing *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087 (9th Cir. 1972); *Huber Baking Co. v. Stroehmann Bros. Co.*, 208 F.2d 464 (2d Cir. 1953) (supporting affidavits left parties' rights uncertain)).

### B. Injunctive Relief in the Context of Non-Compete Agreements

As previously mentioned, a party seeking the issuance of a preliminary injunction generally must make a *prima facie* showing that the party will prevail on the merits of the case and a substantial threat that that party will suffer irreparable injury if the injunction is not granted. "However, in the event an employee enters into an agreement with his employer not to compete, pursuant to LSA–R.S. 23:921, and fails to perform his obligation under such an agreement, the court shall order injunctive relief even without a showing of irreparable harm, upon proof by the employer of the employee's breach of the non-compete agreement." *Vartech Sys., Inc. v. Hayden*, 2005-2499 (La. App. 1 Cir. 12/20/06), 951 So. 2d 247, 255 (citing *Clear Channel Broad., Inc. v. Brown*, 04–0133 (La. App. 4th Cir. 3/30/05), 901 So.2d 553, 557; La. R.S. 23:921(H)). "In determining whether the employer has met his burden of proof, the courts have been called on to

36

consider the validity and enforceability of the agreement sought to be enforced by the employer." *Id.* (citations omitted).

In other words, although La. R.S. 23:921(H) relieves the former employer of the requirement of proving irreparable injury, the former employer still must prove that it is entitled to the relief sought. And, "[w]here the actions sought to be enjoined pursuant to a non-compete agreement do not fall within the exception found in LSA–R.S. 23:921(C) or where the non-compete agreement is found to be unenforceable for failure to conform to LSA–R.S. 23:921, the employer is unable to establish that it is entitled to the relief sought." *Id.* at 255–56 (citing *SWAT 24*, 808 So. 2d at 307; *Clear Channel*, 901 So. 2d at 556–58).

### 1. Substantial Likelihood of Success on the Merits

As the party seeking injunctive relief, Plaintiff must establish that there is a "substantial likelihood of success on the merits" on each of its breach of contract claims. *Gumns*, 2020 WL 2510248, at *3 (citations omitted). Again, the elements a plaintiff must prove in claiming breach of contract are: "(1) the obligor's undertaking an obligation to perform; (2) the obligor failed to perform the obligation (the breach); and (3) the failure to perform resulted in damages to the obligee." *RAMJ Constr., L.L.C. v. Seola Enterprises, Inc.*, No. 17-01789, 2018 WL 3232781, at *2 (M.D. La. July 2, 2018) (quoting *Denham Homes, L.L.C. v. Teche Fed. Bank*, 2014-1576 (La. App. 1 Cir. 9/18/15), 182 So. 3d 108, 119) (citing La. Civ. Code art. 1994).

In short, for the reasons set forth below, the Court finds that Plaintiff has not met its burden in showing a substantial likelihood of success on the merits on its claims for breach of any of the three provisions at issue.

### a.  Non-Competition

The Court notes that Defendant repeats the same arguments here regarding validity. Specifically, Defendant contends that, as to the claims for breach of the non-competition and non-solicitation clauses, Plaintiff has no chance of succeeding on the merits because La. R.S. 23:921 renders those provisions unenforceable.

Again, as a threshold matter, Plaintiff must establish that the Agreement complies with La. R.S. 23:921(C) to show it is entitled to a TRO. The crux of the issue before the Court is whether the geographical scope of the Agreement is overly broad. The Court conducted a hearing on this matter and had the parties submit post-hearing briefs. As previously explained, the Court found the Agreement's geographical limitation enforceable under La. R.S. 23:921(C) for purposes of Rule 12(b)(6).[5] However, when conducting a Rule 12(b)(6) analysis, the Court's consideration of facts is constrained to the allegations in the operative complaint, which the Court construes in a light most favorable to Plaintiff. By contrast, the standard for obtaining injunctive relief is much higher, and the Court is to consider matters outside the operative complaint—specifically, here, the testimony from the hearing and the evidence submitted by the parties in connection with that hearing.

    i.    <u>Whether the Agreement is Valid and Enforceable Based on the Geographical Limitation</u>

As mentioned above, with respect to a non-compete agreement's geographical limitation, La. R.S. 23:921(C) imposes two requirements for a valid and enforceable agreement. At issue here is the second "substantive limit," which mandates that "non-competition agreements . . . be limited

---

[5] *See supra* "Analysis," at Section (IV)(B)(2)(a)(ii) of this ruling, where the Court observed the *Verified Complaint*'s allegation that "Deep South operates throughout the state of Louisiana and throughout the United States[;]" the Court then stated: "Construing this fact in a light most favorable to Plaintiff, the Court finds that dismissal based on overbroad geographic scope is not appropriate at this stage of the litigation; Plaintiff will be required to show that it actually 'conducts business' in each area listed in the Territory, but that showing is not required for purposes of the *Motion to Dismiss*."

in enforcement to parishes where the first employer *actually carries on a like business* therein." *Waguespack*, 185 F. Supp. 3d at 929 (citation and quotations omitted) (emphasis added). Defendant first argues that the Agreement is invalid for being geographically overbroad because Plaintiff's business activities as they relate to a majority of the counties and parishes listed are not sufficient to constitute "carrying on business," as Plaintiff's evidence shows it does not have a location or customers in each of those listed territories. (Doc. 51 at 13–16.)

As the Fifth Circuit explained, whether an employer actually carries on a like business in each of the parishes listed in its non-compete agreement's geographical restriction requires courts to engage in a factual inquiry, "first considering evidence regarding the nature and extent of [the employer]'s business" to determine whether the employer carries on a like business in each of those parishes. *Arthur J. Gallagher & Co. v. Babcock*, 339 F. App'x 384, 387–88 (5th Cir. 2009) (finding that the district court "should have considered evidence concerning whether [employer] 'carries on a like business', as defined by Louisiana law, in all of Louisiana's parishes.")

The Fifth Circuit did not, however, explain what types of activities by an employer are sufficient to constitute carrying on a like business, nor has the Louisiana Supreme Court provided a concrete standard for the quantity or quality of business activity required by La. R.S. 23:921(C)'s geographical limitation. On this point, Plaintiff primarily relies on cases from the Third and Fifth Circuit Louisiana Courts of Appeal, arguing that mere solicitation of customers or business in a listed territory is sufficient to establish an employer "carries on a like business" in that territory. (*See* Doc. 52 at 20 (citing *Moores Pump & Supply, Inc. v. Laneaux*, 98-1049 (La. App. 3 Cir. 2/3/99), 727 So. 2d 695, 698; *H2O Hair, Inc. v. Marquette*, 06-930 (La. App. 5 Cir. 5/15/07), 960 So. 2d 250, 258–60; *see also West Carroll Health Sys., L.L.C. v. Tilmon*, 47,152 (La. App. 2 Cir. 5/16/12), 92 So. 3d 1131, *writ denied*, 2012-1387 (La. 11/2/12), 99 So. 3d 665).) In contrast,

Defendant argues that carrying on a like business under La. R.S. 23:921(C) requires the employer to currently have a location or actual customers in each specific territory listed. (Doc. 51 at 13 (citing *Vartech Sys., Inc. v. Hayden*, 2005-2499 (La. App. 1 Cir. 12/20/06), 951 So. 2d 247, 258; *see also Env't Safety & Health Consulting Servs., Inc. v. Fowler*, 2019-0813, 2020 WL 1173587 (La. App. 4 Cir. 3/11/20).)

To determine whether Plaintiff has provided sufficient evidence to show that the Agreement's geographical provision is not overly broad, the Court must first articulate the standard to be imposed in this case. Thus, a discussion of cases in which Louisiana courts have handled this specific issue is warranted. The First and Fourth Circuits have both indicated that the Louisiana non-compete statute contemplates that the parishes specified in the agreement must be "parishes where the ex-employer actually has a location or customers." *Env't Safety & Health Consulting Servs., Inc. v. Fowler*, 2019-0813, 2020 WL 1173587, at *6 (La. App. 4 Cir. 3/11/20) (quoting *Vartech Sys., Inc. v. Hayden*, 2005-2499 (La. App. 1 Cir. 12/20/06), 951 So. 2d 247, 258); *see also Zanella's Wax Bar, LLC v. Trudy's Wax Bar, LLC*, 2019-0043 (La. App. 1 Cir. 11/7/19), 291 So. 3d 693, 698.

Other Louisiana courts, however, have not recognized La. R.S. 23:921(C) as imposing a rigid requirement that the ex-employer have actual customers or a location in each parish listed. For example, in *Moores Pump & Supply, Inc. v. Laneaux*, 98-1049 (La. App. 3 Cir. 2/3/99), 727 So. 2d 695, the Third Circuit was tasked with deciding whether an agreement's geographic scope—which listed forty-three Louisiana parishes by name—was overly broad. The court found that the geographic restriction was not overly broad because the ex-employer "ha[d], at least, established a prima facie case that it *solicits business* in all the parishes listed in the agreement." *Id.* at 698 (emphasis added).

Similarly, in *H2O Hair, Inc. v. Marquette*, 06-930 (La. App. 5 Cir. 5/15/07), 960 So. 2d 250, the Louisiana Fifth Circuit Court of Appeal was asked to determine whether the ex-employer's business activities were sufficient to constitute carrying on a like business in Orleans Parish. The court concluded that "the trial court did not err in finding that H20 does business in Orleans Parish for purposes of the non-competition agreement." *Id.* at 259–60. The court, however, did not explicitly reject other Louisiana courts' interpretation of La. R.S. 23:921 as requiring an actual customer or location in the specified parishes. *See id.* at 259 (quoting *Vartech* for the rule that "the parishes specified in the agreement must be parishes where the ex-employer actually has a location or customers. . . . [because] [e]mployers are not permitted to lock former employees out of markets in which the employer does not operate.") (citations omitted). Rather, the *H2O* court found that H2O did business in Orleans Parish because "[i]t was uncontradicted that a substantial portion of H2O's customers are residents of Orleans Parish, *and* that H2O solicitation of customers in Orleans Parish via advertising and other means is integral to its business." *Id.* at 259–60 (emphasis added).

Finally, in *West Carroll Health Sys., L.L.C. v. Tilmon*, 47,152 (La. App. 2 Cir. 5/16/12), 92 So. 3d 1131, the Louisiana Second Circuit Court of Appeal focused not on actual customers or business facilities in the listed parishes, but on the ex-employer's overall business interest in the listed territory. There, the ex-employer, West Carroll Health System ("WCHS"), had no buildings or health care facilities outside of West Carroll Parish, but the non-competition agreement entered into with its former employee listed Morehouse Parish as a territory the agreement applied to. *Id.* at 1134. WCHS argued that the non-competition agreement was valid to the extent it applied to Morehouse Parish because WCHS had "at least 280 patients who reside[d] in Morehouse Parish

and travel[ed] to West Carroll for medical services." *Id.* at 1135. The court explained the geographical limitation expressed in La. R.S. 23:921(C) in the following manner:

> The present geographic limit in the post–1989 version of the Statute broadly allows for many parishes to be "specified" in the noncompetition agreement. Nevertheless, a particular parish may be off limits to the employee only if the "employer carries on a like business therein." In view of the statutory history of the Statute and the nature of commercial business activity that generally does not abruptly end at the parish line of the principal location of a business, the lack of an actual business facility in Morehouse in this case is not the only measure for the geographic test of the Statute. Its language of "carrying on" "business" allows for the employer to demonstrate *significant business activity* which might be *competitively impacted* in a parish outside of the location where the employee worked. The customer "territory" concept is therefore still a business interest of the employer recognized under the Statute.

*Id.* at 1137–38 (emphasis added).

The court further noted that WCHS's asserted business interest in Morehouse Parish was its "client base," primarily because (1) West Carroll Parish, where WCHS had a facility, shared a common boundary with Morehouse Parish, and (2) "WCHS presented evidence that in the prior four years 280 patients from Morehouse made 1,567 office visits with West Carroll physicians under whom [the ex-employee] worked." *Id.* at 1138. Ultimately, the court held that the trial court did not err in finding that WCHS carried on a "like business" in Morehouse Parish because of "the number of [Morehouse Parish] patients involved and their immediate proximity to the WCHS facilities." *Id.* at 1138.

When considering the various interpretations of "carries on" business discussed above, it is clear that the employer may prohibit competition and solicitation in a listed parish or county if it has actual customers in, has a physical location in, or performs business activities in the listed area. Less clear from the jurisprudence, however, is whether solicitation of customers in a given parish or county satisfies the statutory requirement. The Court finds Plaintiff's argument persuasive on this issue.

42

Requiring actual customers or a business location in each specific parish or county fails to account for "significant business activity" an employer may have in areas where it has no facility or current clients. *Id.* at 1138. The statutory language carrying on "business" does not call for such a rigid standard, especially in light of the United States Fifth Circuit's instruction that courts determine where an employer carries on business by considering the "nature and extent of" the employer's business. *Arthur J. Gallagher & Co.*, 339 F. App'x at 387. As the court explained in *West Carroll*, at the heart of this inquiry is whether the employer's business interest "might be competitively impacted" in the county or parish listed. 92 So. 3d at 1138; *see also H2O Hair, Inc.*, 960 So. 2d at 259–60 (finding the employer carried on business in the parish because its customers resided there and because employer's solicitation of customers in that parish was "integral to its business.").

An employer that is actively soliciting the business of prospective or prior customers in a given parish or county is conducting significant business activity in that area. Moreover, if one of that employer's ex-employees begins conducting similar business in that same area, the employer may be rightfully concerned about the negative impact on its own enterprise. This is not to say, however, that widespread media advertising may necessarily constitute carrying on business in every area where a potential customer is reached by it. Given the public policy disfavoring these kinds of agreements and the strict construction the Court must give, the solicitation must—at the very least—be active, targeted, and specific.

Additionally, Defendant argues the geographic restriction is overbroad because Plaintiff "does not establish that it is *currently* carrying on business" in the parishes and counties listed, which, according to Defendant, is required by La. R.S. 23:921(C). (Doc. 51 at 15.) Defendant points out that a substantial portion of Plaintiff's evidence shows work completed by Plaintiff in

the past. (*Id.* (explaining that much of the work was completed over three years ago and, in some cases, the evidence shows work completed over ten years ago).)

Plaintiff responds that "neither the statute nor the courts interpreting it" require a timing requirement for carrying on business, pointing out that Defendant cites no cases for this principle. (Doc. 54 at 7.) Moreover, Plaintiff avers, because the "nature of Deep South's business is to sell and install products and services in the wireless telecommunications industry[,]" its customers may not necessarily purchase products from or require services by Deep South on a "daily, weekly, or even yearly" basis. (*Id.*) Therefore, argues Plaintiff, "[a] provider such as Deep South is carrying on or engaging in business in locations where it has sold products or services to ongoing customers without having to meet some arbitrary frequency or interval in every parish and county in its market." (*Id.*)

Numerous courts have made abundantly clear that one of the paramount goals of Section 921(C) is to protect employees by ensuring they know and understand the extent of the prohibitions they are agreeing to *before* signing a non-competition agreement. The Louisiana Fourth Circuit Court of Appeal explicitly discussed this policy concern in *Aon Risk Servs. of Louisiana, Inc. v. Ryan*, finding that the legislature's intent in drafting Section 921(C) was "that the employee know on the front end what his potential restrictions might be and exactly what price he was being called upon to pay in exchange for employment." 2001-0614 (La. App. 4 Cir. 1/23/02), 807 So. 2d 1058, 1062. The court continued: "By specifying the parishes . . . and requiring that the employer be doing business in them, the employee is not later caught in a position where he finds that he has given up much more than he bargained [for] should his employer greatly expand the geographic range of his business after the agreement is executed." *Id.*; *see O'Hara v. Globus Med., Inc.*, 2014-1436 (La. App. 1 Cir. 8/12/15), 181 So. 3d 69, 82, *writ denied*, 2015-1944 (La. 11/30/15), 182 So.

3d 939 ("The purpose of requiring that the geographic limitation be specified is to provide an objective measure of the agreement's validity and for the employee to know and understand the limitations upon the signing of the agreement.") (citing *Bell v. Rimkus Consulting Grp., Inc. of Louisiana*, 07-996 (La. App. 5 Cir. 3/25/08), 983 So. 2d 927, 934); *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 623 (W.D. La. 2010).

It was with this key principle in mind that several courts invalidated non-competition agreements that prohibited activity based on uncertain, future events—that is, events occurring after the execution of the contract. For example, in *Medivision, Inc. v. Germer*, the non-competition clause prohibited the former employee for one year after employment ended from "providing ophthalmological services at any location within ten miles of any office of the Center[,]" and the term "Center" was elsewhere defined in the agreement to include ". . . any future additional offices in the Greater New Orleans Area." 617 So. 2d 69, 72 (La. Ct. App.), *writ denied*, 619 So. 2d 549 (La. 1993). The Louisiana Fourth Circuit Court of Appeal affirmed the trial court's finding that the agreement was unenforceable, quoting with approval the trial judge's reasoning: "The contract here proscribes competition within ten miles of offices not established at the time the contract was executed. The employee could not determine at the time of execution the limits of the prohibition. The contract thus contains a potestative element." *Id.* (also finding the agreement unenforceable because, *inter alia*, it failed to specify the parishes or municipalities); *see Garcia v. Banfield Pet Hosp., Inc.*, 2009-0466 (La. App. 1 Cir. 1/21/10), 35 So. 3d 261, 265, *writ denied*, 2010-0393 (La. 4/30/10), 34 So. 3d 299 (holding the non-competition clause prohibited competition within a six-mile radius of certain places of business "on the date of [employee's] termination of employment" was invalid because it tied the agreement to "circumstances existing at future dates").

45

Further, in *McLaughlin*, the Eastern District re-emphasized the general rule that "carries on a like business" is measured at the time the contract is signed. *McLaughlin v. BancorpSouth Ins. Servs., Inc.*, No. 17-7604, 2018 WL 1035083 (E.D. La. Feb. 23, 2018). There, the former employee, McLaughlin, had executed the agreement in 2003 and stopped working for his former employer, Bancorp, in 2017. *Id.* at *6. The non-solicitation clause contained language tethering the prohibition "to parishes where *at the of the employee's departure* Bancorp was carrying on a like business." *Id.* at *5. The court denied summary judgment for Bancorp due to several concerns it had regarding the validity of the non-solicitation clause, one of which was that "in 2003 when McLaughlin agreed to the [agreement], he had no way to determine the geographical limits of" the agreement's non-solicitation clause. *Id.* at *6 (citing *Garcia*, 35 So. 3d 261; *Medivision*, 617 So. 2d 69).

The Court agrees that La. R.S. 23:921(C) does not allow the geographical limitation to be based on business that occurs after the date the contract is executed. This interpretation is consistent with Louisiana's strong public policy disfavoring non-competition agreements and serves the policy's motivating purpose. *See SWAT 24*, 808 So. 2d at 298 (the state's underlying desire is "to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden.") (citations omitted).

The thornier issue presented in this case, however, is whether an employer may use business activities occurring *before* execution of the non-competition agreement in order to show it "carries on" a like business in the geographical areas specified in the agreement. To this Court's knowledge, no Louisiana courts have directly addressed this specific issue. In diversity cases, when applying Louisiana law to resolve a particular issue, the federal court's job "is to 'determine as best [it] can [how] the Louisiana Supreme Court would decide' it." *Jorge-Chavelas v. Louisiana*

46

*Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 850–51 (5th Cir. 2019) (quoting *Gulf & Miss. River*

*Transp. Co. v. BP Oil Pipeline Co.*, 730 F.3d 484, 488 (5th Cir. 2013) (quotation omitted)).

However, when the Louisiana Supreme Court has not definitively resolved an issue, the United

States Fifth Circuit instructs federal courts to proceed as follows:

> When the absence of a controlling high court decision requires us to make an "*Erie* guess" about Louisiana law, we consider many of the same sources we use when guessing the law of other jurisdictions: decisions and reasoning of the state's courts; general rules of the jurisdiction, such as those governing statutory interpretation; and secondary sources like treatises. *Id.* at 488–89. But Louisiana's "civilian methodology" means the pecking order of those sources is different than it is for a common law state. *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 607 (5th Cir. 2014). Louisiana's "Constitution, codes, and statutes" are of paramount importance to its judges. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). The doctrine of stare decisis, a creature of common law, is alien to the civilian system. *Boyett*, 741 F.3d at 607. Unlike stare decisis, which can flow from one decision, in the civil system numerous court decisions must agree on a legal issue to establish *jurisprudence constante* (French for constant jurisprudence). And even when that consensus exists in the caselaw, it remains only persuasive authority for the *Erie* guess; "we are not strictly bound" by the decisions of Louisiana's intermediate courts. *Am. Int'l Specialty Lines*, 352 F.3d at 261 (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)); *see generally* Alvin B. Rubin, Hazards of a Civilian Venturer in Federal Court: Travel and Travail on the Erie Railroad, 48 La. L. Rev. 1369 (1988).

*Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 850–51 (5th Cir. 2019).

Thus, the Louisiana non-compete statute is of "paramount importance" and is the necessary

starting point for this inquiry. *Id.* at 851. In determining whether "carries on" a like business within

the meaning of La. R.S. 23:921(C) includes business the employer conducted before execution of

the non-compete agreement, the Court first looks to the clear language set forth in La. R.S.

23:921(C). Moreover, when taking into account Louisiana public policy disfavoring non-compete

agreements, strict compliance with the words of La. R.S. 23:921(C) is even more justified.

*Ferrellgas, L.P. v. McConathy*, No. CIV.A 1:10-CV-00178, 2010 WL 1010831, at *4 (W.D. La.

Mar. 15, 2010) (noting that, because of "the strong public policy component involved, Louisiana

courts have generally required 'mechanical adherence to the requirements listed in the law (especially the geographical and time limitations).' ") (quoting *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips*, 651 So.2d 395, 399 (La. App. 2d Cir. 1995)).

The relevant statutory language here provides that an "employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer *carries on* a like business therein[.]" La. R.S. 23:921(C). The legislature's careful use of present tense, as indicated by the words "carries on," cannot be ignored. Plaintiff argues that the language "carries on" does not impose such a timing requirement, but that interpretation is belied by the clear language of the statute as well as Louisiana's public policy.

In most instances, when an employee signs a non-competition agreement, that agreement is entered into at or near the commencement of his or her employment with a particular employer. If La. R.S. 23:921(C) were interpreted to include the employer's past business, the employee would be prohibited from competing in areas where its employer, for example, may have made a single sale or performed services only once in the past; this would include situations where the single activity occurred years or even decades before the employee signed the agreement. In such a case, it is likely that the employee would have no way of knowing at the time of signing "what his potential restrictions might be." *Aon Risk Servs. of Louisiana, Inc.*, 807 So. 2d at 1062.

In addition, this would allow employers to include substantially more geographic areas in their non-competition agreements, including areas where the employer lacks any significant business interest at the time its employee agrees not to compete there. Construing Section 921(C) in this way does not comport with the requirement that these agreements be strictly construed

against the employer. *See SWAT* 24, 808 So. 2d at 298. Therefore, the Court interprets "carries on a like business" as requiring the employer to be carrying on business in each specifically listed geographical area on the date the non-competition agreement was executed.

However, as expressed earlier, the Court concludes that, depending on the kind of business involved, it is not necessary for the employer to have a physical location, employees performing work, or customers located in a county or parish in order to be carrying on business there, such as when the employer is actively soliciting business in a given county or parish. In addition, Plaintiff has presented evidence that it had an ongoing Master Services Agreement with at least one client that required Plaintiff to perform cell tower maintenance and repair at any time on any of its client's cell locations. Considering the nature and extent of Plaintiff's business, the Court will consider the parishes and counties in which Plaintiff proved it was carrying on this kind of business at the time Defendant entered into the contract, May 18, 2017.

Plaintiff has submitted a plethora of evidence purporting to show that it carries on business in each of the 1,546 counties and parishes listed in the Agreement. A summary of this evidence is Plaintiff's Exhibit 104, a demonstrative exhibit that, according to Plaintiff, shows it carried on business in every listed territory. (Tr. 246: 3–11.) Plaintiff contends that the comprehensive list set forth in Exhibit 104 is supported by the data contained in Plaintiff's Exhibits 1, 2, 3, 4, 8, 37, 77, 93, and 101. (*See* Pl. Ex. 104.)[6] The Court will address these exhibits in turn.

As mentioned earlier, Plaintiff currently has a Master Services Agreement with one of its customers, Ericsson, Inc. ("Ericsson"). (Doc. 54 at 7; Tr. 165: 21–25, 166: 1.) Pursuant to this

---

[6] In an effort to protect confidential information, Plaintiff moved to, *inter alia*, substitute certain exhibits previously admitted at the hearing with redacted copies. (Doc. 48.) That motion was granted. (Doc. 49.) It appears to the Court that the redacted copy substituted for the original Exhibit 104 contains additional, substantive data not contained in the original. For example, the original Exhibit 104 does not contain any data pertaining to business conducted anywhere in Pennsylvania, whereas the redacted copy sets forth almost two pages of data ostensibly showing the counties in Pennsylvania where Plaintiff carries on business. (*See* Pl. Ex. 104 at 23–24.) This additional information, however, does not change the outcome.

contract, Plaintiff maintains Ericsson's telecommunications towers by performing "cell site maintenance for Ericsson wherever [Ericsson] [has] cell sites located, including in the southeast, Ohio, Illinois, Indiana, West Virginia, Kentucky, Tennessee, Florida, Mississippi, Alabama, Georgia, Arkansas, and Oklahoma, among other states." (Doc. 52 at 19, n.90 (citing Tr. 165:12–166:5).)

Plaintiff's Exhibits 1 and 2 reflect a series of "maintenance tickets" issued by Ericsson to Plaintiff, purportedly showing the work locations where Plaintiff performs work for that client. (Tr. 167: 1–21.) Many of these tickets date back to as early as 2012, and some of the tickets were issued in 2018, after the Agreement between Plaintiff and Deep South was executed. (*See* Pl. Exs. 1, 2.) At the hearing, Westerman explained the tickets as follows: When one of Ericsson's cell sites is broken or otherwise not performing correctly, Ericsson's system sends Deep South an e-mail; that e-mail represents the maintenance ticket, which is essentially a "work order" explaining the problem that needs to be fixed and authorizing Deep South to go to work. (Tr. 166: 1–5.) Each ticket provides the exact location, time, date, and type of problem applicable to that specific cell site. (Tr. 166: 6–10.) Exhibits 1 and 2 consist of a collection of these e-mails or tickets that Deep South receives from Ericsson. (Tr. 166: 15–19, 167: 18–21.) Exhibits 1 and 2 provide the street address, city, state, and zip code for the location of the maintenance work needed. (Tr. 167: 1–14.) Although those exhibits do not specify the exact parishes and counties where work was to be performed, the demonstrative exhibit, (Pl. Ex. 104), identifies the county or parish in which each of the cities identified in Exhibits 1 and 2 are located. (Tr. 167: 6–7.)

As previously explained, Plaintiff's work activities occurring after May 18, 2017—the date Defendant executed the Agreement at issue—cannot be used to establish Plaintiff carries on a like business in the parishes and counties where that business occurred. However, with respect to the

maintenance work Plaintiff performed for Ericsson on or before May 8, 2017, the Court finds this work sufficient to establish Plaintiff was carrying on a like business in the parishes and counties listed by those tickets due to the existence of the Master Services Agreement between Plaintiff and its customer, Ericsson. The Master Services Agreement, which was in effect in May of 2017, indicates that Plaintiff had an ongoing contractual relationship with Ericsson at the time Defendant executed the non-compete agreement at issue. Moreover, as shown by the tickets, the amount of maintenance work Plaintiff performed for Ericsson pursuant to the Master Services Agreement was substantial, and the type of business activity it reflects—maintenance of cell sites or telecommunication towers—would clearly satisfy the substantive "carr[ying] on a like business" standard imposed by La. R.S. 23:921(C).

Therefore, the Court finds that Plaintiff has satisfied its burden of showing the validity of the Agreement's geographical limitation as to the parishes and counties where it performed maintenance work for Ericsson on or before May 18, 2017. Accordingly, the parishes and counties referenced in Plaintiff's demonstrative exhibit that are supported by Exhibit 1 (PLTF_000001–PLTF_000917) and Exhibit 2 (PLTF_004228–PLTF_004283) were permissibly included in the Agreement's Territory.

The Court now turns to Plaintiff's Exhibit 3. The second page of Exhibit 3 is an e-mail sent by a Deep South employee, Sterrenberg, to Defendant on January 14, 2020. (Pl. Ex. 3, PLTF_000946; Tr. 159: 2–6.) As explained by the subject line, the e-mail concerned some additional documents that were found on the server, one of which is a reference list. (Pl. Ex. 3, PLTF_000946.) The documents listed in the "Attachment(s)" line of the e-mail indicate that the attached reference list—which makes up the remainder of Exhibit 3—is from May of 2010. (*Id.*) At the hearing, Westerman explained that this reference list represented an example of the type of

document Deep South would put together for potential customers, showing the type of work Deep South does, the type of customers it serves, and where it has performed work for the customers and/or projects referenced therein. (Tr. 159: 9–17.)

Importantly, Exhibit 3 shows that all of the work referenced therein was performed by Deep South between 2006 and 2009, with the exception of three projects for which the date is listed as "March – Present." (Pl. Ex. 3, PLTF_000947–PLTF_000953.) The work performed between 2006 and 2009 is not sufficient to show Plaintiff was "carrying on business" in those territories as of the date of the Agreement's execution on May 18, 2017. As stated above, the Court allowed past work activity to show Plaintiff was carrying on business as of 2017 for Ericsson's cell site towers, but that finding was specifically premised on the fact that the maintenance work was performed pursuant to a Master Services Agreement that was in effect on May 18, 2017. With respect to the customers for whom this work was performed, Plaintiff has neither claimed nor presented any evidence showing the existence of a contractual relationship that rises to the level of the Ericsson Master Services Agreement.

Additionally, as for the three projects with dates indicating work was performed "March – Present," the exhibit taken as a whole, including the e-mail attaching the reference list, suggests that use of the word "present" indicates the work was ongoing as of May 2010. (*See* Pl. Ex. 3, PLTF_000946.) Given the lofty standard for obtaining a TRO, to convince this Court that the work performed from "March – Present" for those three customers shows Plaintiff was carrying on business in those areas on May 18, 2017, Plaintiff would need further evidence showing either: (a) that this work was conducted pursuant to a contract between Plaintiff and those customers that was in effect as of May 18, 2017; or (b) that Plaintiff was still conducting the work described for those customers on May 18, 2017. No such evidence has been presented. As a result, the Court finds that

Exhibit 3 does not sufficiently show Plaintiff was carrying on business in the counties and parishes referenced therein at the time of the Agreement's execution. Thus, the Agreement is overly broad and unenforceable as far as those counties and parishes are concerned. Accordingly, the parishes and counties referenced in Plaintiff's demonstrative exhibit, (Pl. Ex. 104), that are supported by Exhibit 3 (PLTF_000945–PLTF_000953) are hereby severed from the Agreement's Territory.

Deep South contends that Plaintiff's Exhibit 4 shows it carried on business in Lee County, Florida based on a job it performed for Crown Castle. (Pl. Ex. 104 at 4 (citing Pl. Ex. 4, PLTF_000987).) Exhibit 4, which Plaintiff has labeled "2017 Deep South Communications, LLC Major Projects List," establishes that Plaintiff performed tower modifications on a 1034' guyed tower in Bonita Springs, Florida, a city located in Lee County. (Pl. Ex. 4, PLTF_000987.) Some of the other projects referenced in Exhibit 4 are described as being performed for a span of months or years. (*See, e.g.*, *id.*, PLTF_000986 (Plaintiff performed a project for Union Pacific from "November 2016 – March 2017").) In contrast, the project conducted for Crown Castle in Lee County is described as being performed in "April 2015." (*Id.*, PLTF_000987.)

Presumably, this means that the project for Crown Castle ended in 2015, before Defendant executed the Agreement. As stated above, without other evidence establishing Plaintiff had an ongoing relationship with Crown Castle as of May 18, 2017, that rises to the level of the Master Services Agreement with Ericsson, this evidence is not sufficient to show Plaintiff was carrying on business in Lee County, Florida at the time of the Agreement's execution. Thus, the Court will sever Lee County from the Agreement's Territory.

The demonstrative exhibit also relies on Plaintiff's Exhibit 8 as evidencing that Plaintiff carried on business in Dallas County. (*See* Pl. Ex. 104 at 28 (citing PLTF_000944).) Exhibit 8 is a Google calendar entry for Defendant that was made on July 19, 2017; the calendar appointment

was for a meeting scheduled with End 2 End on July 26, 2017. (Tr. 229: 2–16.) The meeting was to be held "in Dallas or in the Plano area." (Tr. 229: 17–20.) Both the time of the calendar entry and the meeting occurred after May 18, 2017, and neither the testimony nor the contents of Exhibit 8 provide enough information for the Court to determine whether Plaintiff had been negotiating with or soliciting business from End 2 End on May 18, 2017. (*See* Pl. Ex. 8, PLTF_000944.) Hence, Plaintiff has not provided enough evidence for the Court to decipher whether Plaintiff was carrying on business in Dallas County, as Plaintiff contends this exhibit shows, at the time the Agreement was executed. Therefore, the Court will sever Dallas County from the Agreement's Territory.

Plaintiff's Exhibit 37 is a 753-page document concerning "a possible Verizon Wireless opportunity" that was presented to Plaintiff in 2019. (Tr. 173: 8–13.) The first page of that document is a duplicate of an e-mail sent on March 20, 2019, to Defendant from Penny Wong, the Verizon Project Procurement Manager at that time. (Pl. Ex. 37, PLTF_001748.) Defendant promptly forwarded this e-mail to Westerman and Jeremy Hollier, another Deep South employee, on March 21, 2019, stating: "FYI; sharing and available if we want to talk through this; it's due (supplier profile and pricing) next Monday COB." (*Id.*) As shown by the e-mail to Defendant, Wong was inviting Deep South to bid on the "Nokia VZW Central TX market (TX, LA, AR, OK) Small Cell Construction project" that would be "starting soon." (*Id.*) Attached to the e-mail is the matrix pricing file for the upcoming project. (*Id.*) Wong concluded the e-mail by advising that, if Deep South was not interested, it should kindly respond to the e-mail by indicating "no bid," but that, if Deep South was interested, it should send its "pricing and survey file back by" the following Monday. (*Id.*)

At the hearing, Westerman testified that Verizon is currently one of Deep South's customers, and that in the past, Deep South has performed work for Verizon "all over the place," but "typically along the Gulf Coast." (Tr. 173: 16–19.) He further stated that Wong's e-mail to Defendant showed a situation where Nokia was asking Deep South whether it was "interested in building small cells for the carrier, in this case . . . Verizon, in these different markets; Texas, Louisiana, Arkansas[,] and Oklahoma." (Tr. 173: 20–25, 174:1.)

Defendant argues that Exhibit 37 cannot establish Deep South carries on business in any geographical areas because the data contained in that exhibit "is simply the market data for Nokia—no[t] evidence of any actual construction or maintenance work in any of the identified counties." (Doc. 51 at 6.) Furthermore, Defendant argues that the testimony presented at the hearing further supports this conclusion because Westerman did not testify that Deep South's bid was successful, nor does the testimony provide any evidence "of actual work performed by Deep South in any of the territory[ies] listed by [Penny Wong] as Nokia's market." (*Id.*)

The Court agrees with Defendant on this point. Exhibit 37 does not evidence any work performed by Deep South or the existence of any Deep South customers. To support the counties and parishes listed in its demonstrative exhibit, (Pl. Ex. 104), Plaintiff cites to counties and parishes listed in Exhibit 37, but those locations are merely part of Verizon's "Sub Market list of counties/states" contained in the "Supplier Q&A" tab attached to Wong's e-mail. (*See* Pl. Ex. 37, PLTF_ 002102–002109.) Put another way, as Defendant correctly points out, the areas listed in Exhibit 37 are "simply [part of] the market data" provided to Deep South, not areas in which Deep South conducted business. (Doc. 51 at 6.)

Exhibit 37 is likewise inadequate to show Deep South solicited business in these parishes and counties, as it is unclear whether Deep South ever responded to the "possible Verizon Wireless

opportunity," much less submitted a bid on the project described in Exhibit 37. Rather, the 753-page exhibit consists of an invitation to bid on the project and hundreds of pages detailing information concerning same. Standing alone, this evidence is not sufficient to establish Plaintiff carried on business in those parishes and counties. And, even if it was sufficient for that purpose, the invitation to bid was made in 2019, after Defendant executed the Agreement at issue. Therefore, the Court rejects Plaintiff's contention that Exhibit 37 shows it carries on a like business in the parishes and counties identified therein. As a result, the Court finds that the Agreement's geographical limitation is overly broad and unenforceable as it pertains to those specified counties and parishes.

Plaintiff's Exhibit 77 similarly concerns a possible business opportunity that was presented to Deep South *after* Defendant executed the Agreement at issue. (*See* Pl. Ex. 77, PLTF_001112.) However, even if the evidence set forth in Exhibit 77 concerned matters occurring on or before the date Defendant executed the Agreement, Exhibit 77—like Exhibit 37—would still be insufficient to establish Plaintiff carries on business in the parishes and counties specified therein. On April 27, 2021, a representative of Aviat Networks, Inc. ("Aviat") e-mailed Westerman about a possible business opportunity concerning federal stimulus money being allocated to various cities, counties, and states. (*Id.*) At the hearing, Westerman indicated that Aviat is one of Deep South's "suppliers of microwave radios" and thus reached out about this upcoming federal funding because of Aviat's interest "in moving and selling radios." (Tr. 174: 19–21.)

In the e-mail to Westerman, the Aviat representative explains that "Aviat has been pouring effort into understanding the Federal Money flow that is coming ***VERY SOON*** to Cities, Counties, and States and trying to best understand who will get how much, and how it can be used for Telecom Infrastructure." (Pl. Ex. 77, PLTF_001112 (emphasis in original).) The e-mail was

56

essentially Aviat's attempt to "assist" Deep South's team in securing some of these projects by providing Deep South with a "primer" on the information related to the upcoming stimulus. (*Id.*) According to Westerman, the basic purpose of the Aviat e-mail was to provide Deep South with locations where the business opportunities would be in terms of the dollars to be spent at the county, parish, and state level (that is, "details on who got the funding and how much") so that Deep South could later reach out and develop business there. (Tr. 174: 21–25, 175: 1–15.) The remainder of Exhibit 77 consists of the attachments to Aviat's e-mail, which is additional information provided by Aviat on the details of the stimulus funding to be issued.

No evidence was submitted that directly ties any of Plaintiff's business activities to the possible stimulus money discussed in the 2021 e-mail from Aviat. As Defendant correctly points out: "The exhibit provides no evidence of customers or any solicitation of potential customers within the data provided by Aviat." (Doc. 51 at 5.) Plaintiff has not explained how—if at all—it has pursued any of the business activity discussed in Exhibit 77. For the same reasons the Court rejected Plaintiff's reliance on Exhibit 37, the information contained in Exhibit 77 is similarly insufficient to show Plaintiff carries on a like business in the counties and parishes referenced therein. Therefore, as to the parishes and counties allegedly supported by the data in Exhibit 77, the Court finds that the Agreement's geographical limitation is overly broad and unenforceable under La. R.S. 23:921. Accordingly, the parishes and counties referenced in Plaintiff's demonstrative exhibit, (Pl. Ex. 104), that are supported by Exhibit 37 (PLTF_001748– PLTF_002500) and Exhibit 77 (PLTF_001112–PLTF_001742) are hereby severed from the Agreement's Territory.

Next, the demonstrative exhibit cites Plaintiff's Exhibit 93[7] as showing that Plaintiff carried on business in Mecklenburg County, which is the county in which Charlotte, North Carolina sits. (*See* Pl. Ex. 104 at 20 (citing Pl. Ex. 93, PLTF_002513).) Exhibit 93 is a Google calendar entry; this calendar appointment was for Defendant to attend an annual meeting put on by ITS America, a trade association, from December 7, 2021 through December 10, 2021. (Pl. Ex. 93, PLTF_002513; Tr. 132: 14–20.) At the hearing, Defendant indicated that he attended this meeting at that time in Charlotte, North Carolina. (Tr. 132: 21–23.) When asked whether this was part of the Deep South territory, Defendant responded: "It happened to be the national show, so it would have included all the regionals that Deep South was interested in." (Tr. 132: 25–25, 133: 1–3.) This exhibit was not discussed further at the hearing. Again, because the aforementioned activity occurred after Defendant executed the Agreement at issue, it cannot establish that Plaintiff was carrying on a like business in Mecklenburg County as of May 18, 2017. Therefore, the Court will sever Mecklenburg County from the Agreement's Territory.

Finally, the Court turns to Plaintiff's Exhibit 101, which is "a list of customer information" that was generated in October of 2022 from Deep South's accounting software. (Tr. 157: 17–24.) At the hearing, when asked what customers this list reflected, Westerman explained that this is not an exhaustive list, but is rather a representative list of Deep South's customers that shows where each customer is billed. (Tr. 158: 5–8 ("So . . . one customer on here we might bill it at one location, but there might be thousands of jobs that we do for that customer.").) This 150-page exhibit

---

[7] The redacted copy of Exhibit 104 cites Plaintiff's Exhibit 78 as showing that Plaintiff carries on business in Mecklenburg County, North Carolina based on the annual meeting held by ITS America. (Pl. Ex. 104 at 18.) However, the bates number cited, PLTF_002513, is the bates number for Exhibit 93, and Exhibit 93 concerns the ITS America meeting in Mecklenburg County, North Carolina, while Exhibit 78 does not. Thus, the Court assumes this was a typographical error and will only discuss Exhibit 93.

provides each customer's name, billing address, and total balance, but does not provide any dates. (*See* Pl. Ex. 101, PLTF_004071–PLTF_004220.)

The Court is unable to glean from Exhibit 101 *when* or *where* Plaintiff performed work or conducted other business activities for these customers. In addition, Plaintiff has not shown an ongoing contractual relationship with any of these customers comparable to the one with Ericsson based on the Master Services Agreement between Ericsson and Plaintiff. For these reasons, Plaintiff has not met its burden of showing the validity of the Agreement's geographical restriction insofar as it relies on the data set forth in Exhibit 101. Thus, the Court finds the Agreement is overly broad and unenforceable on this ground. Accordingly, the parishes and counties referenced in Plaintiff's demonstrative exhibit, (Pl. Ex. 104), that are supported by Exhibit 101 (PLTF_004071–PLTF_004220) are hereby severed from the Agreement's Territory.

In sum, the Agreement is impermissibly overbroad because Plaintiff has not established that it was carrying on business in all 1,546 counties and parishes listed in the Agreement's "Territory" provision. As explained above, however, this Agreement contains a standard severability clause, (*see* The Agreement, § 7, Doc. 8-4), and the Court may "rely on a contractual severability clause to excise the geographic areas" which run afoul of La. R.S. 23:921(C). *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 292 (5th Cir. 2012) (citations omitted). The Court is inclined to do so here. Therefore, for the reasons stated above, the Court finds that the only parishes and counties surviving severability are those supported by the evidence contained in Exhibits 1 and 2; every other specifically listed county and parish is hereby excised from the Territory. In the interest of judicial efficiency and economy, the Court will not specifically

delineate each specific county and parish set forth in the thirty-four page demonstrative exhibit that is supported by Exhibits 1 and 2.[8]

    ii.    <u>Whether Plaintiff Satisfied its Burden of Showing Defendant Likely Breached the Agreement</u>

Next, the Court must determine whether Plaintiff has shown a substantial likelihood of success on the merits on its claim that Defendant breached the Agreement's non-competition provision by obtaining employment with End 2 End. The non-competition clause provides in pertinent part: "While employed by Employer and for a period of two years following the end of such employment relationship, Employee shall not, *in the Territory*, . . . engage in any business that directly or indirectly *competes with* or *is similar to* the business of Employer." (The Agreement, § 5(B), Doc. 8-4 (emphasis added).) Thus, in assessing whether Plaintiff will likely prove a breach here, the Court's finding turns on whether Plaintiff has shown a substantial likelihood of proving: first, that Deep South and End 2 End are considered "similar" businesses within the meaning of La. R.S. 23:921(C); and second, that Fellegy engaged in said competing business in one of the territories now remaining post-severance.

In the *Verified Complaint*, Deep South asserts that, because End 2 End "competes directly" with Deep South, Fellegy—as an employee of End 2 End—"is competing with Deep South throughout the United States in breach of the Agreement." (*V. Compl.* ¶¶ 32–33, Doc. 1.) In opposition to the *Motion for TRO*, Defendant argues that Plaintiff cannot prevail here because Plaintiff has not proved that Deep South and End 2 End are competitors, which is required to prevail on a breach of the covenant not to compete. (Doc. 17 at 12–13.) According to Defendant:

---

[8] The Court notes, however, that Exhibits 37 and 77 alone account for somewhere around 1,051 counties and parishes out of the 1,546 listed in the demonstrative exhibit (*See* Pl. Ex. 104.). Now that all of the offending areas—not just those supported by Exhibits 37 and 77—have been excised, the Agreement's geographic scope is substantially limited.

> End 2 End and Deep South are not competitors. The Complaint alleges End 2 End
> is a competitor based on this terse statement: "[End 2 End] holds itself out as a
> network infrastructure specialist engaged in the business of consulting,
> engineering, and executing comprehensive solutions for our clients throughout the
> United States." (Complaint, ¶ 31.) However, in fact, the two businesses pursue a
> different client base in different states for different types of services. (Fellegy Decl.,
> ¶ 41.) While Deep South seeks to develop physical build-outs of wireless networks,
> End 2 End does not do that work in-house. (Fellegy Decl., ¶¶ 42–43.) Instead, End
> 2 End focuses its business on the design and software needed to run the wireless
> networks. *Id.* Moreover, Deep South seeks out clients that would need its services
> of physical build-outs – *i.e.* state departments of transportation, prime road/bridge
> contractors, the US Army Corp of Engineers, major wireless telecom companies,
> and tower owner/operators. (Fellegy Decl., ¶ 44.) End 2 End's business focuses
> primarily on utilities. (Fellegy Decl., ¶ 45.)

(*Id.* at 13.)

In response, Plaintiff focuses on the language of the statute addressing non-competes,

which provides in relevant part that an "employee may agree with his employer to refrain from

carrying on or engaging in a business *similar to* that of the employer[.]" La. R.S. 23:921(C)

(emphasis added). According to Plaintiff, the statute applies here because End 2 End and Deep

South engage in the same or similar businesses and compete for the same customers. (Doc. 23 at

2.) For instance, Plaintiff states in its affidavit that the two businesses "sell the same products,

including networks, towers, fiberoptic runs, and microwave radios, to the same customers[,]"

(Westerman Decl. ¶ 3, Doc. 23-1), and they "are both authorized resellers of the microwave radios

that GE manufactures and therefore compete for the same customers for these sales[,]" (*id.* ¶ 5).

In *Arthur J. Gallagher & Co. v. Babcock,* Nos. 08-290, 08-185, 2011 WL 121891 (E.D.

La. Jan. 10, 2011), *aff'd*, 703 F.3d 284 (5th Cir. 2012), the Eastern District of Louisiana noted:

> Louisiana courts have not clearly articulated a standard for determining whether
> two businesses are similar for purposes of La. R .S. § 23:921(C). However, courts
> have indicated that activities subject to differing descriptions or definitions are
> dissimilar. *See e.g.*, *Ticheli v. John H. Carter Co., Inc.*, 996 So.2d 437, 441
> (La.Ct.App.2008) ("the business of selling the various types of industrial valves
> and instrumentation is not subject to another description or definition."); *Baton
> Rouge Computer Sales, Inc. v. Miller–Conrad*, 767 So.2d 763, 765

(La.Ct.App.2000) ("[w]hile the types of computer systems sold may be diverse, the business of selling them is not an activity subject to various descriptions or definitions."). This is precisely the situation here.

*Id.* at *7.

The Court finds that Plaintiff has satisfied its burden of showing that Deep South and End 2 End are "similar" within the meaning of La. R.S. 23:921(C). In the case cited above, *Babcock*, the Eastern District found that "the casualty and property insurance services provided by RMSI and the life and health insurance services performed by defendants while at Gallagher [were] not 'like business[es]' " within the meaning of the statute because of the differing descriptions and definitions set forth by the State of Louisiana:

> The State of Louisiana makes a clear distinction between brokers of various types of insurance. Louisiana defines each line of insurance, such as property, casualty, life, and health, differently and maintains different licensing requirements for professionals working in each line. La. R.S. §§ 22:1545 and 22:1547. A broker licensed to sell one line of insurance may not sell any other line of insurance without first becoming duly licensed as to that line. La. R.S. § 22:1543.

*Id.* (footnote omitted). Hence, the court's conclusion in *Babcock* relied on the fact that Louisiana law clearly differentiated between casualty and property insurance services and life and health insurance services to the point that it imposed "different licensing requirements" on professionals providing those services. *Id.*

By contrast, here, the distinction between Deep South and End 2 End's services is nowhere near as clear cut. The fact that both business "sell the same products, including networks, towers, fiberoptic runs, and microwave radios, to the same customers[,]" (Westerman Decl. ¶ 3, Doc. 23-1), and "are both authorized sellers of the microwave radios that GE manufactures[,]" (*id.* ¶ 5), undermines the distinctions advanced by Defendant. Based on these facts, the businesses of Deep

South and End 2 End are subject to similar descriptions or definitions, regardless of who builds or designs what is sold.

Additionally, however, to prove a substantial likelihood of success on the merits on its claim that Fellegy breached the non-competition provision, Plaintiff must show it is likely to succeed in proving Fellegy competed within one of the territories listed in the Agreement. (*See* Exhibit A, "Territory," Doc. 8-4 at 5–14.) According to Defendant, Plaintiff "fails to allege *where* it believes Fellegy is competing." (Doc. 17 at 13 (emphasis added).)

To prove Fellegy likely breached the non-compete provision, Plaintiff must show a substantial likelihood that Fellegy competed "in the Territory" as that geographic area is defined in the Agreement. (*See* Exhibit A, "Territory," Doc. 8-4 at 5–14.) Before the Court relied on the Agreement's severability clause to excise certain counties and parishes from the Territory, that provision specifically listed every parish in Louisiana and every county within the following fifteen states: Ohio, Georgia, Alabama, Florida, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, West Virginia, Arkansas, Kentucky, and Pennsylvania. (*See id.*) Following the excision, however, the only remaining parishes and counties are those in which Plaintiff has carried on business pursuant to its Master Services Agreement with Ericsson. (*See* Pl. Exs. 104, 1, 2.)

Put another way, the Territory now only consists of the parishes and counties set forth in the demonstrative exhibit, (Pl. Ex. 104), that are supported by the data set forth in Exhibits 1 and 2 concerning the maintenance tickets from Ericsson. Thus, in order for Plaintiff to show a substantial likelihood of success on the merits on its claim that Defendant breached the non-competition clause, Plaintiff must—at the very least—demonstrate that Defendant is competing

within one of the specific parishes or counties remaining in the Territory. In sum, the Court finds that Plaintiff has failed to make this showing.

The non-competition clause provides that the "[e]mployee shall not, *in the Territory*, directly or indirectly . . . engage in any business that competes with or is similar to" Deep South's business. (The Agreement, § 5(B), Doc. 8-4 (emphasis added).) Neither the *Verified Complaint* nor any of Plaintiff's briefs *specifically* allege where Plaintiff contends Fellegy is competing in violation of the Agreement. The *Verified Complaint* instead states that End 2 End engages in business and competes with Deep South "throughout the United States" and thus that "Fellegy, as an employee of [End 2 End], is competing with Deep South throughout the United States in breach of the Agreement." (*V. Compl.* ¶¶ 31–33, Doc. 1.)

At the hearing, Plaintiff's counsel ran through every state listed in the Agreement, asking Defendant whether each state is within his current territory at End 2 End. (Tr. 134: 6–25, 135: 1–16.) In response, Defendant answered yes to each state, with the exception of West Virginia, to which he responded, "I don't think so . . . No. I think not." (*Id.*) Throughout the hearing, Plaintiff several times questioned Defendant about End 2 End's business in various states listed in the Agreement. However, following this Court's severance of the offending counties and parishes, the Territory now does not come close to encompassing every parish or county for any *one* of the sixteen states listed therein.[9]

Because no one state is fully covered by the Agreement, Plaintiff cannot prevail by merely claiming that End 2 End does business in and competes with Deep South's business in a specific state. Rather, Plaintiff must show a substantial likelihood of proving that Defendant—through End

---

[9] For example, only nineteen Louisiana parishes now remain in the Agreement's geographical limitation, which is less than half of the number originally listed. (*See* Pl. Ex. 104 at 11–12.) Only seven counties remain for Alabama. (*Id.* at 1–2.) Only two counties remain for Missouri and North Carolina. (*Id.* at 13–15, 17–19.) Only three counties remain for Oklahoma. (*Id.* at 21–23.)

2 End—is competing with Deep South's business in the specific *counties* and *parishes* remaining in the Territory. Plaintiff has not done so here. Therefore, the Court finds that Plaintiff has not shown a substantial likelihood of success on the merits on its claim that Defendant breached the non-competition clause at issue. Consequently, because Plaintiff failed to prove the first element required to obtain a TRO, the Court need not discuss the remaining elements; the *Motion for TRO* as it relates to the non-competition clause is denied.

### b.  Non-Solicitation

To show entitlement to relief on its claim for breach of the non-solicitation clause, Plaintiff must make a similar showing that the Agreement is valid and enforceable under La. R.S. 23:921(C). The Court incorporates its prior analysis here by reference. (*See supra* "Whether the Agreement is Valid and Enforceable Based on the Geographical Limitation," at Section (V)(B)(1)(A)(i).) The facts alleged in the *Verified Complaint* pertaining to breach of the non-solicitation clause are as follows. First, Plaintiff states that—over the course of Fellegy's employment with Deep South—he developed a business relationship on behalf of Deep South with various customers, including GE. (*V. Compl.* ¶ 34, Doc. 1.) Before Fellegy stopped working for Deep South, "GE expressed a desire to make Deep South its account holder for its wireless product line for the State of Arkansas account. However, after Fellegy's departure, Deep South discovered that [End 2 End], Fellegy's new employer, would continue to be GE's account holder for its product line in Arkansas." (*Id.* ¶ 35.) Plaintiff continues: "Upon information and belief, Fellegy has solicited, induced, and diverted Deep South customers and their business for his and [End 2 End]'s benefit since his resignation, including the business of GE." (*Id.* ¶ 76.) Therefore, "Fellegy violated Paragraph 5(C) of the Agreement pertaining to the non-solicitation of customers." (*Id.* ¶

77.) These are the only factual allegations Plaintiff makes in its *Verified Complaint* concerning solicitation.

Defendant, on the other hand, submits in his affidavit that he has not solicited any Deep South clients. (Peter Fellegy Decl. ¶ 33, Doc. 16-2.) More specifically, Defendant alleges that he had no role in End 2 End's retention of GE's business in Arkansas and currently has no responsibility for End 2 End's business relationship with GE. (*Id.* ¶¶ 37, 38.) He further states that he "provided no information to anyone at End 2 End or any third-party regarding GE's business in Arkansas" and never spoke with anyone at GE about Deep South after his employment ended. (*Id.* ¶¶ 39, 40.)

As to the first requirement for a breach of contract claim, that the obligor undertook an obligation to perform, the Court has applied the severability clause and concludes that the Agreement is an enforceable contract under Louisiana law. However, Plaintiff has not met its burden of showing a "substantial likelihood" that it will prove Defendant breached the Agreement's non-solicitation provision. Under the non-solicitation clause, for a period of two years after Defendant's employment ends and only in the "Territory," Defendant cannot solicit or obtain the business of any of Deep South's clients, nor can he "solicit, request, influence, induce, or otherwise encourage" any of Deep South's clients to change their business with Deep South. (The Agreement, § 5(C), Doc. 8-4.)

Although Plaintiff claims Defendant breached the non-solicitation clause because it "solicited, induced, and diverted" GE and other Deep South clients, (*V. Compl.* ¶ 76, Doc. 1), not one concrete, specific fact has been submitted in support of that conclusion. Rather, Plaintiff continues to argue that, while still a customer of End 2 End, GE allegedly told Deep South it planned to make Deep South its account holder instead of End 2 End but then failed to carry

through. Plaintiff essentially asks the Court to infer impermissible solicitation on Fellegy's part from these surrounding circumstances. Yet there are many other explanations for why GE could have decided to not change its account holder in Arkansas, and Fellegy specifically denies any involvement in GE's failure to hire Plaintiff. Thus, in this respect, the *Verified Complaint* is "too vague or conclusory to demonstrate a clear right to relief under Rule 65." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2949 (3d ed. 2016).

Furthermore, at the hearing, Fellegy testified that he "was told" GE made the decision to retain End 2 End as its channel partner servicer in Arkansas in January 2022—which would mean that GE made this determination while Fellegy was still employed by Deep South. (Tr. 114: 22–25; 115: 1–7.) Fellegy's employment with End 2 End did not commence until four months later. (Tr. 115: 8–11.) Fellegy further testified that: (1) he did not speak with anyone at GE about the Deep South business in Arkansas during the four-month gap between his employment with Deep South and his employment with End 2 End; and (2) since he began working with End 2 End in June 2022, he has not spoken with anyone at GE about Deep South's potential to be a channel partner in Arkansas or End 2 End's channel partner relationship in Arkansas. (Tr. 115: 8–22.)

Deep South, on the other hand, has presented neither direct testimony nor any documentary evidence to specifically rebut Fellegy's claims in this respect. At the hearing, the Court addressed this exact issue:

> **Court:** But I heard [Fellegy's] specific testimony was to the effect that he had really nothing to do with that. And I didn't hear any direct testimony – I heard Mr. Westerman say, you know, two plus two equals four. I can infer from the circumstances that he did it, but I didn't hear any direct testimony that said he had anything to do – in fact, I heard specific testimony from Mr. Fellegy that he had nothing to do with the retention of G.E. at End-2-End.
>
> **Ms. Anderson:** He denies soliciting a Deep South customer, that's what he said. I think there are – there is a good deal of circumstantial evidence, especially with him retaining the Deep South contacts on his cell phone, and working for a

competitor in overlapping territories with the territories in the Agreement. I think that is certainly sufficient to show a substantial likelihood of success on the merits at the TRO stage. You know, whether we'll be able to uncover anything else in discovery is another matter.

The other issue that we have to be cognizant of is he works for End-2-End which is a competitor and there are other salespeople within End-2-End. And he reports to this individual I think Mike Brown, who's the VP of Sales, and, you know, not only – you know, Mr. Fellegy cannot directly or indirectly violation the obligations under his Agreement. So I think there are a lot of questions to be asked. I certainly believe that the circumstances we have here indicate – certainly raise questions about [his] denial.

(Tr. 255: 10–25, 256: 1–11.)

The hearing transcript makes clear there is a possibility—dependent upon what information discovery *may* later disclose—that Defendant played a hand in soliciting the business of GE away from Deep South. However, the existence of such a possibility, without any direct evidence, is not enough for the "extraordinary remedy" of injunctive relief. *Gumns v. Edwards*, No. 20-231, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020) (Dick, C.J.) (citations omitted). Consequently, the Court finds that Plaintiff has not met its burden of showing a "substantial likelihood" that it will prove Defendant breached the Agreement's non-solicitation provision.

Therefore, the Court finds that Plaintiff has not made a *prima facie* showing that it is substantially likely to succeed on the merits on its claim that Defendant breached the non-solicitation provision. As Plaintiff failed to prove the first element required to obtain a TRO, it is not necessary to discuss whether the other elements were proven. On this ground alone, the *Motion for TRO*, as it relates to the non-solicitation clause, is denied.

### c.  Non-Disclosure of Confidential Information

Plaintiff has not met its burden of showing there is a "substantial likelihood" it will prove Defendant breached the non-disclosure of confidential information provision. The Court already addressed the sufficiency of the factual allegations in the pleadings and incorporates that analysis

here by reference. (*See supra* "The Non-Disclosure of Confidential Information Provision," at Section (IV)(B)(2)(b).) To summarize, the Court concluded that the allegations concerning Defendant's "use" of confidential information could not be considered a breach of the non-disclosure of confidential information provision because use alone is not prohibited by the clear and unambiguous language of the contract. The same result is warranted here.

Moreover, even if Section 4 did prohibit using the confidential information—as opposed to only transmitting the information to another—Plaintiff nevertheless has not shown it is entitled to a TRO based on the pleadings. The factual allegations set forth in the *Verified Complaint* are even more conclusory than those pertaining to Plaintiff's claim for breach of the non-solicitation provision. The standard for obtaining injunctive relief under Rule 65 is much more demanding than the standard required for a claimant to survive a Rule 12(b)(6) motion. Rule 65 requires affidavits or verified complaints to contain "specific facts" that "clearly show" a right to injunctive relief. Fed. R. Civ. P. 65(b)(1)(A). The allegations in the *Verified Complaint* not only fail to meet that requirement, but they are also controverted by Defendant's affidavit, wherein he stated that he never provided any information "to anyone at End 2 End or any third-party regarding GE's business in Arkansas." (Peter Fellegy Decl. ¶ 39, Doc. 16-2.) Without more proof to support Plaintiff's assertions here, the "extraordinary remedy" of injunctive relief is not available. *Gumns*, 2020 WL 2510248, at *3 (citations omitted).

The hearing testimony largely expounds upon the factual basis for Plaintiff's allegations that Defendant used confidential information in violation of the Agreement. While the *Verified Complaint* did not identify specific facts pertaining to Defendant's alleged breach, the testimony—as well as Plaintiff's post-hearing brief—shows that Plaintiff's claim here primarily centers on two things: (1) Defendant's failure to "return" customer contacts on his personal cell phone—that is,

69

his failure to delete them; and (2) Defendant's subsequent "use" of some of those contacts following the end of his employment.

While working for Deep South, Defendant used his personal cell phone to communicate with Deep South customers, prospects, suppliers, and other business contacts. (Tr. 79: 15–25, 80: 1–5.) During this time, he saved to his phone the contacts he deemed significant for Deep South business. (Tr. 80: 6–11.) Defendant testified that he did not keep any notes about customer preferences or specific customer jobs "or anything like that," but would save the company's name, address, phone number, and the e-mail address and phone number for the representative he specifically dealt with. (Tr. 80: 12–25, 81: 1–2, 6–9.)

Other than his personal cell phone, Defendant did not have any other phone for his work with Deep South. (Tr. 89: 10–12.) He testified that Deep South allowed him to use his personal cell phone for work and that he did not recall any restrictions being placed on his use of his cell phone. (Tr. 89: 13–20.) In contrast, Westerman testified that Defendant was supposed to place all work-related information in a Google security app installed on his cell phone, which would allow Deep South to enable the app at any time, but that he learned after Defendant left Deep South that he had instead commingled the work contacts with his personal contacts. (Tr. 227: 6–14.)

Based on the testimony presented, Defendant failed to return the Deep South contacts on his personal cell phone because he failed to delete them. When asked whether he made any effort to return that information to Westerman, Defendant responded: "I have one phone, just one." (Tr. 81: 19–21.) He also stated that he did not return the Deep South contacts. (Tr. 81: 24–25, 82: 1.) However, he later indicated that he believed he did return all of the contact information on his phone in *some* form, because he created a comprehensive "folder structure" that included contact information for all prospective and current customers, summaries of active pursuits, and a list of

client names, phone number, e-mail addresses, and locations. (Tr. 101: 1–25, 102: 3–15.) He created this folder structure on his last day at Deep South as part of his transition out of the company. (Tr. 100: 18–25, 101: 1–11.)

The testimony further shows that Defendant has used at least two of the contacts from his phone after his resignation from Deep South. When asked by Plaintiff's counsel whether he has contacted Deep South contacts following his resignation, Defendant stated he has not. (Tr. 139: 14–22.) However, this testimony conflicts with his prior statements when examined by Plaintiff's counsel:

> Q: And you still have the contacts on your phone today?
> A: Yes.
> Q: And is Edgard from G.E. one of those contacts?
> A: Yes.
> Q: And that's still on your phone today?
> A: Yes.
> Q: And you've communicated with him?
> A: Yes.
> Q: What other contacts from Deep South are on your phone that you've communicated with?
> A: Shane Gillespie, who's the Northern American Sales Director at G.E. Former associates that I have across the country that I've known for a while.

(Tr. 82: 2–14.)

Again, the Agreement's non-disclosure of confidential information provision does not prohibit mere use of the phone contacts. Instead, the key issue here is whether, based on the testimony at the hearing, Plaintiff has shown a substantial likelihood of proving that Defendant communicated, divulged, or made available to another person or entity that contact information. None of the testimony referenced above indicates that Defendant conveyed the customer contact information to another person or entity, only that he failed to delete contact information from his phone and subsequently used two of those contacts.

71

At one point, Plaintiff does seem to suggest that Defendant may have communicated certain information to an End 2 End employee in order to solicit GE's business. The Court pointed out the lack of direct testimony alleging facts to show Defendant was involved in End 2 End's retention of GE's business; Plaintiff's counsel responded in relevant part:

> He denies soliciting a Deep South customer, that's what he said. . . . there is a good deal of circumstantial evidence, especially with him retaining the Deep South contacts on his cell phone . . . The other issue we have to be cognizant of is he works for End-2-End which is a competitor and there are other salespeople within End-2-End. And he reports to this individual I think Mike Brown, who's the VP of sales, and, you know, not only – you know, Mr. Fellegy cannot directly or indirectly violate the obligations under his Agreement.

(Tr. 255: 18–21, 256: 3–8.)

Plaintiff seems to argue that Defendant may have divulged contact information to another End 2 End employee in order to induce GE from taking its business to Deep South. The Court is unpersuaded. First, there is no direct evidence of this. Second, because GE was already doing business with End 2 End before it allegedly approached Deep South, it is very possible that End 2 End already had the GE contact information Defendant had on his phone. Third, Defendant testified that GE made the decision to keep its business with End 2 End several months before Defendant's employment with Deep South ended, and Plaintiff provided no testimony or documentary evidence to rebut that assertion. Finally, suggesting that Defendant disclosed information based on the surrounding circumstances is simply not enough to show a substantial likelihood that Plaintiff will prove Defendant breached the non-disclosure of confidential information provision. "Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) (citing 7 Moore's

Federal Practice ¶ 65.04(s) (1982); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2942, at 368 (1973)).

In conclusion, the Court finds that Plaintiff has not clearly demonstrated a substantial likelihood of success on the merits on its claim that Defendant breached the Agreement by violating the confidentiality provision. Just as with its claims for breach of the non-competition and non-solicitation clauses, Plaintiff has not proven the first element required to obtain injunctive relief. As a result, the Court need not discuss whether the other three elements were proved. Therefore, the Court will deny the *Motion for TRO* in its entirety.

## VI.    LEAVE TO AMEND

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955) (citation omitted). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] ... make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is

> reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Plaintiff has not requested leave to amend the operative complaint in the event the *Motion to Dismiss* is granted. Nevertheless, it does not appear "to a certainty" that Plaintiff cannot state a viable claim for breach of the non-disclosure of confidential information provision. *Id.* Thus, "the Court will act in accordance with the 'wise judicial practice' and general rule" and grant Plaintiff leave to amend. *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018) (deGravelles, J.).

## VII. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Rule 12(b)(2) Motion to Dismiss Plaintiff's Complaint for Lack of Personal Jurisdiction and Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim* (Doc. 16) filed by Defendant Peter M. Fellegy is **DENIED** in part and **GRANTED** in part.

More specifically, the *Motion to Dismiss* is **DENIED** with respect to Defendant Peter M. Fellegy's request for dismissal based on lack of personal jurisdiction under Rule 12(b)(2) and his request for dismissal of the claims for breach of the non-competition and non-solicitation clauses under Rule 12(b)(6). However, the *Motion to Dismiss* is **GRANTED** with respect to dismissal of

the claim for breach of the non-disclosure of confidential information provision under Rule 12(b)(6), and this claim is **DISMISSED WITHOUT PREJUDICE**.

      **IT IS FURTHER ORDERED** that Plaintiff shall be given twenty-eight (28) days in which to amend the operative complaint to cure the deficiencies described above. If Plaintiff fails to do so, Plaintiff's claim for breach of the non-disclosure of confidential information provision will be dismissed with prejudice.

      **IT IS FURTHER ORDERED** that the *Motion for a Temporary Restraining Order and Preliminary Injunctive Relief* (Doc. 8) filed by Plaintiff Deep South, LLC is **DENIED.**

      Signed in Baton Rouge, Louisiana, on <u>January 23, 2023</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**